**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 9:23-cv-81150-RLR**

ANDREW TATE AND TRISTAN TATE,

    Plaintiffs

vs.

EMMA GABBEY, MONA TABARA GABBEY,
WILLIAM GABBEY, ALIONA UNTILA,
AND MATTHIEU MARTELLY

    Defendants.

_____/

## DEFENDANTS' RESPONSE TO THE
## COURT'S ORDER REGARDING JURISDICTION

    Pursuant to this Court's Order to Show Cause of August 17, 2023, Defendants respectfully submit this Response. In support of this Response, Defendants additionally submit their concurrently filed Amended Notice of Removal, Amended Rule 7.1 Disclosure, and the Declaration of Sergeant Matthieu Martelly.

### INTRODUCTION

    Andrew and Tristan Tate are under indictment in Romania for sex trafficking and other related crimes. The state-court lawsuit for which Defendants seek removal is a transparent attempt to intimidate and harass material witnesses to that foreign criminal prosecution. The suit's unethical and illegal purpose is obvious on its face—the bulk of the complaint's 57 pages are spent smearing the two women who were taken into protective custody by Romanian authorities as

victims.[1]  The suit additionally names the parents of one of the women as well as a Sergeant in the U.S. Marine Corps Reserve, who based on his training concerning international sex trafficking, was so worried for one of the women that he contacted the U.S. Embassy in Romania.

The Court has two independent sources of jurisdiction over this case. First, the case is appropriate for the Court's jurisdiction under Section 1332(a). The Plaintiffs' domicile likely creates diversity under Section 1332(a)(1) or (a)(2). Second, this case is independently subject to this Court's jurisdiction under 28 U.S.C. §§ 1442 and 1442a because Defendant, Sergeant Mathieu Martelly, is a member of the U.S. Marine Corps Reserves and acted at all times relevant to claims against him in this case under color of his office.

## I.  The Court Has Jurisdiction Under 18 U.S.C. § 1332(a) Through Diversity

### A.  Factual Background: The Plaintiffs' Elusive Domicile

On the basis of the Plaintiffs' filings in state-court, it is not possible to determine the domicile of the Tate bothers for the purpose of Section 1332(a). The Complaint identifies them as "British-American brothers" and "international businessmen currently residing in Romania." Amended Complaint (Compl.) at ¶ 13. Their "international presence can be attributed to the values and life experiences that began in youth . . .living in both the United States and the United Kingdom." Compl. at ¶ 15. The Complaint emphasizes the Tate brothers' international status in several places. *See* Compl. at ¶ 17, 18, 21, 22, 23, and 25.  It goes on to state that "[t]he Tate Brothers' use of social media and travel is a distinguishing factor in their success," including their "ability to fly anywhere in the world at a moment's notice." Compl. at ¶ 23. And, "[t]he Tate Brothers have previously owned properties globally and regularly travel to different countries for

---

[1] The suit also incorporates by reference an equally reckless suit (filed by the same attorney as this action), against one of the witnesses, Emma Gabbey, as well as her attorney. Compl. at 16, n. 5. Defendants reserve all rights of counterclaim against the plaintiffs of both suits.

business and recreation. Their ability to buy, sell, and invest in assets of any kind, and sell their product greatly depends upon their ability to hold accounts in the international banking system and travel any distance at a moment's notice." Compl. at ¶ 25.

Next the Complaint avers that the Tate brothers moved to Romania in 2015 and that they are "full-time residents of Romania." Compl. at ¶ 27. However, the complaint also states that Andrew Tate appeared on a "British reality TV show called *Big Brother*" in 2016. Compl. at ¶ 29. And it has been reported many times that Andrew Tate was removed from the show Big Brother in 2016[2] reportedly, because he was being criminally investigated in the U.K.[3] This is supported by Andrew Tate's own explanation of why he left the U.K., where he had been previously residing, for Romania,[4] although the exact date he left the U.K. is unclear from that explanation.

Numerous news outlets identify the Tate brothers as being dual citizens of the United Kingdom and the United States.[5] Andrew Tate has said online that he was born in Washington, D.C., and that his family moved to "southside Chicago . . . then Detroit, then Gary, Indiana . . .

---

[2] *See, e.g.*, Antoinette Radford, *Who is Andrew Tate? The self-proclaimed misogynist influencer*, BBC News (Aug. 4, 2023), https://www.bbc.com/news/uk-64125045; *and* Miles Klee, *Andrew Tate Was Kicked Off 'Big Brother' in 2016 Amid Rape Investigation*, Rolling Stone (Jan. 4, 2023), https://www.rollingstone.com/music/music-news/andrew-tate-kicked-off-big-brother-rape-investigation-1234656041/.

