**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

ANDREW TATE AND TRISTAN TATE,

Plaintiffs,

v.

████████, ████████,
████████,

Defendants.

Case No.: **9:23-cv-81150-RLR**

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYM AND FOR PARTIAL SEAL AND PROTECTIVE ORDER

COME NOW ████████, ████████, ████████, and ████████, (Defendants), by and through the undersigned counsel, and respectfully move this Honorable Court, under Fed. R. Civ. P. 5.2, Fed. R. Civ. P. 10, and Fed. R. Civ. P. 26 for leave to proceed in this case pseudonymously as Jane Doe, John Doe, June Doe, Mary Doe, and Liam Doe, and for a protective order. Good cause exists due to the matter's intimate nature, the pending criminal prosecution of the Plaintiffs, Andrew and Tristan Tate ("The Tates" or the "Tate Brothers"), and the real and actual threats to their safety and privacy.

Defendants seek Pseudonyms and a protective order to 1) require the Plaintiffs to keep Defendants' identities confidential throughout this case and thereafter; 2) seal all current and future pleadings and court-filings containing personally identifying information and details involving the relationship or alleged sexual histories of any Defendants from non-party, public viewing; and 3) require that all parties keep discovery exchanged in this matter containing Defendants personally

1

identifying and private information, as outlined in the proposed protective order, confidential throughout this case and thereafter, absent an order by this Court. Supporting the instant Motion, the Defendants state as follows:

## I. INTRODUCTION

Defendants ███████ and ███████ are victims of sexual assault and sex trafficking at the hands of Andrew Tate, a social media influencer, former kickboxer, and owner of a large webcam business,[1] and his brother, Tristan Tate ("the Tates" or "the Tate Brothers"), and their associates. ███████ and ███████ are also key witnesses in a Romanian sex trafficking prosecution against the Tates and their associates. The Tates' present lawsuit is, at least in part, an unveiled attempt to abuse the American civil justice system to intimidate ███████ and ███████ from participating in the Romanian criminal prosecution. The Tates' complaint is part of an ongoing effort to influence public opinion as to the ongoing criminal case, and to further harass and traumatize these women. This is evidenced by the outrageous, scandalous, and highly impertinent "facts" asserted in Plaintiffs' Complaint, their choice to sue ███████ parents and close friend who sought to protect ███████, and the innumerable public actions and words of the Tate Brothers, their attorney, Joseph McBride, and their millions of social media followers.

Accordingly, Defendants seek a protective order under Federal Rules of Civil Procedure 5.2(d) and (e), Federal Rule of Civil Procedure 10, and Federal Rule of Civil Procedure 26(c) and for leave to proceed under pseudonyms, for good cause where: 1) publishing their identities on the public docket or in the media will violate substantial privacy rights; 2) Defendants are already

---

[1] "A **webcam model** (colloquially, **camgirl**, **camboy**, or **cammodel**) is a video performer who streams on the Internet with a live webcam broadcast. A webcam model often performs erotic acts online, such as stripping, masturbation, or sex acts in exchange for money, goods, or attention." *Webcam Model*, Wikipedia, https://en.wikipedia.org/wiki/Webcam_model.

being subjected to further emotional injury and threats to their safety, necessitating protection from this Court; and 3) publishing Defendants' identities and alleged details surrounding this matter will jeopardize pending criminal proceedings, all of which outweigh the presumption of openness in judicial proceedings.

## II. FACTUAL BACKGROUND

   A.  *Plaintiffs Andrew Tate and Tristan Tate*

The Tate Brothers are "international businessmen" and "major social media influencers" who attribute their success to their social media use and boast of "[t]heir massive social media presence (previously in the tens of millions of followers, putting them in the top 1% of social media personalities in the world)." Compl. at ¶¶13, 21, 23. The Tates rose to fame in part due to their self-proclaimed misogyny[2] including boasts of running a profitable webcam pornography business,[3] having "a harem,"[4] teaching men how to "get girls,"[5] taking young women's virginity,[6] and counseling men on how to do the same.[7]

In 2017, Andrew Tate was banned from Twitter for posting that women should "bare [sic]

---

[2] Antoinette Radford, *Who is Andrew Tate? The self-proclaimed misogynist influencer*, BBC (Aug. 4, 2023), https://www.bbc.com/news/uk-64125045 ("In an interview with another YouTuber, he said he was 'absolutely a misogynist', and added: 'I'm a realist and when you're a realist, you're sexist. There's no way you can be rooted in reality and not be sexist.'").

[3] *See e.g., TATE tells the story of his webcam BUSINESS*, YOUTUBE (July 1, 2022), https://youtu.be/wSURJ7JChqA?si=hTn_v83rQr51wd3t at 02:11 – 7:08; *Tristan Tate: God Mode*, YOUTUBE (Jan. 15, 2023), https://www.youtube.com/watch?v=Ao4pvTjGbFY at 00:28-00:47; *Andrew Tate Tells His Life Story*, YOUTUBE (Jun. 20, 2021), https://www.youtube.com/watch?v=fhUi1htVeJc at 15:48 – 20:45; 37:15- 40:55.

[4] *See Tristan Tate: God Mode*, *supra* note 3, at 24:41-25:30.

[5] *See generally Tristan Tate: God Mode*, *supra* note 3.

