## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:23-CV-81150-RLR

ANDREW TATE & TRISTAN TATE

                    Plaintiffs,

      v.

EMMA GABBEY, et al.,

                    Defendants,

_____/

### ANDREW AND TRISTAN TATE'S MOTION FOR REMAND
### AND SUPPORTING MEMORANDUM OF LAW

Plaintiffs Andrew Tate and Tristan Tate ("Plaintiffs"), under 28 U.S.C. § 1447, hereby move to remand this case to the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida ("Florida State Court"), and proffer the following memorandum of law support of their claims:

### INTRODUCTION

Under Florida state law, plaintiffs have asserted eight claims against Defendants related to a series of statements that began in April of 2022. Defendants, in their Notice of Removal, concede at least three of the group, Mona Gabbey, William Gabbey, and Matthieu Martelly, are citizens of Florida, the forum state, and that Plaintiffs are residents of Romania.[1] Plaintiffs have been domiciled in Romania since 2015, and are not domiciled in the United States. (See Affidavits of Plaintiffs attached hereto as Ex. C). Due to the domicile and residence of Andrew Tate and Tristan Tate, the Plaintiffs have rightfully filed their action in the Florida State Court.

---

[1] See ("Notice") (Dkt. 1 at ¶¶ 15; See also Ex. A); See also Plaintiffs, in their Amended Notice of Removal ("Amended Notice"), which also states, "[a]s alleged in their Amended Complaint, the Plaintiffs Andrew and Tristan Tate reside in Romania." (Dkt. 22 at ¶¶ 15; See also Ex. B).

1

In their Response to this Honorable Court's Show Cause Order, Defendants assert a series of inflammatory allegations unsupported by facts, irrelevant to showing cause, and contradicted by all the available evidence in this case. Plaintiffs will briefly address these spurious allegations here while respectfully reserving the right to address them comprehensively later, should this Honorable Court deem necessary.  First, Andrew and Tristan Tate are the Plaintiffs and victims in the matter before the court.  The Defense's incessant need to paint the Defendants as victims should cease immediately.  Second, it is inferred and accepted that when a lawyer represents to an American court of law that a person has an open or active criminal case, the inference is that said criminal case is domestic. Therefore, at the outset, it is crucial to underscore that neither Andrew nor Tristan Tate are defendants in any criminal case anywhere in the United States of America. Defendants, therefore, are not entitled to special treatment of any kind from this Honorable Court. Third, while it is true that the Plaintiffs have been charged in Romania, those charges are unsubstantiated and based on a series of malicious and defamatory lies that are contradicted by the bulwark of evidence supporting the Plaintiffs' claims in the matter before this Honorable Court. Fourth, Andrew and Tristan Tate's rights as American Citizens are not diminished by what occurs in Romania.  Fifth, it is incontrovertible that Defendant Emma Gabbey was in Romania for six days in April of 2022, where she was free to come and go as she pleased at the Plaintiffs' Romanian Estate.  This claim is supported by CCTV footage showing Defendant E. Gabbey entering and exiting the Tate Estate at will. [2]  Despite this, Defendant E. Gabbey made a series of sworn statements to the Romanian Court suggesting that she was held captive.  This example is one of a series of defamatory lies that impeach the veracity of the foreign case and E. Gabbey's credibility.

---

[2]*See* video of girls freely entering and exiting Andrew and Tristan Tate's Romanian Estate, https://drive.google.com/file/d/1CIT3fPAXnG0-UuxbXUL6F211jBHO8pMa/view.

## FACTS RELATED TO PROCEDURAL HISTORY

In January 2023, Plaintiffs, through counsel, contacted Served Forum Defendants and Defendant, E. Gabbey, to initiate a good faith dialogue regarding false allegations made against Plaintiffs by Defendants, which received no response. As a result, Plaintiffs filed a lawsuit against the Defendants on July 11, 2023, which was amended on July 12, 2023.  In the Amended Complaint, Plaintiffs assert claims against Defendants for Defamation (Count I), Defamation Per Se (Count II), Commercial Defamation (Count III), False Imprisonment (Count IV), Tortious Interference with a Business Relationship (Count V), Civil Conspiracy (Count VI), Intentional Infliction of Emotional Distress (Count VII), and Negligent Infliction of Emotional Distress (Count VIII). Dkt. 1, Ex. A, at ¶¶ 112-49 of Amended Complaint.

On July 11, 2023, Plaintiffs filed an unsigned Summons in Florida State Court, requesting that the Court issue a signed summons to facilitate service, as well as filed a Complaint on the same date. The Florida State Court then issued a signed summons on July 12, 2023. Upon issuance of the summons, Plaintiffs effected proper service upon Served Forum Defendants at their place of abode in Palm Beach County, on July 17, 2023, in compliance with Florida Rules of Civil Procedure. The affidavit of service is attached hereto as Exhibit D.