[3] *See* Klee, note 2, *supra* ("[I]t has emerged that production house Endemol Shine, its parent company Banijay UK, and broadcaster Channel 5 had been informed on June 8, 2016, that Hertfordshire Police were investigating criminal complaints against Tate.").

[4] *See* iClips TV, *Andrew Tate: Why I Left England for Romania*, YouTube (May 21, 2021), https://www.youtube.com/watch?v=9xdnzmuUedY.

[5] *See, e.g.*, George Wright and Matt Murphy, *Andrew Tate detained in Romania over rape and human trafficking case*, BBC News (Dec. 30, 2022), https://www.bbc.com/news/world-europe-64122628; and Jenny Gross, *Andrew Tate Is Released From Jail and Placed Under House Arrest*, The New York Times (Apr. 3, 2023), https://www.nytimes.com/2023/04/03/world/europe/andrew-tate-house-arrest-romania.html. News articles such as these are the basis of Defendants' averment on information and belief in their rule 7.1 Disclosure. DE 1.

then I went to Goshen, Indiana when I was around 4 . . . I was in Goshen, Indiana until I was 11 then I moved to Luton, England.[6] It has been reported that both brothers moved to England with their mother after their parents' divorce.[7] However, their true citizenship status and domicile is unknown, and this is no accident. The Tate brothers repeatedly describe how they travel often, and have many passports for the express purpose of, "prevent[ing] a single government having access or control over your entire life."[8] In the same video Andrew Tate goes on,

> If I make a mistake and England wants me in jail, I can fly with a Nigerian passport or an American passport, or an English passport, or a Polish passport, or an Estonian. I have so many [ ] passports. What? Are you going to block them all? They can't stop me traveling, there's always a passport I can pull out. There's always a driver's license I can pull out. If you ban one, I've got another one. I have bank accounts in 19 countries.

In another video Andrew Tate advocates this approach saying, "I have over 7 passports, I have over 15 driver's licenses, I have residences in over 30 countries, I have bank accounts in over 40 countries let's say. So, the goal being that no one government controls my life."[9]

As for business activities in the United States, the Complaint states that Tristan Tate invited Defendant Emma Gabbey to meet in person at an event in Miami in December of 2021. Compl. ¶ 43. It also states that Tristan Tate "resided at a Miami property with a group of male and female friends during his visit and invited E. Gabbey to a property at which he was staying" and that he eventually departed Miami later that same month. Compl. at ¶ 65. The Complaint's account of the

---

[6] *See* TateSpeech by Andrew Tate, *The Worst Things About Being Rich*, rumble (date unknown), https://rumble.com/v1gluzu-the-worst-things-about-being-rich-.html at mins. 1:15-13:07.

[7] *See* Radford, note 2, *supra*.

[8] *See* TateSpeech by Andrew Tate, *MAKE YOURSELF UNCONTROLLABLE #traveling*, rumble (date unknown), https://rumble.com/v1gm4hi-make-yourself-uncontrollable-traveling.html.

[9] *See* Wealthy Expat, *Andrew Tate's INSANE Passport Strategy (Breakdown)*, YouTube (Aug. 8, 2022),  https://youtu.be/eilMS7ZYyYg?si=3ksV8bjLGCHx2tYV at mins. 0:57-1:27.

messages between Tristan Tate and Emma Gabbey between December 2021 and April 2022 suggest that he was residing in Romania. *Id*. ¶¶ 66-70.  The Complaint also describes that the brothers would be away from Romania for "extended periods." Compl. at ¶ 31.

The citizenship/resident status of the Defendants is much clearer. Emma Gabbey is an American citizen and not a resident of Florida but the state of ███████ *See* Defs' Amnd. Rule 7.1 Disclosure. Aliona Untila is a citizen of Moldova and Romania and does not reside in the United States. Mona and William Gabbey are American citizens and residents of Florida. Sergeant Matthieu Martelly is an American citizen and a resident of Florida. *Id.*

Defendants Mona and William Gabbey and Sergeant Martelly have not been properly joined in this action. Fraudulent joinder occurs where "there is no possibility the plaintiff can establish any cause of action against the resident defendant." *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989). In the present case, there is no possibility that the Plaintiffs can establish their state-law claims against the Gabbeys or against Sergeant Martelly. Sergeant Martelly's report to the U.S. Embassy is protected by absolute privilege.