[6] *See Tristan Tate: God Mode, supra* note 3, at 37:22 – 42:30.

[7] *See e.g., HU [LEAKED] Tate shares ONLYFANS Secrets | Only Fans Elites FULL Course [Top Secrets]*, YOUTUBE (July 25, 2022) https://www.youtube.com/watch?v=y3n7HB03UK8; and *Tristan Tate: God Mode*, *supra* note 3.

some responsibility" for being raped.[8]

In 2018, the Tates created the PhD (Pimping Hoe's Degree) program, charging men $450 for a video course on how to attract and control women.[9] In August 2022, Andrew Tate was banned from YouTube, TikTok, Instagram and Facebook for violating the platforms' hate speech policies, though thousands of copycats and fan accounts still repost his messages.[10] Once Elon Musk took over Twitter, the Tates were permitted to return to the platform, and within just three months, even while jailed, Andrew Tate amassed nearly 5 million followers.[11] As of August 16, 2023, Andrew Tate was the 25th most searched person on Google, topping Kim Kardashian, Donald Trump, and Joe Biden.[12]

> B. *Plaintiffs and their Associates are Currently Facing Criminal Prosecution by the Romanian Authorities for Multiple Charges Involving Defendants* ███████████████, *including Human Trafficking and Sexual Assault[13].*

---

[8] Morgan Sung, *Andrew Tate issues final 'final message' to viewers after ban from various social media platforms*, NBC NEWS (Aug. 24, 2022, 7:56 PM), https://www.nbcnews.com/pop-culture/andrew-tate-issues-final-final-message-viewers-ban-various-social-medi-rcna44670.

[9] EJ Dickson, Adam Rawnsley, & Stefania Matache, *Andrew Tate Built an Empire on Bullshit. Here's the Real Story*, ROLLING STONE (Mar. 15, 2023), https://www.yahoo.com/entertainment/andrew-tate-built-empire-bullsh-173212463.html.

[10] Jessica Taylor Price, *Now banned by TikTok and others, Andrew Tate rode wave of online misogyny, says Northeastern expert*, NORTHEASTERN GLOBAL NEWS (Aug. 30, 2022), https://news.northeastern.edu/2022/08/30/andrew-tate/.

[11] Liam James, *Andrew Tate's Twitter continues to reach millions of followers despite arrest: Misogynist influencer's account remains on-brand even with its namesake behind bars*, INDEPENDENT (Jan. 11, 2023, 5:18 PM), https://www.independent.co.uk/news/world/europe/andrew-tate-twitter-account-tweeting-b2259557.html.

[12] *The 100 Most Searched People on Google in 2023*, GLIMPSE (Aug. 16, 2023), https://meetglimpse.com/insights/most-searched-person/.

[13] The names and identities of ████████████████ were kept confidential in the Romanian indictment and initial Romanian press coverage of the Tate Brothers' arrests, as victims of human trafficking and sexual assault. The Tate Brothers, and their associates, were the first to force ██████████████████ in the public eye by identifying them on social media and through this lawsuit. As such, Defendants do not waive the protection of Rule 5.2(a), and have moved separately to file this present motion and the referenced Romanian Indictment under seal.

Defendants ███████████████ are young women who were manipulated and groomed by the "friendly, successful, charismatic, young, wealthy, and highly generous" Tate Brothers into believing they were in safe, romantic relationships with the pair.[14] Compl. at ¶¶33, 35. ████████████ met for the first time at the Tate's Bucharest compound in Romania after they were each separately lured to Romania, believing they would be continuing their romances with Tristan Tate and Andrew Tate, respectively.[15] Instead, the women found themselves trapped in a human trafficking organization operated by the Tates and their associates, where they experienced alienation, isolation, constant surveillance, threats of retaliation for disobedience, and in ███████ case, sexual assault and violence.[16]

████████████████ escaped the Tates' Romanian compound in April 2022 with help from the U.S. Embassy and Romanian Directorate for Investigating Organized Crime and Terrorism (DIICOT). The Tate Brothers were arrested for human trafficking and other crimes on December 29, 2022. On June 20, 2023, the Tates were formally charged with rape, human trafficking, and forming an organized crime group to sexually exploit women.[17]

Additionally, on June 14, 2023, the Tates were served with legal papers for a civil suit on behalf of four women from the U.K. who allege "multiple rapes, serious physical assaults including strangulations and beating with a belt, and coercive and controlling behaviour."[18]

---

[14] *See* forthcoming Romanian Indictment at 5-7, 41-44, 134 -227. Defendants will file a motion to file the full indictment under seal shortly after filing this motion.

[15] *See* forthcoming Romanian Indictment at 5-7, 41-44, 134 -227.

[16] *See* forthcoming Romanian indictment 38-44, 134 – 215, 218 – 221, 235-255.

[17] Lucy Williamson & George Wright, *Andrew Tate charged with rape and human trafficking*, BBC (June 21, 2023), https://www.bbc.com/news/world-europe-65959097; *see also* forthcoming Romanian Indictment.

[18] Tim Hume, *Andrew Tate's Legal Headaches Just Got a Whole Lot Worse*, VICE (June 14, 2023, 12:25 PM), https://www.vice.com/en/article/jg55kd/andrew-tate-civil-lawsuit-romania.