These allegations arise from, *inter alia*, Defendants' unlawful, malicious, reckless, and intentional conduct of falsely accusing Plaintiffs of human trafficking, among other crimes. *Id.* Defendant, E. Gabbey, also has another lawsuit pending in Florida State Court for extortion, conspiracy to commit extortion, intentional infliction of emotional distress, and abuse of process, which Plaintiffs anticipate will include several of the same witnesses as this pending case. (Ex. E, Pg. 3).

On July 17, 2023, Served Defendants were properly served a copy of the Complaint and

Amended Complaint. On the last day to answer the Amended Complaint, counsel for Served Forum Defendants filed inconsequential papers with the Florida State Court, which also requested a thirty (30) day extension to respond to the Amended Complaint. The additional thirty (30) day extension was requested, by motion, even though counsel for Defendants knew about the lawsuit almost immediately after it was filed, as shown by Danielle Pinter's quotes in the news articles. (Ex. F).

Attorneys for the Defendants have refused to respond to the impending lawsuit. Upon counsel for Plaintiffs notifying Defendants' counsel that the filing of such inconsequential papers did not toll proceedings and the matter would be proceeding forward due to the damages accruing, the Defendants erroneously filed a removal of this case, in what appears to be an effort to toll proceedings at the Florida State Court level until a motion for remand can be heard by this Court.

The Notice filed by Defendants also indicates that Defendants E. Gabbey, Matthieu Martelly, and Aliona Untila (collectively "Unserved Defendants") have not been served. This is for good reason, as Unserved Defendants are concealing themselves even by admission of their own attorney. Counsel for Defendants has also refused to answer, on several occasions, whether she represents the other Unserved Defendants, E. Gabbey and Aliona Untila, in this matter, and whether or not counsel would accept service on their behalf. However, in the same news article, attorneys for Defendants clearly indicate that they represent at least E. Gabbey and Aliona Untila, although they are not mentioned by name in the article. *Id*. Furthermore, in the same news article, counsel for Defendants can be quoted as indicating that the Defendants, E. Gabbey and Aliona Untila, are concealing themselves, which counsel appears to be actively assisting in such Defendants avoiding service of process. *Id*.

In addition, the Notice clearly indicates where Served Forum Defendants reside and

Unserved Defendant, Matthieu Martelly, but conveniently leaves out where E. Gabbey and Aliona Untila reside, except to reference generally of their citizenship. Counsel for Unserved Defendants, E. Gabbey and Aliona Untila, continually disregard the question of representation and acceptance of service. In its Order to Show Cause, this Court identified that Defendant E. Gabbey was not listed as a resident anywhere in the world. (Dkt. 1 at ¶¶ 15). In Defendants' Amended Notice, they list E. Gabbey's state of residence, but apparently blacked it out to continue to hide such from the court and opposing counsel.  In conjunction with the past conduct of counsel for Defendants, this can only be interpreted as counsel actively concealing the location of Defendants, E. Gabbey and Aliona Untila, to avoid service and slow the progression of this matter.

Moreover, the Notice of Removal further inaccurately claims that E. Gabbey is not a resident of the State of Florida. *Id*. However, based on all information compiled by investigators in preparation to serve her, she is a resident of Palm Beach County, Florida.  As such, Plaintiffs have caused to be filed an affidavit of diligent search for Unserved Defendant, E. Gabbey. (Ex. G). Plaintiffs have also attached other information compiled during the search evidencing Florida as the residence of E. Gabbey.

All actions taken by counsel for Defendants after the filing of this lawsuit in Florida State Court have been taken for the obvious purpose to delay the matter from proceeding, including concealment of Unserved Defendants and insignificant eleventh-hour filings requesting additional time. This Notice and attempted removal is no different and serves no other purpose than to delay Plaintiffs pursuing their claims.

**FACTS RELATED TO THE CASE OF KENNETH MARLIN FISHER VS. EMMA GABBEY AND DANI PINTER**

Next of pertinent discussion is the Florida State Court case filed by Kenneth Fisher ("Mr. Fisher") against E. Gabbey, which does include Danielle Pinter ("Ms. Pinter") as a Defendant and leads to her accusing Attorneys for Plaintiffs of being "unethical" and "reckless" as well as claiming that Mr. Fisher's own information and information E. Gabbey gave access to was somehow "illegally" obtained. E. Gabbey has repeatedly harmed Mr. Fisher on several occasions and even went as far as to file a fabricated restraining order against him, when he did not comply with her demands.[3] The following admissions by E. Gabbey in a text exchange with Mr. Fisher clearly demonstrates that E. Gabbey weaponized the justice system against Mr. Fisher to suit her own needs by constructing and masterminding a "completely false narrative" under oath. The following exchange regarding the filed restraining order reads, in pertinent part, as follows:

> M. Fisher: **"The things I remember being on it were that I - was a heavy user of illicit drugs - would beat you when you tried to leave - restrained you from leaving or calling the cops - often left you on the side of the highway if you said anything to upset me."**
> M. Fisher: "- and that I had been stalking you and showing up places that I knew you would be after you ended things."
> E. Gabbey: **"that's so fucked up that i wrote that. i'm going to clear this up."**
> E. Gabbey: "not to defend any of this but to clarify i promise i never said you were a user of drugs…"
> M. Fisher: "You weren't the one writing it?"
> E. Gabbey: "the things i were definitely reworded and exaggerated. they asked me of events and then they reworded my words in the official injunction document. i was brought in to speak to two lawyers. (the legal aid who had just finished law school that was defending me & her colleague who was training her)."
> E. Gabbey: "**I am incredibly sorry that what I said encapsulated a completely false narrative. Especially that paints you as a terrible person because you aren't. You never deserved to be treated that way. Nobody does.**"
> E. Gabbey**: "None of it was okay. Absolutely none of it. Is there anything you can think of that i can do to prove that I understand that and truly am repentant?**" [Emphasis Added.][4]

After the expiration of the restraining order (not to mention E. Gabbey contacted Mr. Fisher, prior to the expiration of the restraining order, which he ignored according to law), E.

---

[3] A copy of the restraining order is attached hereto as Exhibit E, Pg. 75 of the Redacted Exhibits to Plaintiffs' Amended Complaint.

[4] See Exhibit G, Text Message Conversation from Marlin Fisher.

Gabbey came back into contact with Mr. Fisher and initiated a sexual relationship. On or about February 19, 2023, Mr. Fisher inquired into E. Gabbey's allegations against the Plaintiffs, as the story unfolding about the Plaintiffs sounded eerily familiar to him. When Mr. Fisher said he was going to speak up about E. Gabbey's history of lying and false accusations, E. Gabbey tried to silence Mr. Fisher by implying that she would have to make known that he statutorily raped her, after she induced him into the sexual relationship by lying about her age! These types of lies and coercion have been extensively outlined in Kenneth Fisher's lawsuit.[5]

Counsel for the Defendants, Ms. Pinter, has falsely accused Plaintiffs' Attorneys of filing an "illegal" and "unethical" lawsuit, as well as being "reckless." This attempt to defame the undersigned counsels will not be tolerated especially because Ms. Pinter has sent extortionate correspondence to a potential witness for the Plaintiffs, which resulted in the lawsuit against her and is a result of her reckless conduct. Never has counsel for Plaintiffs seen such unethical correspondence from an attorney, which threatens to expose a witness to embarrassment or shame, while also threatening to harm his relationships and livelihood, if the witness did not keep what he knew to himself concerning E. Gabbey's character and prior false allegations against a slew of both males and females. (A true and correct copy of the email sent to Kenneth Fisher is attached hereto as Exhibit H.) Ms. Pinter's accusations against attorneys for Plaintiffs seems to be self-reflective of her own behaviors. The language of the email from Ms. Pinter to Mr. Fisher is as follows:

> Mr. Fisher,
>
> My client Emma Gabbey has made me aware you are considering conspiring with bad actors associated with the Tate brothers in their effort to harrass [*sic*] and defame my client. I am putting you on notice that my client is a key witness in active, international criminal investigations and this effort by Mr. Ahmed and the Tates is a conspiracy to silence her and amounts to witness tampering. If you participate in this effort I will immediately

---

[5] See Exhibit E, Redacted Exhibits of Tate Lawsuit, Pg. 3.

report you to federal law enforcement as part of the conspiracy. And we will include you in the civil action we are preparing aginst [*sic*] these parties causing my client grave harm.

**I am also aware you committed statutory rape against my client. Although you seem to feel insulated from repercussions because time has passed if you take any actions to further the harrassment [*sic*] and attacks on my client we will be forced to make the media, your employers and your community aware that you had sex with a minor** and we will commit ourselves to fully investigating your actions before and after your abuse of our client and pursue all legal remedies available.

Please cease and desist any involvement with Sulamain Ahmed or any associate of the Tate brothers engaging in harassment, defamation, disclosing of private info, and witness intimidation against our client immediately.