> In Florida, executive officers enjoy an absolute privilege regarding defamatory statements made in connection with the duties and responsibilities of their offices. <u>And the absolute privilege applies no matter how false or malicious words spoken or written by an executive official of government may be</u>. A qualified privilege would not be adequate protection for the public officer, since it would necessitate calling him as a witness to deny malice, and so subject him to cross-examination upon his official conduct in a private suit, and would end by submitting it to the eccentric and unreliable judgment of a jury.

*Tucker v. Resha*, 634 So. 2d 756, 758 (Fla. Dist. Ct. App. 1994), approved, 670 So. 2d 56 (Fla. 1996) (internal quotes omitted) (emphasis added). When he made the report, Sergeant Martelly was acting in connection with his official duties. *See* discussion *infra* at §  II(A) & II(B).

Similarly, the claims against Monna and William Gabbey for reporting concerns for their daughter's safety to the American Embassy in Romania cannot succeed. "The concern of a

parent for the welfare of his child provides a privilege for the occasion of speaking to one having the power or duty to take action for the benefit of the child." *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984). Furthermore, there are no facts pled to plausibly support claims against the Gabbys. In the over 50-page complaint the Gabbys are mentioned only in passing with no specific facts alleged as to William Gabbey. Compl. at ¶ 46, 64, 79, 81, 82, 94, 101. The Complaint alleges no facts indicating actual malice, or even that the Gabbeys had any reason not to believe what Emma Gabbey told them. In fact, the complaint admits that Emma Gabbey sent "distressing" messages to Matthieu Martelly, Compl. at ¶ 89, and that he informed her parents of this information. Compl. at ¶ 99. The sum total of the allegations against the Gabbys are nothing but legal conclusions unsupported by facts. Compl. at ¶ 101, 112-125; *see Ashcroft v. Iqbal*, 556 U.S. 662, 664  (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Such allegations do not get the presumption of truth and are destined to fail. Accordingly, the Florida-resident Defendants were improperly joined and should not be considered for diversity-jurisdiction purposes.

### A.  The Court Should Grant An Evidentiary Hearing To Determine The Plaintiffs' Domicile, Because They Have Obscured It

For Section 1332(a) to apply there must be complete diversity between the parties. *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1557 (11th Cir. 1989). "[F]or diversity purposes, courts should consider only the United States citizenship of individuals who are dual citizens." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1341 (11th Cir. 2011). While "[a] United States citizen with no domicile in any state of this country is 'stateless' and cannot satisfy the complete diversity requirement . . .  against a United States citizen." *King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1170 (11th Cir. 2007) (quoting *Newman– Green, Inc. v.*

*Alfonzo–Larrain*, 490 U.S. 826, 828 (1989)). "[D]omicile is not synonymous with residence; one may temporarily reside in one location, yet retain domicile in a previous residence." *Lama*, 633 F.3d at 1341–42. "For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Id*. (internal quote omitted).

It is impossible to determine with the information available in the Plaintiffs' Complaint, as well as their various statements online and in the media, where exactly the Plaintiffs are domiciled without jurisdictional discovery and/or an evidentiary hearing. While the Tate brothers are currently residing in Romania, and legally not permitted to leave,[10] the Tates went to a lot of effort in the Complaint to describe time spent in both the United States and the United Kingdom and that constant travel was a necessary part of their life and business. This, together with their philosophy of intentionally obscuring their domicile to escape criminal or other liability from any one nation, means jurisdictional discovery is necessary to get to the truth of where the Tate brothers are domiciled.

In *King v. Cessna Aircraft Co.*, despite the plaintiff residing in a foreign country at the time of the injury, and spending the previous years abroad, the Eleventh Circuit found that she intended to one day return to California and so was still domiciled there, the place of her birth. 505 F.3d at 1172. So too here, jurisdictional discovery could find that the Tate brothers while international businessmen and travelers, maintained a U.S. domicile. This would provide subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) and (a)(2) as Defendant Aliona Untila is a foreign citizen.

---

[10] *See*, Catherine Nicholls, Teodora Preda, and Sana Noor Haq, *Controversial influencer Andrew Tate released from house arrest in Romania*, CNN (Aug. 4, 2023), https://www.cnn.com/2023/08/04/europe/andrew-tate-released-house-arrest-intl/index.html.

**B. Because The Plaintiffs Are Attempting To Intimidate Material Witnesses In A Foreign Criminal Proceeding, The Principles Underpinning Alienage Jurisdiction And Equity also Support Having An Evidentiary Hearing**

"[T]he major purpose of alienage jurisdiction is to promote international relations by assuring other countries that litigation involving their nationals will be treated at the national level, and alienage jurisdiction is also intended to allow foreign subjects to avoid real or perceived bias in the state courts . . ." *Life of the S. Ins. Co. v. Carzell,* 851 F.3d 1341, 1346–48 (11th Cir. 2017) (quote omitted). Another policy consideration is that if a dual citizen was able to invoke alien jurisdiction merely on the basis of their dual citizenship "this would give [them] an advantage not enjoyed by native-born American citizens." *Coury v. Prot*, 85 F.3d 244, 250 (5th Cir. 1996). In this case, both the principles of promoting international relations and equity require a deeper look into the Tate brothers' true citizenship and domicile.