C. *Plaintiffs and their Associates Pose a Continued Threat and Danger to Defendants, as Evidenced by their Harassing and Retaliatory Complaint, Leaking of Private Identifying Information, Posting of Vile Content on Social Media, and High-Profile Media Interviews*

Ever since ███████████████ escaped the Tates in Romania, they have faced ongoing targeted harassment and threats from the Tates' fan base, those representing the Tates, and now the Tates themselves through filing this frivolous lawsuit and the PR campaign surrounding it.[19] In December 2022, an attorney for the Tates, sent a cease-and-desist letter to ███ ███ and her parents, threatening a defamation suit with damages amounting to $300 million if she did not fully retract, in writing, the testimony and evidence she provided to Romanian law enforcement.[20] In January 28, 2023, a recorded discussion from jail revealed Andrew Tate instructing an associate to call ████████ and "make it clear to her and her whole family that she will be bankrupt for life for lying if she doesn't withdraw the testimony."[21] This lawsuit and the Tate's above actions are an explicit effort to intimidate ████████████████ from acting as witnesses against them and to evade further criminal investigation and prosecution for their crimes.

The Plaintiff's complaint inappropriately (if not, illegally), identifies ████████ as a child victim of a sexual crime, which had been kept confidential and sealed by the Florida criminal court to protect her. ¶¶36, 49-51. Disturbingly, Plaintiffs do this while concealing and protecting the convicted child predator's identity. *Id.* Additionally, both ██████████████ identities, as well as other personal information about their family members and places of employment, have

---

[19] *See Andrew Tate: The Matrix Strikes Again (NEW BBC HIT PIECE – FULL DOCUMENTARY)*, YOUTUBE (AUG. 31, 2023), https://www.youtube.com/watch?v=1P41opeZxek at 57:06 – 58:50.
[20] *See* Exhibit A, see also, https://www.bbc.com/news/world-europe-64683923
[21] *See* Dickson, *supra* note 11 (according to court documents obtained by Rolling Stone).

repeatedly been spread online at the apparent direction of the Tates.[22] One of many examples is Exhibit A of Plaintiffs' Complaint, another frivolous and harassing lawsuit filed against ███ ████ by Kenneth Fisher (hereinafter "the Fisher Complaint"). Mr. Fisher is a 39-year-old software engineer from Florida,[23] and former romantic partner of ████████, who began his sexual relationship with her when she was 17 years old—a minor—and he was 34 years old. The bases for Mr. Fisher's claims are that ████████, *while a minor and legally unable to consent to a sexual relationship with him*, was an "obsessive liar with a profound and immoral history" who, he alleges, somehow manipulated him into a sexual relationship, even though he continued engaging in statutory rape after discovering she was underage.[24] Mr. Fisher's Complaint then explicitly details, for over 30 pages, the sexual abuse of ████████ as a minor by numerous men, attempting to spin these accounts where men sexually assaulted a vulnerable teenager as "evidence" that ████████ is a "deeply troubled woman who will stop at nothing to destroy another person's life," ¶45, a "mastermind," ¶63, "professional victim" who is "seriously dangerous." ¶72. Mr. Fisher's Complaint, similar to the Tates', also employs repugnant, archaic rape myths and victim-shaming to support his claims, including that ████████ would "revoke consent" and wear "provocative clothing." ¶¶48-49. Allegedly, as a result, ████████, a *child* for a significant portion of their relationship, caused Mr. Fisher, a college graduate and software engineer nearly twenty (20) years her senior, to be "injured" and to suffer "emotional distress." ¶40.

---

[22] *See* Dickson, *supra* note 11 ("The clips that [two of Tate's employees made] have views, they are good and are hitting hard," he told the associate, according to a transcript of wiretapped phone calls from jail in a Feb. 21 court document obtained by *Rolling Stone.* (The transcript has been translated from English to Romanian, back into English.) "Keep going! Good job. Over and over again, different ones … we need the girls to cry, to be frustrated, angry.")
[23] *See* Fisher Complaint at ¶12.
[24] *See* Fisher Complaint at ¶45.

Mr. Fisher's lawsuit was filed by Mr. Maniotis, the same Florida attorney who filed this present lawsuit for the Tates, approximately one week before the Tates instituted their lawsuit. The joint representation and near-contemporaneous filing of inflammatory lawsuits suggests a conspiracy to harass and intimidate these women. Mr. Fisher's complaint specifically mentions the Tates, *see* ¶49(vii) of Exhibit A ("Fisher Complaint") of Plaintiffs' Complaint, and private investigator John DiPaolo who has submitted a sworn affidavit in this case. *Id.* at ¶49(ii). Importantly, Mr. Fisher's complaint largely forms the basis of the "facts" alleged by the Tates in this case. *See* Compl. at ¶¶36, 42, 45-55, 60-62.

Mr. Fisher's case is frivolous and harassing and was filed in concert with and at the direction of the Tates. Notably, Mr. Fisher admits to statutory rape against ████████ in his complaint, as well as includes alleged text messages between himself and ████████ in which he threatens to hand over an entire copy of ████████ illegally copied phone data to the Tate Brothers in support of their defense of their criminal charges. *See Fisher Complaint* at ¶65.