-Dani Pinter

These are the facts of what Ms. Pinter has done. Pinter, therefore, appears to be misleading the court by using catchy words such as "unethical" and "illegal" to describe the Plaintiffs' Attorneys, when attorneys for Plaintiffs have behaved in no such manner. In fact, the clear example of these actions is that of Ms. Pinter and her clients, as they try to conceal the truth about E. Gabbey's extensive history of lying and false allegations. Ms. Pinter actually accused Mr. Fisher of "harassment, defamation, disclosing of private info, and witness intimidation," which is a complete and utter mischaracterization of what happened between Mr. Fisher and E. Gabbey. The text messages between Mr. Fisher and E. Gabbey show clearly that E. Gabbey attempted to intimidate Mr. Fisher as follows:

**Fisher:** "Umm, it sounds like you should come clean then? Apologize, state you have a problem, and need help. No?"
**E. Gabbey:** "Come clean for what?"
**E. Gabbey:** "I didn't do anything wrong."
**Fisher**: "okay, well. I've been asked to provide anything I still have from when we dated. What I have from that time is a backup of my phone documenting everything you said about a ton of people (including 2 separate rapes) and a backup of your phone talking to all these people (including the 2 guys that clearly didn't do anything). What do you think the right thing for me to do is?"
**E. Gabbey:** "You fucked me and dated me knowing I was 17 years old."
**E. Gabbey:** "We can play that game, but it's pointless. I'm literally trying to aid women to be freed of human traffickers."
**Fisher:** "You pretended to be 23 and the statute of limitations on your deception has past. Regardless of which, if you have a history of completely fabricating terrible shit and I have proof of it then it is the right thing to do to provide that."
**E. Gabbey**: "You found out I was 17 and stayed with me. This is so heartbreakingly awful."

**E. Gabbey**: "No reason to keep messaging. You're already doing what you're going to do. I have to do my best to not only protect these women and give them an opportunity to actually get help and be safe, but to do the right thing and be honest about everything I saw."

Fisher: "What are you talking about? And, It might be true that you're trying to help people, but you're trying to do it in a dishonest way. Guess you never changed at all."

**E. Gabbey**: "If this is the route you want to go, then okay. It's really sad but I wish you the best either way."

**E. Gabbey**: "I'm not doing anything dishonestly??"

**Fisher: "I'm not playing along with anything, I was asked about your credibility. To that end, I can answer. I can not answer to anything else. Including your experience in Romania, but I learned a very long time ago not to believe a word you say."[6]**

On the same day, immediately following this discussion, is when Mr. Fisher received the extortionate email from Ms. Pinter attempting to stop Mr. Fisher from turning over information of E. Gabbey's complete lack of credibility and lies, evidence of prior false allegations, and saying what he knew about her deceitful conduct. Florida's extortion statute reads as follows:

"Whoever, either verbally or by a written or printed communication, maliciously threatens to accuse another of any crime or offense, or by such communication maliciously **threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another**, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, **or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will**, shall be guilty of a felony of the second degree.."

Fla. Stat. § 836.05.

## ARGUMENT

### I. The Foreign Domicile of Romania Barred Defendants from Removing This Case

Defendants were not permitted to remove this case because Plaintiffs are domiciled in Romania and are "stateless" under Federal law.

It is well-settled law that, in applying Section 1332(a), there must be complete diversity between the parties. *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1557 (11th Cir. 1989). Courts have further opined that "[a]n individual who is a dual citizen of the United States and another nation is only a citizen of the United States for the purposes of diversity jurisdiction under § 1332(a)."

---

[6] See Exhibit I, Text Message Exchange Between Fisher and E. Gabbey regarding her being truthful.

*Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1341 (11th Cir. 2011). However, U.S. citizens who are domiciled outside of the United States are "'stateless' and cannot satisfy the complete diversity requirement . . . against a United States citizen." *King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1170 (11th Cir. 2007) (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 828, 109 S.Ct. 2218, 2221, 104 L.Ed.2d 893 (1989)).

The Plaintiffs have clearly pled that they are residents of a foreign state, Romania.  Therefore, this Court does not have jurisdiction over the instant case.  For this reason alone, the case should be remanded to Florida State Court.

## II.    The Forum-Defendant Rule Barred Defendants from Removing This Case

Defendants were not permitted to remove this case because there are Defendants that are residents of the forum state that have been properly joined and served before the filing of the Notice of Removal.