Currently, the Tates are facing serious criminal charges in Romania for human trafficking and forming an organized criminal group among other things.[11]  Compl. at 106 -107. They are now attempting to use the United States legal system to disrupt the Romanian criminal case by suing the victims/witnesses in that ongoing criminal case. Prior to filing this suit, the Tates sent Ms. Gabbey and her parents a letter threatening to sue them for 100 million dollars each, if Ms. Gabbey did not retract her statement to Romanian law enforcement in writing.[12] Andrew Tate has described abusing the legal system in the past with frivolous claims he knows have no merit just to harass

---

[11] Lucy Williamson & George Wright, *Andrew Tate charged with rape and human trafficking*, BBC News (Jun. 21, 2022), https://www.bbc.com/news/world-europe-65959097.

[12] See Exhibit A; *see also* Lucy Williamson, *Andrew Tate threatens legal action against accuser*, BBC News (Feb. 18, 2023), https://www.bbc.com/news/world-europe-64683923; *and* Morgan Winsor, *Andrew Tate accusers forced into hiding after online harassment from 'troll army,' lawyer says*, abcNEWS (Jul. 17, 2023), https://abcnews.go.com/International/andrew-tate-accusers-online-harassment/story?id=100569030.

someone critical of him online.[13] Considering the serious impact this litigation could have on the Romanian criminal case, it is appropriate that this case be treated at the national level or at the very least, that this court allow the Defendants to conduct jurisdictional discovery so that the Court can consider all of the evidence before making its decision.

Additionally, if becoming a dual citizen and residing abroad means a U.S. citizen can then defeat diversity and forum shop to drag a foreign citizen testifying against them into a U.S. state court when they are being prosecuted abroad, this would present quite the advantage not available to U.S. citizens residing at home. It would also incentivize international crimes by U.S. citizens abroad as they could sue any foreign witnesses against them in U.S. state courts while avoiding the scrutiny of the Federal court system.

Furthermore, in this case the Tates have sued a foreign citizen, Defendant Aliona Untila. The principle of ensuring she is treated at the national level when she has been sued by a United States citizen, alleged to have committed horrific crimes against her abroad, requires careful consideration by this Court. None of the cases which have found that U.S. citizens domiciled abroad are not appropriate parties to a diversity action, have analyzed a situation where a U.S. citizen is alleged to have committed transnational crimes in the U.S. and in foreign nations, intentionally obfuscate their domicile, and then attempted to use the U.S. legal system to sue foreign nationals they are alleged to have abuse abroad in a foreign criminal case. This is simply not a typical diversity case.

The closest case to address these issues is *Sadat v. Mertes*, 615 F.2d 1176, 1182 (7th Cir. 1980). The court in *Sedat* explained that, "alienage jurisdiction was intended to provide the federal

---

[13] *See* Entrepreneurs in Cars, *PTW # 57 – Andrew Tate – How To Destroy Haters*, YouTube (Jan. 20, 2022),  https://www.youtube.com/watch?v=AkcC84AKVBU at mins. 8:55-13:07.

courts with a form of protective jurisdiction over matters implicating international relations where the national interest was paramount." *Sadat v. Mertes*, 615 F.2d 1176, 1182 (7th Cir. 1980). In *Sadat*, the Court analyzed whether the Plaintiff's Egyptian citizenship was so dominant that he should be considered a foreign national for purposes of 1332(a)(2). 615 F.2d 1187-88.  Ultimately, the *Sadat* court found that the Plaintiff in that case was a U.S. citizen and made efforts to retain his citizenship so could not be considered to have renounced it. 615 F.2d at 1188. However, the Court recognized that, "the paramount purpose of the alienage jurisdiction provision [is] to avoid offense to foreign nations because of the possible appearance of injustice to their citizens."

This case raises similarly compelling concerns regarding international relations. But here, it is not the Plaintiffs who need the national protection of the federal courts but the Defendants. Jurisdictional discovery could reveal two possibilities of paramount international concern. First, that the Tates in fact have maintained a U.S. domicile that could trigger diversity jurisdiction; or second, that the Tates have so abandoned their U.S. citizenship so as to be regarded as foreign citizens for the purposes of 1332(a)(2).