Two different private investigators hired by the legal team for Fisher and the Tates, Richard S. Loveridge, and John DiPaolo, whose sworn affidavits were included as exhibits in the Fisher complaint, spent months hunting down virtually anyone ████████ has ever had contact with based on information they received from Mr. Fisher. Mr. Fisher, illegally and without ███. ████████ consent, copied all the data from ████████ phone and provided this illegally-obtained information to at least one private investigator and to other Tate associates, such as Sulaiman Ahmed.

Mr. Ahmed is a U.K. citizen who launched and, since at least February 2023, has maintained a harassment campaign against ████████ on social media. Mr. Ahmed's posts have

incited further harassment of ███████ by Tate "fans," including death threats.[25] Mr. Ahmed even traveled from the U.K. to Florida to "investigate" ███████, putting her in extreme fear for her safety. This fear was reinforced when Mr. Fisher indicated that he would be sharing information he had illegally obtained from ███████ with Mr. Ahmed and/or John DiPaolo. Since Mr. Ahmed's trip to Florida, he has been publicly claiming he will "expose" the truth about ███████. In a recent interview, Andrew Tate referenced information contained in the Fisher complaint before any party had even been served or the case made public.[26] On July 11, 2023, Mr. Tate's New York attorney, Mr. Joseph McBride, tweeted a reference to ███████ as a "prolific fraudster" mirroring the language in Mr. Fisher's complaint and this complaint.[27]

Prior to this lawsuit, Mr. McBride arranged an interview for his client, Andrew Tate, with Tucker Carlson.[28] That interview went live on Twitter on July 11, 2023, garnered over 100 million views, and provided a platform for Andrew Tate to spread obvious misinformation about the criminal case in Romania, such as: the transparently false claim that he was not charged with any sexual crimes.[29]

The same day the Tucker Carlson interview went live, the present case was filed. The Tates' attorney, Mr. McBride – before a single party had been served – began posting about the

---

[25] *See* Exhibit B, *see also* ███ Declaration and ███ Declaration.

[26] @ReachMorpheuss, X (June 29, 2023, 10:58 PM), https://twitter.com/reachmorpheuss/status/1674613244793872384?s=46&t=DSX2Yul1qhDZka5 NXLVNRQ.

[27] *See* @McBrideLawNYC, X (July 7, 2023, 11:19 AM), https://twitter.com/McBrideLawNYC/status/1677336610692530177.

[28] *See* @McBrideLawNYC, X (July 11, 2023, 8:17 PM), https://twitter.com/McBrideLawNYC/status/1678921389665923072 ("Thank you @elonmusk for the retweet! It took a lot of work and coordination to make this interview happen. Watch out for our filing coming this week, where we show the world that @Cobratate & @TateTheTalisman are innocent!").

[29] *See* @TuckerCarlson, *Ep. 9 The Andrew Tate Interview,* X (July 11, 2023, 5:05 PM), https://twitter.com/TuckerCarlson/status/1678873144201818115?s=20, at 19:28-19:45.

case on Twitter and reaching out to press.[30] Then, on July 19, 2023, Mr. McBride posted a link on Twitter to a Google Drive ███████████ associated with this case which contained unredacted private information of Defendants ██████████.[31] Mr. McBride has over 105,000 followers on Twitter (and increasing with the publicity of this case).[32] Within just a few hours of Mr. McBride's publishing the Defendants' private information on Twitter, the tweet had received over 13,000 views.[33] Additionally, the Google Drive link Mr. McBride shared with thousands made the documents containing private information available for download. Accordingly, Mr. McBride's actions exposed the Defendants to harassment, physical harm, and identity theft.[34]

Andrew Tate then did an interview with Candace Owens, while still on house arrest, in which he repeated misinformation about the criminal case, smeared ████████████, and directed viewers to check out the Complaint in this case which had been posted to Twitter.[35] That video has been viewed nearly 5 million times on YouTube.[36] Following that interview, on August 5, 2023, Candace Owens did a follow up episode on her podcast wherein she read large

---

[30] *See* @McBrideLegalNYC, X (July 11, 2023, 8:17 PM), https://twitter.com/McBrideLawNYC/status/1678921389665923072 and @McBrideLegalNYC, X (July 19, 2023, 3:12 PM), https://twitter.com/McBrideLawNYC/status/1681743720243253248.
[31] *See* Exhibit C. Mr. McBride posted a twitter "thread" which contained a news release, a link to the complaint, and a link to google drive which contained all ███████████ ████████████████ which include private information of the Defendants including their phone numbers, dates of birth, names of family members, and passport information.
[32] *See* @McBrideLawNYC, X, https://twitter.com/McBrideLawNYC (last visited Sept. 7, 2023).
[33] *See* Exhibit C; *see also* Dani Pinter Declaration.
[34] *See also* FLA. STAT. ANN. § 817.568(4) (West 2021) ("Any person who willfully and without authorization possesses, uses, or attempts to use personal identification information concerning a person without first obtaining that person's consent, and who does so for the purpose of harassing that person, commits the offense of harassment by use of personal identification information, which is a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.").
[35] *See* Candace Owens Podcast, *Candace Owens x Andrew Tate: The Interview*, YOUTUBE (July 28, 2023) https://www.youtube.com/watch?v=d9_YWu9WAvg at 1:47-1:51.
[36] *Id.*

excerpts of the Complaint in this case, repeating the vile, outrageous, defamatory, and harassing

claims against ████████████████████.[37]

The Tate Brothers have a devoted following of millions,[38] and the interviews they gave

Tucker Carlson and Candace Owens increased their publicity.[39] Part of the Tates' business has

been to amass and train a large following of fans devoted to promoting (and defending) them on

social media.[40] The Tates have harnessed and unleashed their army of social media trolls[41] to

---

[37] *See* Candace Owens Podcast, *Candace Investigates Andrew Tate's "Victims"*, YOUTUBE (Aug. 5, 2023), https://youtu.be/XRcANlQIzm0?si=uZ5edXPRcyPi3j8z at 6:15 –1:00:00.