It is a well-established rule that removal statutes should be construed narrowly, with doubts resolved against removal. *See Allen v. Christenberry*, 327 F.3d 1290, 1293 (11th Cir. 2003); *see also Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996) ("The removal statute should be construed narrowly with doubt construed against removal."). The forum-defendant rule prohibits removal in diversity cases if one of the defendants is a citizen of the forum state. It states that a diversity case "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). As the Supreme Court has explained, "[d]efendants may remove an action on the basis of diversity of citizenship if there is complete diversity between all named plaintiffs and all named defendants *and no defendant is a citizen of the forum State*." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 84 (2005) (emphasis added); *accord Moore v. N. Am. Sports, Inc.*, 623 F.3d 1325, 1328 (11th Cir. 2010). As this Court has recognized, "[r]emoval is 'intended to protect out-of-state defendants

from possible prejudices in state court.'" *Carpenter v. Apotex Corp.*, No. 08-60526-CIV, 2008 WL 11332029, at *2 (S.D. Fla. Aug. 7, 2008) (quoting *Lively v. Wild Oats Markets, Inc.*, 456 F.3d 933, 940 (9th Cir. 2006)). In light of this, "[t]he purpose of the forum state defendant rule is to allow plaintiffs to choose a forum because a forum state defendant does not need the protection of removal rights." *Id.* at 2.

Defendants appear to be relying on the meritless argument that Served Defendants "have not been properly joined." This flies in the face of case law and the facts of this case.

As stated *supra*, the forum defendant rule states that a diversity case "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). Courts have interpreted the purpose of the "properly joined" language "to prevent a plaintiff from blocking removal by joining as a defendant a resident party against whom [the plaintiff] does not intend to proceed, and whom [the plaintiff] does not even serve." *Goodwin v. Reynolds*, 757 F.3d 1216, 1221 (11th Cir. 2014), citing *Sullivan v. Novartis Pharm. Corp.*, 575 F.Supp.2d 640, 644 (D.N.J.2008).

In *Rising Phoenix Holding Corp. v. Ross*, a similar issue was presented before the United States District Court, S.D. Florida, and the court's order, relied heavily on *Goodwin* stating specifically that, "[T]he purpose of the language [properly joined] is 'to prevent a plaintiff from blocking removal by joining as a defendant a resident party against whom [the plaintiff] does not intend to proceed, and whom [the plaintiff] does not even serve.... We find this interpretation persuasive." No. 22-62147-CV, 2023 WL 3032095, at *1 (S.D. Fla. Apr. 21, 2023).

In the instant case, not only have the Served Forum Defendants been properly served, but they are almost at the very center of the false allegations against the Plaintiffs. Thus, the Plaintiffs intend to pursue the Served Forum Defendants and the Unserved Defendants to the fullest extent permitted by law. This is evident from a plain reading of the Complaint, which centers around the

Served Forum Defendants and their daughter, E. Gabbey, conspiring with other actors to spread false information about Plaintiffs. In this case, not one Defendant has even tried to rectify the destruction caused by their false allegation and information spreading, even as the Plaintiffs sat in a Romanian jail for several months, confined to house arrest for even more time, and eventually moved to supervised release as the Romanian government unravels the web of false allegations told by Defendants.

In addition to Plaintiffs being residents of Romania, the forum-defendant rule likewise bars the Defendants from removing this case. Defendant concedes that "Defendants Mona and William Gabbey are residents of Palm Beach County, Florida." (Dkt. 1, Ex. A). They are, therefore citizens of Florida, the forum state, and Defendants were thus not permitted to remove this case. *See* 28 U.S.C. § 1441(b)(2); *Daviero*, 2011 WL 1304640; *Int'l Marine Underwriters*, 2016 WL 11431679; *Schewe*, 2009 WL 10667797; *Plombco Inc.*, 2013 WL 5863571.

The same conclusion follows here, namely—the case should be remanded.

### III.  Martelly is Not Entitled to Removal of this Action under Section 1442(a) because Martelly was not Acting Under the Color of Office and Does Not have a Colorable Defense

As argued in the Response to Show Cause Order, Defendant Martelly is not entitled to remove this action under Section 1442(a) because he was not acting under the color of his office and does not have a colorable defense, assuming *arguendo* that he is a Marine Reservist.

28 U.S. Code § 1442(a)(1) provides that "a civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

"(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or

individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue."

The Eleventh Circuit follows the precedent established by the Supreme Court, which held that "[t]here must be [a] causal connection between what the officer has done under asserted official authority and the state prosecution." *Maryland v. Soper,* 270 U.S. 9, 33, 46 S.Ct. 185, 190, 70 L.Ed. 449 (1926).

Proper removal of an action under section 1442(a)(1) has historically required the satisfaction of two separate requirements.  First, the defendant must advance a "colorable defense arising out of [his] duty to enforce federal law." *Mesa v. California*, 489 U.S. 121, 133, 109 S.Ct. 959, 966–67, 103 L.Ed.2d 99 (1989) (quoting *Willingham*, 395 U.S. at 406–07, 89 S.Ct. at 1816).  That defense need only be plausible; its ultimate validity is not to be determined at the time of removal. *Id*. at 129, 109 S.Ct. at 964.  However, absent the assertion of a federal defense, a state court action against a federal officer is not removable. *Id*.