In the first instance, a U.S. citizen will be potentially disrupting a foreign criminal case against them and intimidating a foreign victim witness in that case. And in the second, a foreigner will be attempting to use the U.S. court system to disrupt a foreign criminal investigation while intimidating a U.S. victim witness to that investigation and her U.S. family and a member of the U.S. military.[14] This case presents serious issues of national concern and unique issues of first impression regarding diversity of citizenship. Therefore, the Defendants respectfully request the Court order the parties to conduct jurisdictional discovery and set an evidentiary hearing to resolve this issue. *See generally, B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 551 n. 14 (5th Cir. 1981)

---

[14] *See generally* Martelly Declaration (attached)*.*

("the trial court may hold an evidentiary hearing to resolve these limited questions of jurisdictional

fact" such as "there is a contested question of fact regarding the true domicile of the parties"); .

## II.  The Court Also Has Jurisdiction Under 28 U.S.C. §§ 1442 And 1442a, Because Defendant Martelly, A Reserve Marine, Acted Under Color Of His Office When He Reported Suspected Trafficking In Persons

This case is subject to removal on the basis of 28 U.S.C. §§ 1442 and 1442a. Section 1442a

reads:

> A civil or criminal prosecution in a court of a State of the United States against a member of the armed forces of the United States on account of an act done under color of his office … may at any time before the trial or final hearing thereof be removed for trial into the district court of the United States for the district where it is pending in the manner prescribed by law, and it shall thereupon be entered on the docket of the district court, which shall proceed as if the cause had been originally commenced therein and shall have full power to hear and determine the cause.

28 U.S.C.A. § 1442a.[15]  "One of the main purposes of this removal statute is to allow United States

armed forces members an opportunity to raise any possible defenses in federal court." *Margan v.*

*Chemetron Fire Sys., Inc.*, 954 F. Supp. 1127, 1130 (E.D. Va. 1997). The Supreme Court has

explained the purpose of the neighboring federal-officer removal statute--Section 1442--in this

way:

> One of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts. The position of the court below would have the anomalous result of allowing removal only when the officers had a clearly sustainable defense. The suit would be removed only to be dismissed. Congress certainly meant more than this when it chose the words 'under color of office.' In fact, one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. The officer need not win his case before he can have it removed. In cases like this one, Congress has decided that federal officers, and indeed the Federal Government

---

[15] The armed forces of the United States include the Navy and the Marine Corps. 10 U.S.C. § 101(a)(4). And the reserves are components of both the Navy and the Marine Corps. 10 U.S.C.A. § 8061; *see also* § 8001(a)(2) (The U.S. Marine Corps "includes the Regular Marine Corps, the Fleet Marine Corps Reserve, and the Marine Corps Reserve.").

itself, require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of s 1442(a)(1).

*Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969) (citation omitted). The rationale for military-member removal is the same as that for federal-officer removal.

> The United States Military may only act through its officers, and those officers must necessarily act within the individual states. The purpose of the United States Military—to secure the safety of this nation—can best be achieved if the actions of the military proceed without interference by the individual states. If a member of the armed services faces a state prosecution as a consequence of his carrying out his duties as a member of the military, the federal government has an acute interest in protecting the individual for his acts taken pursuant to properly bestowed federal authority. In such a situation the availability of a removal statute is critical to the Federal Government's ability to protect its interests and ensure its proper functioning.

*State of Ga. v. Westlake*, 929 F. Supp. 1516, 1520 (M.D. Ga. 1996). Courts recognize the overlap between Sections 1442 and 1442a and often apply them in tandem. S*ee e.g. People of Puerto Rico v. Santos-Marrero*, 624 F. Supp. 308, 309 (D.P.R. 1985) ("Military personnel may request removal under either section 1442 or 1442a since they are "officers of the United States"."); *see also Naas v. Mitchell*, 233 F. Supp. 414, 416 (D. Md. 1964). ("In view of the 'comparable' language of the two sections [] the court in construing the meaning of section 1442a will consider the history behind the enactment of section 1442(a)(1) and the cases arising under this latter section.").

Finally, under Section 1442, the entire case must be removed, even if only one of the Defendants is a federal officer. *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) Indeed, "the policy of the section would be frustrated if a plaintiff or a prosecutor, by joining non-federal defendants with no desire to remove, could retain the suit in a tribunal that might administer not only the laws of the State, but equally Federal law, in such a manner as to paralyze the operations of the government." *Id*.; *see also Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981) ("Since the federal officer is the only one entitled to remove under s

1442, he alone can remove without other defendants joining in the petition, and the entire case is removed to the federal court.").