[38] *See* Plaintiffs' Complaint at ¶23; *see also* Sanya Burgess, *Andrew Tate: How the arrest of controversial influencer has impacted his Twitter following*, SKY NEWS (Apr. 29, 2023, 5:51 PM), https://news.sky.com/story/andrew-tate-how-the-arrest-of-controversial-influencer-has-boosted-his-twitter-following-12867054#:~:text=His%20profile%20spiked%20in%20popularity%20after%20three%20key%20events%20and,more%20than%206.4%20million%20followers; @Cobratate, X, https://twitter.com/Cobratate  (last visited Sept. 7, 2023) (showing 7.8 million followers); *and* @TateTheTalisman, X, https://twitter.com/TateTheTalisman (last visited Sept. 7, 2023) (showing 2.4 million followers).

[39] *See* @McBrideLawNYC, X (Aug. 6, 2023, 9:12 PM), https://twitter.com/McBrideLawNYC/status/1688357385482428416 (promoting an interview between Tucker Carlson and Tristan Tate).

[40] Shanti Das, *Inside the violent, misogynistic world of TikTok's new star, Andrew Tate*, THE GUARDIAN (Aug. 6, 2022, 12:28 PM), https://www.theguardian.com/technology/2022/aug/06/andrew-tate-violent-misogynistic-world-of-tiktok-new-star ("The coordinated effort, involving thousands of members of Tate's private online academy Hustler's University and a network of copycat accounts on TikTok, has been described by experts as a 'blatant attempt to manipulate the algorithm' and artificially boost his content. In less than three months, the strategy has earned him a huge following online and potentially made him millions of pounds, with 127,000 members . . . many of them men and boys from the UK and US.").

[41] *Id.* ("The posts do not come from Tate himself . . . but from hundreds of accounts, often using his name and photo, run by his followers – members of Hustler's University. Members, including boys as young as 13, are told they can earn up to £10,000 a month through lessons on crypto investing, drop shipping and by recruiting others to Hustler's University, earning 48% commission for each person they refer. To have the best chance of getting people to sign up, they are advised to stoke controversy to improve their chances of going viral. In one guide, Hustler's University 'students' are told that attracting 'comments and controversy' is the key to success: 'What you ideally want is a mix of 60-70% fans and 40-30% haters. You want arguments, you want war.'").

harass, intimidate, defame, terrify, and threaten ███████████████.[42]

These actions are not accidental or reactionary—they are a calculated strategy of harassment and intimidation meant to bully these witnesses out of cooperating in the Romanian criminal case. This is a pattern for Andrew Tate.[43] He once described a very similar campaign of harassment and doxxing against a man who said critical things about him online:

> Andrew Tate.: "I had some spare time and I decided to destroy his brand and do my absolute best to wreck his life. . . ."
>
> Richard Cooper: "But, you know, then you went like . . . full on . . . him, . . . you got his family involved. I think you mentioned his parents name."
>
> Andrew Tate: "Well I certainly got his family involved. They birthed scum Richard. They will pay."
>
> Richard Cooper: "How did you manage to include his family in a lawsuit? Like, like, how would they be involved with him running his mouth on Twitter? . . . ."
>
> Andrew Tate: " . . . Listen, I'm part of networks and groups. I'm part of organizations where I can drop a $20,000 prize and say, this Twitter tag, 20 grand with ideas and information that's going to destroy his life. It took . . .that's all I did. It took three minutes. I have his name, his address, his dad's job, his sister's bra size, you name it. . . ."
>
> Andrew Tate.: " . . . It took all of three minutes to get all the information and as for litigating his parents. . . . I don't need a reason. You're gonna have to defend yourself. **Regardless, that's the thing about the American legal system, you cannot ignore it. I don't care if it costs me a million dollars to take $1,000 out of your bank. You are gonna be in court twice a month for the rest of your human years. I don't care. I will sue you for any and every reason forever. And you're gonna have to hire lawyers and turn up for ever. I will do that. I'm that guy. I'm petty. I'm petty and I've got a lot of money and a lot of time. . . ."**[44]

The Tates are attempting to abuse the court system to smuggle in lies about Defendants

---

[42] *See* Exhibit B and Exhibit D.

[43] Das, *supra* note 42 ("In 2019, police were called after Tate showed up at the house of Mike Stuchbery, a journalist who had been critical about him online . . .").

[44] *PTW #57 – Andrew Tate – How to Destroy Haters*, YOUTUBE (Jan. 20, 2022), https://www.youtube.com/live/AkcC84AKVBU?feature=share.

that can then be shared on social media shielded from defamation claims using litigation privilege. However, most of the content is not properly documented or authenticated, and even includes blatant hearsay. See Compl. ¶¶49, 51, 58-59.  The Tates are actively engaging in obstruction of justice by litigation:  attempting to abuse the legal system as part of a larger strategy to destroy these women's lives for testifying about what they witnessed and experienced to law enforcement.