Second, the defendant must establish that there is a "causal connection between what the officer has done under asserted official authority" and the action against him.  *Maryland v. Soper*, 270 U.S. 9, 33, 46 S.Ct. 185, 190, 70 L.Ed. 449 (1926) (interpreting predecessor statute); see also *Willingham*, 395 U.S. at 409, 89 S.Ct. at 1817.  However, the Supreme Court has held that, in a civil suit such as this, it is sufficient for the defendant to show that his relationship to the plaintiff "derived solely from [his] official duties."  *Willingham*, 395 U.S. at 409, 89 S.Ct. at 1817.  In such a case, the causal connection requirement "consists, simply enough, of the undisputed fact that [the defendant was] on duty, at [his] place of federal employment, at all the relevant times." *Id*.

Furthermore, in *Naas v. Mitchell*, the court opined that "[u]nder both section 1442a and section 1442(a)(1) removal is authorized where the act complained of was under color of office." 233

F. Supp. 414, 416 (D. Md. 1964). The action in *Naas* arose from a motor vehicle accident where the defendant was a member of the armed forces, was driving a motor vehicle owned by the United States Government to perform his assigned duties, and was acting within the scope of his office or employment. *Naas*, 233 F. Supp. 414, 416 (D. Md. 1964). However, the court in *Naas* further opined that "acting in the performance of one's duties or acting within the scope of one's office or employment is not synonymous with acting under color of office." *Id.* Congress has not used these terms interchangeably but instead has used them in the various sections authorizing removal with niche regard for their specific, definite, and distinctive meanings.[7]

The *Naas* court used a colorful explanation from *State* of *Oklahoma v. Willingham*, which arose out of a motor vehicle accident involving a postal carrier. D.C.E.D.Okla.1956, 143 F.Supp. 445. That court, in *State of Oklahoma*, explained that "[t]he efficient operation and administration of the work of the Post Office Department does not require a carrier, while delivering mail to drive his car from a stopped position into the path of an approaching automobile." *Id.*

Similarly, as in this case, Martelly's actions did not contribute to the efficient operation of the United States Marine Corps, nor was it related to his official training and title of Field Artillery Cannoneer. As in the *State of Oklahoma*, just by Martelly's alleged status of a United States Marine Reservist does not give him the ability to recklessly defame and inflict harm on people all over the world and then claim it is under the color of his office because it does not contribute to the efficient operation of the armed forces.

---

[7] That the phrase 'color of such office' permits removal only in those cases where the act complained of bears a causal relationship to the defendant's official duties is made clear by a review of the history and purpose of section 1442. It has been described as having: originated in 1833 during the 'nullification' controversy between the United States and South Carolina. Its purpose was to protect those charged with the enforcement of the federal revenue laws from prosecutions in a state court for violations of state law. See *State of Tennessee v. Davis*, 100 U.S. 257, 25 L.Ed. 648, where its constitutionality was upheld.

To the contrary, the official DoD PowerPoint presentation[8] on CTIP explains that DoD personnel are to not get directly involved and report any suspicions to their superior officer or to call or email the DoD Inspector General Hotline. This is for good reason, which common sense would dictate is to have someone competently trained, actually under the color of their office, to investigate such allegations before they are spread all over the world as truth and foreign police start kicking in doors.

What is not included in the DoD PowerPoint presentation, nor the Tactics, Techniques, and Procedures for the Field Artillery Manual Cannon Gunnery, is reporting suspicions of human trafficking to "a couple of Marines and Foreign Military friends in Eastern Europe" that are on "standby." (See Exhibit E, Ex. C Pg. 6 showing the text message from Martelly to E. Gabbey stating such).  In fact, if Martelly would have been giving attention to what E. Gabbey was saying or was actually trained, under the color of his office, to spot human trafficking and investigate such allegations, Martelly may have realized the statements from E. Gabbey to both him and her parents were redflags that E. Gabbey was actually lying to him.  Instead, Martelly proceeded to recklessly and with wanton disregard for the truth spread misinformation around the world, which has had a substantial impact on the lives of the Plaintiffs.

Martelly admitted that he got directly involved and discussed the allegations with E. Gabbey's parents, who are the Served Defendants in this matter.  As discussed above, text messages were sent to Served Forum Defendants, which indicated that they had no issues leaving Romania and to please not have the police intervene.  In addition, Martelly had a previous romantic relationship with E. Gabbey and this is not derived solely from his duties as required to be under the color of his office.

---

[8] Exhibit J, DoD PowerPoint Regarding Human Trafficking.

Martelly was not acting under the color of his office.  As such, Martelly woefully fails to show that he was acting under the color of his office as prescribed by statute, legislative history, and case law.