### A. Sergeant Martelly Acted Under Color of His Office Within the Meaning of Section 1442a

In *Willingham*, the Supreme Court also addressed how "color of office" should be construed:

> Past cases have interpreted the 'color of office' test to require a showing of a 'causal connection' between the charged conduct and asserted official authority.
> ….
> If the question raised is whether they were engaged in some kind of 'frolic of their own' in relation to respondent, then they should have the opportunity to present their version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish. Petitioners sufficiently put in issue the questions of official justification and immunity; the validity of their defenses should be determined in the federal courts.

*Willingham v. Morgan*, 395 U.S. 402, 409, 89 S. Ct. 1813, 1817, 23 L. Ed. 2d 396 (1969) (quote omitted).  The connection between the state-law claims against Sergeant Martelly and his official duties is obvious. The Complaint alleges that Sergeant Martelly defamed the Tates by reporting his suspicions of human trafficking to the U.S. Embassy in Romania. Compl. ¶¶ 91, 112-25. According to the Complaint, Sergeant Martelly told Ms. Emma Gabbey that he made the report because "it's my literal job…" Compl. ¶ 96. It surely was his job. Sergeant Martelly was trained to recognize and report human trafficking. Martelly Decl. ¶¶ 3-4, 6-7.  *Compare Howard v. Sikula*, 627 F. Supp. 497, 500 (S.D. Ohio 1986) (color of office standard met where "all of the contacts between [Plaintiff] and Defendants relevant to the defamation claim occurred while these parties were performing duties at least apparently required by their capacities as Air Force Reservists.").

Federal-officer removal under Section 1442 requires the officer to assert a colorable federal defense. *Mesa v. California*, 489 U.S. 121, 129-34 (1989). Some cases interpret Section 1442a to also require a member of the armed forces seeking removal to assert a colorable federal defense.

*See, e.g.*, *Westlake*, 929 F.Supp. at 1520-21; *but see People of Puerto Rico v. Santos-Marrero*, 624 F. Supp. 308, 310 (D.P.R. 1985) (holding that "allegation of a federal defense is not essential for removal" under Section 1442a).

In all events, the standard is met here. In *Magnin*, the Eleventh Circuit held that a federal official asserts a colorable federal defense when they "assert that they were following federal law." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1428 (11th Cir. 1996). "[I]t is sufficient for the defendant to show that his relationship to the plaintiff derived solely from his official duties." *Id.* at 1427–28 (internal quotes omitted). In *Magnin*, the removing defendant was an employee of a private airplane manufacturing company, who exercised the authority of the Federal Aviation Administration as a Designated Manufacturing Inspection Representative ("DMIR") when he signed a certificate of airworthiness.

> At least part of Smith's defense is that he acted within the scope of his federal duties, that what he did was required of him by federal law, and that he did all federal law required. That defense raises a federal question, which justifies removal. The extent to which federal law imposes certain requirements upon Smith as a DMIR, and whether it may afford him any corresponding protection as a DMIR from tort liability, are issues of federal law.

*Id.* 1428.

In this case, Sergeant Martelly was acting within the scope of his official duties and within the parameters of federal law. As a Reserve Marine, he is required to take regular training on combatting trafficking in persons (TIP). Martelly Decl. ¶¶ 4-5. These trainings are required by both federal law and regulation. *Id.* ¶ 7. Among other things, the trainings cover how service members can recognize the signs of human trafficking and how to report them to their chain of command or law enforcement. *Id.* ¶ 6. Sergeant Martelly acted in accordance with his training. After learning of a potential TIP situation involving an American citizen he knew in Romania, he consulted with his chain of command, then reported the situation to law enforcement in Romania

by contacting the U.S. Embassy. *Id*. ¶¶ 14-16.[16] Accordingly, the civil suit against him for acting under the color of his office by reporting a suspected case of human trafficking is removable under Section 1442a.

### B.  Sergeant Martelly Meets The Elements For Removal Under Section 1442

 "A defendant may remove a case to federal court under § 1442(a)(1) if two elements are met. First, "the defendant must establish that there is a causal connection between what the officer has done under asserted official authority and the action against him." *Einhorn v. CarePlus Health Plans, Inc.*, 43 F. Supp. 3d 1268, 1269–70 (S.D. Fla. 2014) (internal quotations omitted). Second, "the defendant must advance a colorable defense arising out of [his] duty to enforce federal law." *Id*.