## II. LEGAL ARGUMENT

### A. Defendants Should be Permitted to Proceed Under Pseudonym Because Defendants' Privacy Rights Outweigh the Presumption of Openness in Judicial Proceedings.

Generally, a complaint must identify the names of all parties. *See* Fed. R. Civ. P. (10)(a). However, "[i]n some 'exceptional' cases, the public interest in knowing the identity of all the parties must yield 'to a policy of protecting privacy in a very private matter.'" *Freedom from Religion Found., Inc. v. Emanuel Cnty. Sch. Sys.*, 109 F. Supp. 3d 1353, 1356 (S.D. Ga. 2015) (quoting *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981)). A party may proceed anonymously by demonstrating "a substantial privacy right which outweighs the 'customary and constitutionally-imbedded presumption of openness in judicial proceedings.'" *Id.* (quoting *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992)).

Like most federal courts, the Eleventh Circuit uses a multi-factor balancing test, in which no one factor is dispositive, to determine whether a party should be allowed to proceed anonymously. *See Freedom from Religion Found., Inc. v. Emanuel Cnty. Sch. Sys.*, 109 F. Supp. 3d 1353, 1356 (S.D. Ga. 2015). The court first considers: "(1) whether the [parties] who seek anonymity are challenging governmental activity; (2) whether the prosecution of their suit compels them to disclose information of the 'utmost intimacy;' and (3) whether [the parties] will be compelled to admit their intention to engage in illegal conduct, thus risking criminal prosecution." *Id.* at 1356-57.

13

In addition, the court "should carefully review all the circumstances of a given case and then decide whether the customary practice of disclosing the [party]'s identity should yield to the [party]'s privacy concerns." *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992). For example, courts have also considered whether the parties are minors, whether proceeding under their own names puts them at risk for violence or physical harm, and whether it would be fundamentally unfair to the opposing party to allow them to proceed anonymously. *See Plaintiff v. Francis*, 631 F.3d 1310, 1316 (11th Cir. 2011).

In *Plaintiff v. Francis*, the Eleventh Circuit considered whether "denying the plaintiffs anonymity at trial [would] require them to disclose information of utmost intimacy[.]" 631 F.3d 1310, 1316 (11th Cir. 2011). The appellate court stated that "[t]he issues involved in this case could not be of a more sensitive and highly personal nature — they involve descriptions of the [p]laintiffs in various stages of nudity and engaged in explicit sexual conduct while they were minors who were coerced by the [d]efendants into those activities." *Id*. at 1317. The court determined that the defendants would not be harmed by the plaintiffs proceeding anonymously because they already knew the plaintiffs' identities and could "conduct[] a full range of discovery in building a defense at trial." *Id*. at 1319. In vacating the district court's denial of the plaintiffs' motion to maintain their anonymity, the Eleventh Circuit concluded that the lower "court failed to give due consideration to the concerns the [p]laintiffs raised about being forced to maintain the suits in their own names." *Id*. at 1319.

Likewise, in the present case, Plaintiffs are publicizing information "of utmost intimacy," namely, Defendants' status as victims of sexual assault and trafficking, their roles in the Romanian prosecution, along with alleging "facts" involving Defendants' previous sexual relationships, including those of ████████ while she was a minor. Defendants are concerned that further

14

litigation of this matter will certainly involve the disclosure of information "of utmost intimacy" if they are not allowed to proceed pseudonymously. Furthermore, the Plaintiffs have already demonstrated their intention to post publicly on social media and in media interviews alleged intimate personal details regarding Defendants. Given the sensitive nature of the criminal case, as well as past sexual crimes committed against ███████ when she was a minor, which comprise the heart of the Plaintiffs' Complaint, the need for protecting the Defendants' true identities is even more pronounced. The Plaintiffs' actions thus far demonstrate the Defendants' personal safety is jeopardized by keeping their names public in this case.

Thus, to maintain their privacy and safety, the Defendants should be permitted to proceed pseudonymously in this lawsuit. *See Doe v. Barrow Cty*., Ga., 219 F.R.D. 189, 193 (N.D. Ga. 2003) (allowing plaintiff to proceed anonymously with challenge to religious monument because of fears for her safety in the community). It is appropriate for the Court to assess "whether [a Party] has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).  Here, Defendants have asserted privacy rights, such as protecting them from:  being re-traumatized as survivors of and witnesses to sex trafficking, exposure to public ridicule and scorn, the association of their names online with the abuse they suffered, and safety concerns related to the Tates and their followers online. These considerations substantially outweigh the presumption of open judicial proceedings.

Moreover, the Plaintiffs will not be prejudiced. The Plaintiffs know the identities of all the Defendants as they were named in this lawsuit against them. In requesting the protection of pseudonyms, the Defendants simply seek redaction of their personal identifying information from the public docket and a protective order against publishing the Defendants' true identities and

personal identifying information for their safety and security and to prevent further harassment.