## IV.  Martelly is Not Entitled to Official Immunity in this Matter

In the Defendants' Response to Show Cause Order they erroneously claim that Defendant, Matthieu Martelly, is entitled to Official Immunity in this matter.

In *Westfall v. Erwin*, the Supreme Court affirmed the Eleventh Circuit's decision and held that conduct of federal officials must be discretionary in nature and within the scope of employment before the official's conduct is found absolutely immune from state tort liability.  108 S.Ct. 580, 98 L.Ed.2d 619 (1988), aff'g, 785 F.2d 1551 (11th Cir.1986).  However, for executive officials in general, the Supreme Court's rulings make plain that qualified immunity represents the norm. *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 2732, 73 L. Ed. 2d 396 (1982).

The Court in *Westfall* recognized that the purpose of official immunity would be defeated by shielding a federal official from state tort liability in situations where the official does not exercise independent judgment.  Indeed, non-discretionary activity has no support from the traditional justification for official immunity.  The discretionary nature of a particular act is central to the question of whether an official should be afforded absolute immunity.  *Westfall*, at ——, 108 S.Ct. at 584–85; see generally *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (where the discretionary nature of the act was dispositive to Justice Harlan's opinion).

In *Scott v. DeMenna*, the Eleventh Circuit reasoned that because the defendant, DeMenna's, job duties, as a "market news reporter," "require[d] inherent discretion in reporting events," the defendant acted within the scope of his employment duties.  *Scott v. DeMenna*, 840 F.2d 8, 9 (11th Cir. 1988).  The Eleventh Circuit in *DeMenna* applied the Supreme Court's discretionary test from

*Westfall*, and found that because inherent in the defendant's job responsibilities as "market reporter" include reporting on "unusual occurrences" within the industry (at issue was whether reporting on a police raid on a major supplier of vidalia onions for mislabeling constituted an unusual occurrence that qualified as a discretionary activity), despite that term not being codified in the market news handbook, the defendant's claim for immunity should have been granted.

Assuming *arguendo* again, that Martelly is a Marine Reservist, in this matter, there is no discretion or wiggle room on reporting procedures.  The PowerPoint provided by the DoD indicates that the report should be to a senior officer or the DoD hotlines. Moreover, Martelly takes it upon himself to alert military friends, other than his commanding officer, and also foreign military friends.

Furthermore, there are no cases that could be located that granted or indicated that a Reservist is entitled to official immunity in any capacity, whether it be absolute or qualified immunity.

**V.    Alienage Jurisdiction is Inappropriate in this Matter for the Same Reason Diversity Jurisdiction Does Not Apply**

Alienage jurisdiction is a form of diversity jurisdiction under which federal courts may hear cases between "citizens of a State and citizens or subjects of a foreign state."  28 U.S.C. § 1332(a)(2). Like the complete diversity rule in cases between citizens of different states, see *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806), alienage jurisdiction prohibits an alien from suing another alien in federal court unless the suit includes United States citizens as plaintiffs and defendants.  It is the burden of the party seeking federal jurisdiction to demonstrate that diversity exists by a preponderance of the evidence. *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir.2002) (citing *Scoggins v. Pollock*, 727 F.2d 1025, 1026 (11th Cir.1984))." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1340 (11th Cir. 2011).

For cases involving dual-citizens, "[t]he courts of appeals deciding this issue have

uniformly held that, for diversity purposes, courts should consider only the United States citizenship of individuals who are dual citizens." *Id* at 1341.  In *Molinos*, the Eleventh Circuit held that the Plaintiff, a dual citizen of both the United States and the Dominican Republic, "is only a citizen of the United States for the purposes of diversity jurisdiction under § 1332(a)." *Id* at 1341.

The issue of alienage jurisdiction begins with 28 U.S.C.A. § 1332, which codifies under federal statute the constitutional requirement for subject matter jurisdiction under Art. III, Section 2. *See Smith v. Carter*, 545 F.2d 909, 911 (5th Cir. 1977).

§ 1332(a) stipulates that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—"

> (1) citizens of different States;
> (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;
> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
> (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

Due to Defendants' Response to Show Cause Order, at issue is whether Andrew Tate and Tristan Tate qualify as citizens subject to subject matter jurisdiction under § 1332.  We have argued that the Tate brothers, although dual citizens of both the United States and Great Britain, are "stateless" because they have been permanent domiciles of the country of Romania for at least seven years.