These elements are easily met here. **First**, the state lawsuit against Sergeant Martelly is causally connected to his actions he took as a Reserve Marine confronted with an apparent case of ongoing sex trafficking. The Complaint alleges that Ms. Emma Gabbey sent Sergeant Martelly "distressing" messages that there was human trafficking occurring at the Tates' compound in Romania. Compl. ¶ 89. Sergeant Martelly understood from her messages that she was in danger. Martelly Decl. ¶ 13. After conferring with his chain of command, Sergeant Martelly contacted the U.S. Embassy in Romania. *Id*. ¶¶ 14-17. Based on his training, Sergeant Martelly understood this course of action to be his duty as a Marine and the best way to preserve Ms. Gabbey's safety. *Id.* ¶¶ 18-19.

Sergeant Martelly contacted the U.S. Embassy in Romania because he believed it was his duty once he had become aware of a potential instance of human trafficking. He acted based on

---

[16] In addition to the colorable federal defense recognized by the Eleventh Circuit in *Magnin*, Sergeant Martelly also asserts Official Immunity and Federal Supremacy. *See* discussion at §§ B(1) and B(2), *infra*.

his training, his understanding of the applicable federal law and regulations, and in consultation

with his chain of command. Martelly Decl. ¶¶ 18-19.  Importantly, based on his training, he did

not believe that taking no action was an option for him because he was a Reserve Marine. *Id*. ¶¶ 8,

10-12.

**Second**, Sergeant Martelly has colorable federal defenses. Because "a core purpose of

federal officer removal is to have the validity of the federal defense tried in federal court," any

colorable federal defense "need only be plausible; its ultimate validity is not to be determined at

the time of removal. The law does not require that the removing defendant virtually win his case

before it can be removed." *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1145 (11th Cir.

2017). Here, Sergeant's decision to contact the U.S. Embassy with his concerns is covered by at

least two colorable federal defenses: Official Immunity and Federal Supremacy.[17]

### 1. Sergeant Martelly Has Official Immunity

In *Barr v. Matteo*, the Supreme Court addressed a suit for libel brought against the Acting

Director of the Office of Rent Stabilization, based on a press release he had authorized to be issued.

360 U.S. 564, 565 (1959). The Defendant maintained that his action in issuing the press release

was covered by an absolute privilege. *Id*. at 569. After closely examining the legal roots of the

privilege asserted by the Defendant, the Supreme Court stated that

> we cannot say that it was not an appropriate exercise of the discretion with which
> an executive officer of petitioner's rank is necessarily clothed to publish the press
> release here at issue. . . . The fact that the action here taken was within the outer
> perimeter of petitioner's line of duty is enough to render the privilege applicable,
> despite allegations of malice in the complaint. . . .

---

[17] While preparing this Response, counsel became aware of the potential applicability of 28
U.S.C. § 2679 to the claims against Sergeant Martelly. Counsel is currently undertaking to confer
with the Office of the United States Attorney concerning whether the Attorney General's
certification under § 2679(d)(1) is appropriate in this case. Considering the need to address this
Court's subject matter jurisdiction this week, counsel presents the colorable federal defenses that
are apparent at this time.

*Id* at 574. Overtime, the contours of the Official Privilege have developed. In *Scott v. DeMenna*, the Eleventh Circuit summarized the rule as refined by the Supreme Court:

> [T]he conduct of federal officials must be discretionary in nature and within the scope of employment before the official's conduct is absolutely immune from state tort liability. … [T]he purpose of official immunity would be defeated by shielding a federal official from state tort liability in situations where the official does not exercise independent judgment. Indeed, non-discretionary activity has no support from the traditional justification for official immunity.

840 F.2d 8, 9 (11th Cir. 1988).

Here, Sergeant Martelly's conduct was at least partially discretionary. He, along with all other Marines, was instructed to always remain alert to the signs of human trafficking. He was directed to report anything suspicious; yet he was also accorded the discretion to decide whether anything he saw or heard suggested that trafficking may be afoot. Decl. ¶ 6. Indeed, in an example communicated throughout the Marine Corps Reserves, another Reserve Marine who reported sex trafficking was commended publicly by his commanding officer for reporting civilian trafficking, because "his judgment and initiative in this situation are perfect examples of how Marines should feel about human trafficking." Decl. ¶ 11 (emphasis added). Similarly, Sergeant Martelly acted within the scope of authority he had a Reserve Marine, while exercising independent judgment as to whether the information he learned from Ms. Gabbey constituted indicia of sex trafficking. Once he first became concerned for Ms. Gabbey's safety, he approached his chain of command for guidance. Decl. ¶ 14. Accordingly, his conduct is covered by Official Immunity.