**B. The Court Should Issue a Protective Order Pursuant to Fed. R. Civ. P 5.2 Because Good Cause Exists Due to Demonstrable Injury to Defendants.**

The Defendants in this matter face a true, tangible risk of danger, revictimization, and permanent injury if the Tates are permitted to continue to publicly release, either through social media or public filings, the unnecessary and irrelevant private and highly sensitive personal details of the Defendants. Allowing the Tate Brothers to litigate this case without protections in place poses a threat not only to the Defendants, but to the integrity of the United States judicial system. As such, good cause exists for this Court to issue a protective order to seal from public view any court filings, or any personal or intimate private information contained in present or future filings regarding any of the Defendants throughout this case and thereafter.

Federal Rule of Civil Procedure 5.2(d) provides that "the court may order that a filing be made under seal without redaction." The Advisory Committee Notes state that this rule "does not limit or expand judicially developed rules that govern sealing." Federal Rule of Civil Procedure 5.2(e) further provides that, "For good cause, the court may by order in a case: (1) require redaction of additional information; or (2) limit or prohibit a nonparty's remote electronic access to a document filed with the court." The Eleventh Circuit and district courts in Florida have addressed the sealing of case files and documents from public view in various contexts.

"Material filed in connection with any substantive pretrial motion, unrelated to discovery, is subject to the common law right of access." *Romero v. Drummond Co., Inc.*, 480 F.3d 1234 (11th Cir. 2007); *Chicago Tribune,* 263 F.3d at 1312 (difference between "material filed with discovery motions and material filed in connection with more substantive motions"); *see also Leucadia, Inc. v. Applied Extrusion Techs., Inc.,* 998 F.2d 157, 164 (3d Cir.1993) ("[T]here is a presumptive right of public access to pretrial motions of a nondiscovery nature, whether

preliminary or dispositive, and the material filed in connection therewith."). A motion "presented to the court to invoke its powers or affect its decisions," whether or not characterized as dispositive, is subject to the public right of access. *United States v. Amodeo,* 71 F.3d 1044, 1050 (2d Cir.1995); *see also Leucadia,* 998 F.2d at 164 (common law right applies to motion to approve settlement agreement); *In re Cont'l Ill. Sec. Litig.,* 732 F.2d 1302, 1309 (7th Cir.1984) (right of access applies to motion to terminate derivative claim).

However, the common law right of access may be overcome by a showing of good cause, which requires "balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential." *Chicago Tribune,* 263 F.3d at 1309. "[W]hether good cause exists . . . is . . . decided by the nature and character of the information in question." *Id.* at 1315. The Eleventh Circuit set forth a non-exclusive list of factors for courts to consider when determining if there is good cause to seal documents that are filed with the Court. Those factors are: (1) "whether allowing access would impair court functions or harm legitimate privacy interests"; (2) "the degree of and likelihood of injury if made public"; (3) "the reliability of the information"; (4) "whether there will be an opportunity to respond to the information"; (5) "whether the information concerns public officials or public concerns"; and (6) "the availability of a less onerous alternative to sealing the documents." *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1245 (11th Cir. 2007).

Courts also consider "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records." *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir. 1983) (citing *Nixon*, 435 U.S. at 596-603 & n.11). Further, a party's privacy or proprietary interest in information sometimes overcomes the public's interest in accessing the

information. *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 598 (1978); Arthur R. Miller,

*Confidentiality, Protective Orders, and Public Access to the Courts,* 105 HARV. L. REV. 427,

464–74 (1991). Ultimately, this decision "is in the court's discretion in light of the facts and

circumstances of the particular case." *MSP Recovery Claims, Series LLC,* 2017 WL 6622648 at

*2 (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978)). This Court has held that

great weight should be given to the privacy interests at stake when criminal witnesses identities

are disclosed because this could, "impede the ongoing investigation through obstruction of

justice and witness intimidation or retaliation." *In re Sealed Search Warrant*, 622 F. Supp. 3d

1257, 1263 (S.D. Fla. 2022).

 The *Romero* factors overwhelming weigh in favor of protecting the privacy interests of the

Defendants in this case, for four main reasons. First, the Plaintiffs have already demonstrated that

they will dig up and publish any private, intimate detail they can find about Defendants no matter

how scandalous and no matter its source. The Plaintiffs have already violated the privacy rights of

█████████ by exposing her identity as a child victim of a sexual crime – privacy rights which

were protected by the Florida judicial system. The Plaintiffs have violated the privacy rights and

protections granted to ███████████████ by the criminal court in Romania for victims of

sexual crimes. Additionally, the Plaintiffs' lawsuit, and their sham "investigations" to support it,

violate the terms of their release from house arrest which forbids any contact with witnesses,[45] and

directly interfere with the Romanian prosecution of the Tates. The Plaintiffs' desire to use the

American civil justice system to carry out their witness-tampering scheme should not be allowed

to harm ███████████████ legitimate privacy interests.

---

[45] *See* Exhibit E, a translated copy of the Tates release terms. (The Bucharest Court of Appeals
ordered the Plaintiffs not to communicate with ███████████████, or their family
members, "directly or indirectly, in any way.")