Defendants claim to find subject matter jurisdiction on the basis of alienage jurisdiction in part because of the precedent set in the Seventh Circuit decision, *Sadat v. Mertes*, 615 F.2d 1176, 1182.  In *Sadat*, the Seventh Circuit found that the Plaintiff, a dual citizen of both the United States and Egypt, was a citizen of a particular state of the United States (namely, Pennsylvania) for the

purposes of § 1332(a)(1), and therefore, federal courts could exercise subject matter jurisdiction over him.  *Id* at 1180.

The two requirements for establishing subject matter jurisdiction under § 1332(a)(1) are (1) being a citizen of the United States; and (2) a citizen of a particular state.  *Id*.  In *Sadat*, the Plaintiff was trying to establish a domicile in the state of Pennsylvania, even though the facts supported an Egyptian residence: he was born, raised, and maintained a home in Egypt, "which home contains his furniture, books, records and valuables."  *Id* at 1181.  Courts evaluate intent of domiciliary as a "state of mind which must be evaluated through the circumstantial evidence of a person's manifested conduct." *Berhalter v. Irmisch*, 75 F.R.D. 539, 541 (W.D.N.Y.1977), and "statements of intent are entitled to little weight when in conflict with the facts," *Garner v. Pearson*, 374 F.Supp. 580, 589 (M.D.Fla.1973)."  *Sadat v. Mertes*, 615 F.2d 1176, 1181 (7th Cir. 1980).

Strangely, Defendants claim *Sadat*'s precedent is most on point for addressing the issues concerning diversity in this case.  See Defendant's Resp. at  9.

However, the holding in *Sadat* would support a finding that diversity jurisdiction does not exist under § 1332(a).  As stated, neither Andrew Tate nor Tristan Tate are residents or domiciliaries of the State of Florida, nor any other state for that matter: they have been residents of Bucharest, Romania for at least seven years now and domiciled there, with no intent of leaving. This is supported, among countless other things, by their home's location in Bucharest, their nearly decades-long residence in Bucharest, their well-documented house arrest in their Bucharest home, in which they were confined to their property, and their continuing to remain in Bucharest despite their house arrest being lifted.

Furthermore, unlike the Plaintiff in *Sadat*, who expressed an intent to domicile in Pennsylvania, never once have Andrew Tate and Tristan Tate expressed an intent to be a citizen, resident, or domiciled in the State of Florida, or any other state of the United States, for that matter.

Indeed, by their own account, Defendants admit that "it is not possible to determine the domicile of the Tate brothers for the purpose of Section 1332(a)." See Defendant's Resp. at 1. By every definition, Andrew Tate and Tristan Tate are "stateless" citizens of the United States, and therefore do not satisfy the requirements for alienage jurisdiction under § 1332(a).

Cases involving tortious acts may be brought into Florida State Court, even for a non-resident of the state of Florida, if (a) the defendant resides in the state of Florida or (b) the majority of the incidents took place in the State of Florida. Both counts here are satisfied: every single Defendant in this case is a citizen of the state of Florida or committed a tortious act within the State of Florida. Moreover, a significant amount of the incidents involved in this defamation occurred in Florida: E. Gabbey directed the false statements into the State of Florida (Compl. at ¶ 9); Matthieu Martelly directed the defamatory statements into the State of Florida to, at least, M. Gabbey and W. Gabbey and several other people and entities (Compl. at ¶ 10); and Tristan Tate first met E. Gabbey in Miami, FL and the two of them spent a great deal of time together in Florida. (Compl. at ¶ 43). Therefore, Florida State Court has jurisdiction over the matter at issue.

**WHEREFORE**, Plaintiffs, Andrew Tate and Tristan Tate, respectfully requests this Court enter an Order remanding this case back to the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida, and because there is no objectively reasonable basis upon which Defendants can base their improper attempt at removal and any additional relief that the Court deems fair and equitable under the circumstances.

Respectfully submitted this 11th day of September 2023,


/s/ Thomas Maniotis, Esq.                    /s/ Joseph D. McBride, Esq.
Thomas Maniotis, Esq.                        Joseph D. McBride, Esq.
Florida Bar No. 122414                       NYS Bar No. 5445879 *Pro Hac Vice*
Equity Legal, PLLC                           THE MCBRIDE LAW FIRM, PLLC
5201 Blue Lagoon Drive, Floor 8              99 Park Avenue, 6th Floor
Miami, FL 33126                              New York, NY 10016
p:321-313-8642                               p: (917) 757-9537
e: tamaniots@equitylegal.net                 e: jmcbride@mcbridelawnyc.com
*Attorneys for Plaintiffs:*                  *Attorneys for Plaintiffs:*
*Andrew & Tristan Tate*                      *Andrew & Tristan Tate*


## CERTIFICATE OF GOOD FAITH CONFERRAL

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on September 11th, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will, on the same day, electronically serve true and exact electronic copies on the persons below to their stated email addresses:

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.