2. **Federal Supremacy: Sergeant Martelly Acted In Accordance With The Enacted Federal Priority Of Combatting Sex Trafficking**

Assuming, arguendo, that Plaintiffs can state a viable claim against Sergeant Martelly for contacting the Embassy and reported suspected trafficking, any state-law liability would be preempted by federal law. As the Eleventh Circuit has explained,

> [The] analysis examines whether the officer's acts have some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law. <u>If the answer to these questions is yes, application of state law, to the extent it unavoidably conflicts with federal law, has no effect, as it would frustrate and impede the compelling federal interest of allowing federal officers to effectively discharge their duties.</u> If the answer is no, state law may apply with full force, as no valid federal interest arises in protecting the ultra vires actions of a federal officer from liability.

*Denson v. United States*, 574 F.3d 1318, 1348 (11th Cir. 2009) (citations omitted) (emphasis added).

The answer here is yes. If the Tates' state-law claims against Sergeant Martelly for defamation had any validity—and they do not—they would collide squarely against the federal policy of having zero tolerance for sex trafficking, and the Department of Defense's comprehensive training requiring the men and women of the armed forces throughout the world to recognize sex trafficking and report it to the appropriate authorities. *See*, Martelly Decl. ¶¶ 6-8, 11-12. "[S]tate law liability simply cannot attach to the acts taken by federal officers in the course of their duties and committed in compliance with federal law, where such action was no more than what was necessary and proper for the officer to do under the circumstances, if application of state law would impede an essential federal function." *Denson*, 574 F.3d at 1349 (quotation omitted). Here, the Plaintiffs' wild assertion that state law creates liability for a federal officer reporting suspected sex trafficking either fails as a matter of law or is preempted by federal law.

//

//

18

## III. The Court Should Use Its Authority And Broad Discretion To Assess Its Jurisdiction Over This Case And, If Necessary, To Assist The Romanian Criminal Prosecution And Investigation.

Should the Court not be persuaded that it already has jurisdiction over this case under §§ 1442 and 1442a, the Court should exercise its authority and discretion to order jurisdictional discovery concerning Section 1332(a).[18] Additionally, in light of the Plaintiffs' attempts to intimidate and harass the Defendants, Defendants note that it may be necessary for the Court to exercise its authority under 28 U.S.C. § 1782 in order to assist a foreign tribunal, should their additional testimony be required for the ongoing criminal case and investigation in Romania.

### CONCLUSION

For the reasons stated above, the case is appropriately removed to this Court's jurisdiction.

Date: August 25, 2023

By:   /s/ Danielle Bianculli Pinter
      Danielle Bianculli Pinter
      Fla. Bar No. 120441
      Benjamin W. Bull*
      Peter A. Gentala*
      Christen M. Price*
      Victoria Hirsh*
      **National Center on Sexual Exploitation**
      1201 F. St., NW, Suite 200
      Washington, DC 20004
      dpinter@ncoselaw.org
      bbull@ncose.com
      pgentala@ncoselaw.org
      cprice@ncoselaw.org
      vhirsch@ncoselaw.org

---

[18] *See generally, CSDVRS, LLC v. Purple Commc'ns, Inc.*, No. 8:13-CV-1811-T-30AEP, 2013 WL 4763948 (M.D. Fla. Sept. 4, 2013) (allowing jurisdictional discovery to ascertain the domicile of the parties); *and United Surgical Assistants, LLC v. Aetna Life Ins. Co.*, No. 8:14-CV-211-T-30MAP, 2014 WL 1268659, at *2 (M.D. Fla. Mar. 27, 2014) (same).

Telephone: 202-393-7245

Christian W. Waugh [FBN 71093]
Mary A. Norberg [FBN 1032028]
Sofie Bayer [FBN 1039616]
**WAUGH PLLC**
201 E. Pine Street, Suite 315
Orlando, FL 32801
cwaugh@waugh.legal
mnorberg@waugh.legal
sbayer@waugh.legal

Telephone: 321-800-6008
Fax: 844-206-0245

*Attorneys for Defendants*

*Admitted pro hac vice.

## Certificate of Service

I hereby certify that on August 25, 2023, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being

served this day on all counsel of record identified on the below Service List in the manner

specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in

some other authorized manner for those counsel or parties who are not authorized to receive

electronically Notices of Electronic Filing.

## SERVICE LIST

Thomas Maniotis
Equity Legal, PLLC
5201 Blue Lagoon Dr., Flr. 8
Miami, FL 33126

321-313-8642
tamaniots@equitylegal.net

Joseph D. McBride
The McBride Law Firm, PLLC
99 Park Avenue, 6th Flr.
New York, NY 10016
917-757-9537
Jmcbridelawnyc.com

*Attorneys for Plaintiffs*