Second, the campaign of harassment online, the demand letter sent to ████████ and her parents in January, the dissemination of Defendants' identities, personal information, and graphic (largely untrue and exaggerated) details about their private/sexual lives, as set forth in detail above, have already resulted in serious injury to the Defendants who have been forced into hiding, face daily harassment, and have suffered irreparable reputational harm. This pattern of behavior demonstrates that Plaintiffs will not act in good faith[46] in this case but will take every opportunity to use the American legal system as another weapon, as a feeder for social media content with which to bludgeon the Defendants, and attempt to disrupt the ongoing criminal case. The likelihood of injury if details regarding the Defendants are made public is certain.

Third, the information contained in the Plaintiffs' complaint is completely unreliable. As discussed above, most of the "facts" alleged by Andrew and Tristan Tate derive from patently meritless assertions by Mr. Fisher in his complaint against ████████. Mr. Fisher's complaint includes numerous sordid tales of ████████ former male adult partners, alleging details concerning multiple nonparties, all while ████████ was under the age of consent. *See* Fisher Complaint, ¶32-51. Mr. Fisher contorts these (and his own) clear statutory rapes of then-minor ████████ into tales in which ████████ is the offender and predator, going as far as naming ████████ an extortionist and blackmailer. *Id.* at ¶¶56-57. Despite this allegation, neither Mr. Fisher, nor the Tate Complaint citing the Fisher Complaint, allege any facts that ████████ sought to gain anything of value from any of these men; in reality, she was a vulnerable *child* who was habitually abused and assaulted by predatory adult men. Fisher's unreliable narrative is repeated and exaggerated by the Tates Complaint. For example, the Tate Complaint includes a

---

[46] Joseph McBride has made repeated derogatory statements online regarding ████████ potentially in violation of S.D. Fla. R. 77.2(c)(4) and R. 77.2(g)(2). *See e.g.* https://twitter.com/McBrideLawNYC/status/1682581350396641280.

header, "***Marlin Fisher is Induced into a Sexual Relationship with E. Gabbey and Then Extorted***", and describes Ms. Gabbey as working a "fraudulent scheme," despite there being no facts alleged within the Fisher Complaint that ████████ ever requested, sought, threatened, or received any tangible benefit from Mr. Fisher. Compl. ¶¶45-46. Such unreliable information, which is false, irrelevant to Plaintiffs' claims, as well as scandalous and damaging to the Defendants, warrants no protection from this Court and no public concern is compromised by its sealing.

And finally, the Plaintiffs know the Defendants' identities and neither allowing Defendants to proceed under pseudonym, nor issuing a protective order preventing disclosure of private information to the public will impede the Plaintiffs' ability to litigate this case. Additionally, the information Defendants seek to seal from public view concerns their personal information with no public relevance, and any interest is outweighed by their privacy interests and preserving the integrity of the ongoing Romanian criminal case. The Court has discretion to craft the requested protective order as narrowly as warranted to balance the interests at stake. Therefore, the balance weighs heavily in favor of protecting the Defendants' identities and private information for their protection and so not to "impede the ongoing investigation through obstruction of justice and witness intimidation or retaliation." *In re Sealed Search Warrant*, 622 F. Supp. 3d 1257, 1263 (S.D. Fla. 2022).

## III. CONCLUSION

WHEREFORE, premises considered, the Defendants respectfully move this Honorable Court to permit them to proceed pseudonymously throughout this litigation and to enter a protective order to protect their information and to prevent further dissemination of sensitive case information by the Plaintiffs.

According to Rule 7.1(a)(3) Counsel for the Defendants have conferred with Counsel for the Plaintiffs in a good faith effort to resolve the dispute raised in this motion and was unable to do so.

Date: September 8, 2023

By:  /s/ Danielle Bianculli Pinter
Danielle Bianculli Pinter
Fla. Bar No. 120441
Benjamin W. Bull*
Peter A. Gentala*
Christen M. Price*
Victoria Hirsh*
**National Center on Sexual Exploitation**
1201 F. St., NW, Suite 200
Washington, DC 20004
dpinter@ncoselaw.org
bbull@ncose.com
pgentala@ncoselaw.org
cprice@ncoselaw.org
vhirsch@ncoselaw.org
Telephone: 202-393-7245

Jillian Roth, Esq. [FBN 1036053]
**Laffey, Bucci & Kent, LLP**
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
jroth@laffeybuccikent.com
Telephone: 215-399-9255
Fax: 215-241-8700

Christian W. Waugh [FBN 71093]
Mary A. Norberg [FBN 1032028]
Sofie Bayer [FBN 1039616]
**WAUGH PLLC**
201 E. Pine Street, Suite 315
Orlando, FL 32801
cwaugh@waugh.legal
mnorberg@waugh.legal
sbayer@waugh.legal
Telephone: 321-800-6008
Fax: 844-206-0245

*Attorneys for Defendants*

*Admitted* pro hac vice.

## Certificate of Service

I hereby certify that on September 8, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF and an unredacted copy of the foregoing document is being served this day on all counsel of record in the conventional manner according to Rule 5.4 and Rule 9B of the CM/ECF Administrative Procedures.

## SERVICE LIST

Thomas Maniotis
Equity Legal, PLLC
5201 Blue Lagoon Dr., Flr. 8
Miami, FL 33126
321-313-8642
tamaniots@equitylegal.net

Joseph D. McBride
The McBride Law Firm, PLLC
99 Park Avenue, 6th Flr.
New York, NY 10016
917-757-9537
Jmcbridelawnyc.com

*Attorneys for Plaintiffs*