UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 9:23-CV-81150-RLR

ANDREW TATE & TRISTAN TATE

    Plaintiffs,
 v.

EMMA GABBEY, et al.,

    Defendants,

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO PROCEED UNDER PSEUDONYM**

  Thomas Maniotis and Joseph D. McBride, attorneys of record for Andrew and Tristan Tate, Plaintiffs in the above-captioned case, respectfully submit the following in response to this Honorable Court's ORDER REQUIRING EXPEDITED BRIEFING (ECF No. 38) dated, September 13, 2023.

  In 2018, Johnny Depp filed a $50 million lawsuit against Amber Heard in Fairfax County, Virginia, for defamation in response to a 2018 op-ed that Ms. Heard published in the Washington Post. Mr. Depp argued that even though Ms. Heard did not name him in the op-ed, the suggestion that Mr. Depp was a domestic abuser devastated his reputation and career. Regarding the allegation against him, Mr. Depp stated, "I will continue to deny them for the rest of my life…I never abused Ms. Heard or any other woman." Mr. Depp filed a declaration alleging that Ms. Heard had a history of fabricating domestic violence allegations against him—declaring that Heard even showed up to a May 2016 court appearance with painted-on bruises. Mr. Depp publicly denied the allegations against him from the case's inception to the jury's verdict. Mr. Depp took the stand for two days in April of 2022 and testified that Ms. Heard's allegations of abuse were "heinous" and "disturbing" and that he wanted everyone to know that the claims against him were

1

"not based in any species of truth." Much of the evidence during the trial centered around witness testimonies and surveillance videos. As well as salacious text messages and shocking recordings circulating across mainstream media and the Internet. Traumatic past events were exhumed and publicly autopsied. The trial was gut-wrenching but necessary due to the severity of the allegations. Had Johnny Depp not publicly spoken out and then defended himself in court, he would have been branded an abuser of women for the rest of his life. Had Ms. Heard been allowed to retreat behind laws protecting actual victims wrongfully, Mr. Depp would have been denied justice.

The instant matter before this Honorable Court bears a striking similarity to the Johnny Depp case but is far more egregious. Like the *Depp* case, Andrew and Tristan Tate are the victims of a throng of defamatory, heinous, and disturbing lies. Like the *Depp* case, these defamatory statements resulted in irreversible damage to Andrew and Tristan Tate's reputation and careers. And like the *Depp* case, at least one of the Defendants has a history of weaponizing laws used to shield women as a sword to harm men, by falsely accusing them in court.

Dissimilar and objectively more egregious than the *Depp* case, Andrew and Tristan Tate have also been deprived of their freedom. The instant matter centers on the Defendants' defamatory statements published to Florida residents, subsequently republished by hundreds of mainstream media news outlets worldwide and across the Internet. Videos of Plaintiffs being taken into custody in December of 2022 have been viewed billions of times. During 2023, Defendants and a cohort of media organizations and online personalities intensified their campaign of smearing Plaintiffs' good names across the world. In addition to being jailed, Plaintiffs were also canceled, deplatformed, and sustained incalculable financial loss.

2

The Defense would have this Honorable Court believe they were jailed, deplatformed, and canceled. This is simply not true and cannot be proven. The Defense would also have this Court believe that the millions of people who support Andrew and Tristan Tate across the globe is something to be ashamed of—when such a show of support is meaningful. Defendants have proffered allegations to this Honorable Court regarding alleged past comments made by the Plaintiffs, which are the subject of pending charges in Romania, where the standard of proof and legal system is entirely different than in America's Courts. Defendants have dared to suggest that those comments arise to the level of criminality and, in a desperate attempt to bury the truth, have attempted to reverse engineer laws designed to protect American women in American Courts. It may be true that some of the Defendants in this case have had complicated lives. Those complications, however, do not excuse them from the extraordinary damage they have done and continue to do to Andrew and Tristan Tate.

As our underlying pleadings demonstrated, Defendants knew and exploited the fact that Andrew and Tristan Tate were famous. Our papers clearly show that Defendants planned to become famous by shopping their fabricated story for movie deals to the highest bidder while disregarding the damage they were doing to the Plaintiffs' lives. As the legal memo below demonstrates, Defendants' arguments are unsupported by law and fact.

Defendants' counsel would do well to stop holding their clients out as victims when they are not. Defendant's counsel would also do well to stop engaging in ad hominem attacks against Plaintiffs' counsel and creating controversy where none exists. Andrew and Tristan Tate have been wronged and harmed by the Defendants and have every right to defend themselves in the court of public opinion—because their livelihoods depend on it. Andrew and Tristan Tate are the Plaintiffs and victims in this case, not the defendants. The evidence of wrongdoing that Plaintiffs

3

have sued Defendants for in this civil matter is overwhelming.  Defendants opened the door to publicity when they sought it out.  They cannot close it now because it no longer suits their nefarious interests. The Defendants' motion to use pseudonyms is unconscionable and should be denied in its entirety.

### **LEGAL ARGUMENT**

The Eleventh Circuit has repeatedly held that "'[g]enerally, parties to a lawsuit must identify themselves' in the pleadings." (*In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1247 (11th Cir. 2020) citing *Frank*, 951 F.2d at 322.) Further, "Federal Rule of Civil Procedure 10(a) provides that 'every pleading' in federal court 'must name all the parties.'" *Id*. The Eleventh Circuit has maintained that Fed. R. Civ. P. 10(a)'s purpose is to "protect[] the public's legitimate interest in knowing all of the facts involved, including the identities of the parties." (*Id* citing Plaintiff B, 631 F.3d at 1315.)

In previous cases, the Eleventh Circuit has applied "a multi-factor balancing test" to determine whether a party's identity should remain anonymous at trial.  See, e.g., *Plaintiff B v. Francis*, 631 F.3d 1310, 1315 (11th Cir. 2011).  Courts have held that "a party may proceed anonymously in a civil suit in federal court by showing that he 'has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" *Plaintiff B v. Francis*, 631 F.3d 1310, 1315–16 (11th Cir. 2011) (internal citation omitted). In determining whether a party has a substantial privacy right, the Eleventh Circuit has applied the three-step test from *Doe v. Stegall*: (1) plaintiffs seeking anonymity were suing to challenge governmental activity; (2) prosecution of the suit compelled plaintiffs to disclose information of the utmost intimacy; and (3) plaintiffs were compelled to admit their intention to engage in illegal conduct, thereby risking criminal prosecution.  653 F.2d 180, 185

4

(5th Cir. 1981) (internal quotations omitted).  Moreover, courts "should carefully review all of the circumstances of the case and then decide whether customary practice of disclosing plaintiff's identity should yield to plaintiff's privacy concerns." *Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992).

In their memorandum of law, Defendants cite a number of seminal Eleventh Circuit decisions, including *Doe v. Frank*, and perhaps most notable*, Plaintiff B v. Francis*, in order to support their asserted claims of a "sensitive and highly personal" interests here that warrants the exceptional prescription of granting pseudonymity to them.

In *Doe v. Frank*, the Eleventh Circuit found that in denying the plaintiff's motion for anonymity, the District Court did not err – even though there was risk that the plaintiff "may suffer some embarrassment" as a result of the disclosure. *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992).  There, the Eleventh Circuit made the point of articulating the public nature of lawsuits that necessarily and overwhelmingly favor disclosure of identities of parties' names, particularly defendants, over nondisclosure.  *Id*.  Moreover, the court only listed a few exceptions where Fed. R. Civ. P. 10(a)'s requirement of naming the parties was lifted: cases involving "mental illness," *Doe v. Colautti*, 592 F.2d 704 (3d Cir.1979), "homosexuality," *Doe v. Commonwealth's Attorney for Richmond*, 403 F.Supp. 1199 (E.D.Va.1975), and "transsexuality*,*" *Doe v. McConn*, 489 F.Supp. 76 (S.D.Tex.1980).  *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992).  Only in those exceptional cases did courts (none of which, it should be noted, arose out of the Eleventh Circuit), carve out a limited exception to the general rule, finding that the "social stigma attached to the plaintiff's disclosure was found to be enough to overcome the presumption of openness in court proceedings." *Id*.

In *Plaintiff B v. Francis*, the Eleventh Circuit found that the district court abused its discretion when it denied the protection of anonymity to several, not all, plaintiffs in that case, who were minors performing casual and voluntary sexual activity on film. 631 F.3d 1310, 1315 (11th Cir. 2011). There, the court focused on the second prong of the test from *Stegall*: whether denying plaintiffs anonymity at trial required them to disclose "information of utmost intimacy." *Id* at 1316. At issue was whether the conduct of four plaintiffs engaged in sexual activity on film constituted behavior of "utmost intimacy," and thereby warranted the protection of anonymity. While all four of the plaintiffs engaged in conduct of a sexual nature, the Court found that only in the cases of two plaintiffs, B and V, did such conduct implicate a matter of "the utmost intimacy." For those two plaintiffs, the footage showed them engaged in "extremely graphic sexual activity," which conduct could "by no means be deemed 'casual.'" *Id* at 1317. The footage showed Plaintiffs B and V engaged in a "lengthy and explicit session of *homosexual intimacy* involving *fondling and oral and manual sex with another underage woman*" [emphasis added]. *Id*. The Court found a privacy interest between the Plaintiffs' "*graphic homosexual conduct* with her widespread public reputation." *Id*. In particular, the Court underscored the homosexual, graphic and non-voluntary nature of the conduct implicated, which directly connected the kind of conduct at issue with the precedent exempting homosexual conduct from the general presumption in favor of disclosure in *Doe v. Commonwealth's Attorney for Richmond* (see above). *Id*.

By contrast, the Eleventh Circuit found that the district court was wrong to have presumed the conduct of two other plaintiffs, J and S, did not rise to the level of a disclosure of "utmost intimacy," simply because their conduct was not the sort of sexual activity defined by Florida statute. See *Id*. However, importantly, the Eleventh Circuit did not find the district court

6

necessarily abused its discretion by not granting those other two plaintiffs anonymity, even though the plaintiffs engaged in conduct that was sexual in nature. *Id* at 1319. Plaintiff J, age 13, and Plaintiff S, age 15, were stopped in the middle of a street when a man approached them with a camera "and began encouraging them to remove their tops so he could film them 'flashing' their breasts." *Id* at 1312. There, "after a period of such encouragement," Plaintiffs S and J "briefly removed their tops and flashed their breasts for the camera." *Id*. But the Eleventh Circuit, despite acknowledging the minor ages of the Plaintiffs and explicit sexual nature of the conduct encouraged and caught on film, rather than holding decisively that the conduct implicated "information of utmost intimacy," remanded the question for reconsideration to the district court, which "has the discretion to grant the motion for Plaintiffs J and S, to deny it after appropriate reconsideration, or to grant it in part and provide some intermediate means for maintaining some degree of anonymity." *Id* at 1319. In concurrence, Judge Moody found "that Plaintiffs J and S, who flashed their breasts for less than a minute while sitting in their car, could not proceed anonymously." *Id* at 1320.

### A.  None of the Traditional Cases In Which Courts Granted Pseudonymity Have Applied to Plaintiffs Instead Of Defendants.

At issue is whether the prevailing legal authorities support a finding of pseudonymity for Defendants, as the Defense moves for here, rather than Plaintiffs. Defendants take great pains to compare the conduct implicated in *Plaintiff B v. Francis*, where a privacy interest rising to the level of "utmost intimacy" was found for some of the plaintiffs there. However, the privacy interest applied only to a select number of the Plaintiffs in that case—and none of the Defendants. See *Plaintiff B v. Francis*, 631 F.3d 1310, 1319 (11th Cir. 2011) (holding that the district court erred in not granting the motion to remain anonymous for two of the four plaintiffs, while also remanding the question of anonymity for the other plaintiffs to the discretion of the district court). Indeed,

7

the parties for which courts granted pseudonymity in *every single case* cited by the Defendants in their legal memorandum implicated the privacy interests of Plaintiffs, not Defendants.  See, e.g., *Freedom From Religion Found., Inc. v. Emanuel Cnty. Sch. Sys.*, 109 F. Supp. 3d 1353, 1362 (S.D. Ga. 2015) (granting *plaintiffs'* motion to proceed pseudonymously); *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981) (finding the trial court order denying *complainants*' motion to proceed anonymously in action challenging prayer and Bible reading in schools was appealable); and Doe v. Frank, 951 F.2d 320 (11th Cir. 1992) (affirming the Court of Appeals' holding that denial of *plaintiff*'s request to proceed with suit under pseudonym was not abuse of discretion) (emphasis added).  In each case, the burden of proof was on the plaintiffs to show anonymity was required: the Defense patently failed to produce case law in which the Defendant moved for anonymity, to say nothing of the burden of proof that would be required in that situation to overcome the presumption of openness in court.  See *Plaintiff B v. Francis*, 631 F.3d 1310, 1314 (11th Cir. 2011).

Most of the Defense's Motion to Proceed Under Pseudonym is centered on cases of alleged "victims" of human trafficking and abuse.  However, Defendants Mona Gabbey, William Gabbey, and Matthieu Martelly are not victims in any criminal proceedings.  Importantly, no Defendant is an alleged victim in *any* American criminal court.

Again, Counsel for Defendants, Ms. Pinter, is attempting to save her own skin with respect to her extortionate email by making false allegations that information was obtained illegally.  But no proof has been set forth supporting those allegations.  They are as baseless as labeling her clients "victims of human trafficking." Counsel for Defendants would like to play the role of judge and jury by continuing to claim that their clients are victims without answering the Plaintiffs' complaint.

8

The Romanian indictment, which Defendants would like to submit under seal, shows blatant inconsistencies and falsehoods that are contradicted by text messages. The text messages quoted in the Plaintiffs' Amended Complaint are only the tip of the iceberg. However, Plaintiffs will file a response to the protective order and the motion to file the Romanian Indictment under seal.

The inconsistencies with the presented text messages show that the allegations against Andrew Tate and Tristan Tate are false. Moreover, email correspondence shows that the Romanian Court is directly responding to emails and sending the Criminal Indictment to random podcasters and online figures. In one correspondence obtained, the email correspondence (containing the Romanian Indictment) was signed by the President of the Court of Bucharest and Judge Gabriel-Mihaela Risnoveanu.[1]

Defendants spend over half of their memorandum of law using news articles and other online sources to try to demean Andrew Tate and Tristan Tate and inflame the Court and the public. However, Defendants have utilized biased, unsubstantiated opinion articles from sources such as the BBC, VICE, and Rolling Stone in a desperate attempt to support their memorandum. Then, after using YouTube videos, Defendants claim that Plaintiffs have used hearsay. The news articles are wholly irrelevant to the issue of proceeding under a pseudonym, protective order, or partial sealing of the matter. Defendants contradict themself in their memorandum. Moreover, they again manage to contradict themselves and use prior quotes from Andrew Tate concerning public lawsuits but then argue that Emma Gabbey's and Aliona Untila's prior and current statements related to this lawsuit are irrelevant. The interesting point here is that – unlike the hearsay used to "support" the Defendants' countless baseless allegations – the great majority of evidence used to

---

[1] *See* Exhibit A, A copy of the email obtained from social media showing the indictment has been sent by the Romanian Court to third parties around the world.

9

support Plaintiffs' Complaint were prior statements of Emma Gabbey and Aliona Untila *themselves*, as well as sworn statements from various sources and pictures obtained from the internet.

Accordingly, the court should deny the Defendants' request of anonymity because they have failed to produce verifiable factual and legal authorities that overcome the high prejudice in favor of disclosure.

### B. Every Situation In Which A Privacy Interest Implicating Pseudonymity Was Found Involved Minors Engaged In Explicit And Even Non-voluntary Sexual Activity.

To find the sort of conduct that would grant pseudonymity based on *Stegall*'s second prong for "information of utmost intimacy," courts have evaluated whether the parties in question were minors. See, e.g., *Plaintiff B v. Francis*, 631 F.3d 1310, 1314 (11th Cir. 2011). Additionally, courts have assessed the *nature* of the sexual conduct itself – namely, whether disclosure would merely cause embarrassment to the party or greater dangers, such as the possibility and the degree to which they might "suffer violence and retaliation for filing the suit." See *Id*. First, Defendants grossly misrepresented the facts of the instant case by repeatedly referring to sexual relationships Emma Gabbey had with other men in the past. The factual record for this case is clear and incontrovertible: Defendant Emma Gabbey, unlike the Plaintiffs in *Doe*, *Francis*, and several other authorities, where a well-founded privacy interest was found, was NOT a minor when she traveled to the Tate Estate and had consensual relations with Tristan Tate. When Tristan Tate met Emma Gabbey in late 2021, she was over 18 years old and had an extensive history of consensual sexual relationships with dozens of other men. Emma Gabbey and Tristan Tate entered a consensual relationship where the two parties mutually agreed to have Emma Gabbey fly over to Tristan Tate's Romanian Estate at his expense, where she had uninhibited access to all his

10

amenities, including a grand swimming pool, several thousand square foot mansion, and dozens of luxury vehicles and other lavish items. Emma Gabbey freely entered and exited the property at her leisure, as is well-documented by the countless hours of CCTV footage that is widely accessible online.

Defendants employed colorful language, such as they were "victims" who were "trapped" or had "escaped." This is a patent lie, as Emma Gabbey and Aliona Untila can be seen on CCTV footage moving freely in and out of the property. In addition, it is common knowledge among witnesses that Aliona Untila ran several miles, almost daily, when she was in Bucharest, Romania. Furthermore, Emma Gabbey and Aliona Untila both had unrestricted use of their cell phones and booked plane tickets to leave. Emma Gabbey even asked her parents to schedule the police raid for a time after they had left and flown to the United Kingdom so she could enjoy a vacation, as demonstrated by the exhibits in our underlying papers. This is also shown in concrete evidence from the Romanian Criminal File.

Crucial to understanding the falsity of any allegation that she was held against her will in Romania, Emma Gabbey stated in text messages to Matthieu Martelly that she "exaggerated" and would do "anything to take it back." This was after the embassy had been alerted, and *not one of the Defendants took steps to correct the falsehood*.

Emma Gabbey became bored after only six days at the Tate Estate. During that time, she underwent a radical change of heart regarding her career: she switched from wanting to become a webcam model, a sentiment she repeatedly expressed to Tristan over months of text messages and in person, to wanting to become a writer.

Despite being treated like royalty and manufacturing a conspiracy with Aliona Untila to steal valuable items from the Tate Estate, only to double take and then play the victim when her

11

criminal scheme was exposed, Emma Gabbey still fails to take any kind of responsibility for what she did. She mistakes harassment for embarrassment; she then turns around and lodges completely groundless and incredibly dangerous charges of human trafficking against Andrew and Tristan Tate, continuing a playbook that she has used on countless other men whose lives have been shattered by her allegations. When she is most in trouble, she doubles down on her victimhood, making herself out to be the center of a conspiracy where the entire world is out to get her. Clearly, Emma Gabbey's fragile psychological makeup is not the sort of privacy interest implicated in other situations where courts granted the pseudonymity exception, such as issues of a fundamentally personal nature like abortion, birth control, or religion. Nor does the conduct at the center of this case implicate explicit sexual acts – such as "a lengthy and explicit session of homosexual intimacy," where *Plaintiff B* court granted anonymity to some of the plaintiffs who engaged in conduct of that nature, which was considered potentially harmful to the plaintiffs' reputation and possibly not voluntary. *Plaintiff B v. Francis*, 631 F.3d 1310, 1317 (11th Cir. 2011). In fact, here sexual conduct is not implicated at all.

This case centers on Emma Gabbey and her sense of entitlement. She has an insatiable ego that leads her into never taking responsibility for anything, including possible criminal conduct. Courts have repeatedly held that "some personal embarrassment" – i.e., a bruised ego – is insufficient for a finding of anonymity. *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir.1992). Emma Gabbey's insecurities and inability to take responsibility for her actions has taken its toll. The embarrassment, and the sense of shame she may feel deep down, however, is not grounds to circumvent the law. Therefore, the court should deny the Defense's request for pseudonymity.

Moreover, in the complaint of Marlin Fisher, where Defendants claim that Emma Gabbey was identified as a sexual assault victim, the crime, and the name of the convicted, was redacted. Emma Gabbey's age alone does not give her the right to go and withhold information from the court that may impact a person's sentencing. Defendants would have this Court believe that the past abuse and current abuse of the justice system by the "victims" is irrelevant. Still, a blind allegation that Plaintiffs are abusing the justice system is of the utmost importance.

Emma Gabbey has a long and demonstrated history (as accounted for in the Plaintiffs' Complaint) of weaponizing the justice system. Defendants have falsely accused the Plaintiffs of weaponizing the justice system when the Defendants *themselves* have a proven track record of weaponizing the justice system for nefarious purposes. This attempt to gaslight the Plaintiffs contradicts all available evidence and must not be tolerated by this Honorable Court.

Shockingly, Ms. Pinter now accuses Plaintiffs' attorneys of misconduct after her clearly extortionate email. Emma Gabbey demonstrably filed a false restraining order against Mr. Fisher that she was withholding information from the court. She even attempted to "scrub" any connection between her and Mr. Fisher after she moved on in her scheming from Fisher to the Tate brothers. She is now looking again to hijack the justice system for her benefit by hiding her wrongdoings and nefarious conduct under a false name, which is part of her modus operandi. If this Honorable Court were to grant Emma Gabbey the ability to proceed under a pseudonym, it would be one more in a long list of aliases that she would use to hide her outrageous conduct.

Also, it is necessary to extinguish the Defendants' allegations that "private information" is being used illegally, or was "stolen." Exhibits to Plaintiffs' Amended Complaint, including pictures and text messages, were legally obtained. Furthermore, the restraining order that Emma Gabbey abusively filed against Mr. Fisher – and later admitted that she engineered "a completely

false narrative" – was legally obtained. The pictures of Emma Gabbey came from her social media postings as well as the postings of third parties. In every instance where Emma Gabbey claimed that her photos were underage, we have taken reasonable precautions to redact them.

### C. Emma Gabbey's and Aliona Untila's Asserted Privacy Interest Fails To Meet The Standard Of "Utmost Intimacy" For a Finding Of Pseudonymity From *Stegall*

At issue is whether any of the conduct for which the Defense claims merits anonymity rises to the degree in both specificity and harm that courts have traditionally found met the high burden to overcome the presumption of openness in judicial proceedings. Throughout their memorandum of law, Defendants fail to mention the specific nature of the conduct that supposedly meets *Stegall*'s test for "utmost intimacy." This ultimately is because *no such damaging conduct whatsoever* is implicated. Instead, Defendants rely on extremely vague references to "intimate personal details" and "the Plaintiffs' actions" that "demonstrate the Defendants' personal safety is jeopardized," without once mentioning the nature of those alleged "actions," or providing any detail as to the alleged privacy interests at issue.

Indeed, even supposing that such elusive conduct (which is patently absent here because it *never* occurred), did exist – it would unquestionably fail to even compare to the lesser conduct of the other two plaintiffs in *Plaintiff B v. Francis* who "flashed their breasts for the camera," for which the Eleventh Circuit remanded to the district court to make a final determination of whether granting anonymity was appropriate. However, Emma Gabbey's reputation for being a serial manipulator, pathological liar, and shameless sex addict is well-documented and long predates Emma Gabbey's unfortunate encounter with Tristan Tate. Even at this pre-discovery phase, the evidence shows that Emma Gabbey flaunted her body on social media and pornographic websites, including Pornhub, OnlyFans, and TikTok, among others, with impunity. She pursued her targets

14

under such names as "Satanslaying," "@hippiehex," and "FuryFatale" with reckless abandonment. She had mastered the art of seduction and repeatedly deployed her tradecraft on unsuspecting victims, including Tristan Tate, luring men into dangerous or compromising situations. Some men have paid steep penalties for their rendezvous with Emma Gabbey. At least two, including Tristan and Andrew Tate, served extended time in prison for her allegations. Another man, Dustin Milner, was left psychologically devastated and driven to suicide. The Defense has attempted to portray Emma Gabbey as the victim despite the overwhelming evidence to the contrary of many lives destroyed by her actions. This is an egregious abuse of process.

The Defendants falsely claim that these women are victims of sexual assault. But nothing could be further from the truth. Plaintiffs' claims are substantiated by text messages and much legally obtained evidence to be admitted at trial. Footnote 1 of Aliona Untila's affidavit indicates that they will not be divulging such information, which is utterly absurd since *any* instance of sexual assault is unsubstantiated by text messages. Untila goes on in her affidavit to claim that she received "death threats" and inserted some photos, none of which mention death or killing – only Karma and Justice. However, Untila had a much different tune when she and Emma Gabbey were planning on selling their story of fabricated heroism to Hulu, Netflix, and Prime. They planned on acquiring fortune and fame but fell short of their goals because their falsehoods had been uncovered. Just as Emma Gabbey and Aliona Untila's plot to financially extort Andrew Tate also fell flat.

Furthermore, there is no proof that the "death threats" Defendants claim are even from legitimate accounts (i.e., not made up by Emma Gabbey and there is not even a reference to a date), as, upon information and belief, Emma Gabbey has been creating fake accounts to continue

15

to spread disinformation and try to bolster her fabricated claims against the Plaintiffs. Also, where are the police reports if they were in so much fear of their life? Why is it only coming out now? The answer is simple, to try to manipulate the Court into believing they are a victim and giving preferential treatment to Defendants.

Next, the Defendants allege that without being allowed to proceed under a pseudonym would cause further emotional injury. *But this is precisely what Defendants Emma Gabbey and Aliona Untila inflicted on the Tate Brothers*. Andrew Tate and Tristan Tate continue to receive a barrage of actual death threats, harassment, misinformation being spread about their indictment and the facts surrounding the allegations by individuals and media outlets, loss of their business, loss of freedom, confusion trying to understand the false allegations, and emotional distress. However the Tate brothers were not given a choice or an option to proceed under a pseudonym and hide behind the justice system when the Defendants falsely accused them.

Furthermore, in her sworn statement, Emma Gabbey alleges that she cannot go out in peace and has had to become a recluse. However, videos posted to her Instagram directly contradict her sworn statement.[2] The video link has been included here specifically to show the propensity of these "victims" to lie to the court without hesitation in their Declarations. Neither did either of their lives look ruined or traumatized when they were gallivanting around the French Riviera right after allegedly being "human trafficked."[3]

For these reasons, the court should deny the Defendants' motion for anonymity.

**D. Other Traditional Factors Supporting A Finding Of Pseudonymity From Stegall's Multipart Test, Such as Governmental Activity and Injury From Admission Of Guilt In a Criminal Prosecution, Do Not Apply to Emma Gabbey nor Aliona Untila.**

---

[2] *See* Video of E. Gabbey partying on the day the Fisher lawsuit was filed.
https://drive.google.com/drive/folders/1cPrSnGeYpviepRSJdKzygk4QENXZpksD?usp=sharing.

[3] *See* E. Gabbey and A. Untila in French Riviera – Redacted Exhibits D.E. 31, Exhibit E, Pgs. 141-43.

16

Beyond what is stated above, none of the other factors traditionally conferring anonymity are present here. The other two prongs of the *Stegall* test: governmental activity and the potential risk of admission of guilt for a criminal prosecution for the anonymity-seeking party, are likewise absent. *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981). So too are the traditional categories of "utmost intimacy" wherein the Eleventh Circuit has found granting the anonymity exception appropriate due to a countervailing social stigma: mental illness, homosexual conduct, or transexual conduct.

Defendants allege a laundry list of problems they believe would follow from the disclosure of their names – "being re-traumatized as survivors of and witnesses to sex trafficking, exposure to public ridicule and scorn, the association of their names online with the abuse they suffered, and safety concerns." However, they fail to ground those concerns in real world harm. This contrasts with the decision in *Plaintiff B v. Francis*, for example, where the Eleventh Circuit made a determination of finding a privacy interest warranting pseudonymity in large part because of "expert testimony the Plaintiffs presented about the mental and reputational harm they would suffer from having their identities disclosed." *Plaintiff B v. Francis*, 631 F.3d 1310, 1314 (11th Cir. 2011). There, the court relied heavily on the opinions of "a clinical psychologist who interviewed and evaluated" the anonymity-seeking plaintiff and found a concrete injury from publicly disclosing that party's name – being labeled a "slut" – and the psychological trauma that would directly flow out of that reputational harm. *Plaintiff B v. Francis*, 631 F.3d 1310, 1318 (11th Cir. 2011).

Here, by contrast, there is no expert testimony suggesting a concrete injury resulting from the harm caused by the disclosure of Emma Gabbey's or Aliona Untila's identity. Similarly absent is the kind of far-reaching commercial implications potentially injuring the plaintiffs like in

17

*Plaintiff B. v. Francis*. There, the plaintiffs' sexually explicit videos were being streamed on websites like IMDB.com that had "millions of visitors each month," and available for purchase through retailers like Amazon.com. *Id* at 1318. By stark contrast, no harm even slightly approaching the sort implicated in *Plaintiff B. v. Francis* is found. Neither Emma Gabbey and Aliona Untila were the subjects of pornographic films – indeed, films of any kind, pornographic or otherwise. Andrew and Tristan Tate have long since retired from the webcam business; they repeatedly discuss this on podcasts, social media, and other outlets. Even at the time Tristan Tate and Emma Gabbey first met, the Tate brothers had been retired from webcam-related businesses for several years. In no way was Emma Gabbey's trip to Bucharest related to webcam modeling. Indeed, if that were the intent, Emma Gabbey would have been better off staying in South Florida, where she previously enjoyed a quite active and well-documented career as a webcam model and porn star. Of course, that part of Emma Gabbey's life did not involve the Tate brothers. As previously noted, soon after she arrived at the Tate Estate, Emma Gabbey abandoned all dreams of pursuing a webcam modeling career and instead refocused her sights on touring Europe and writing (to say nothing of forging conspiracies to extort Andrew and Tristan Tate).

Accordingly, the Defendants' motion to proceed under a pseudonym should be denied because no privacy interests exist here that would warrant such exceptional protections.

Respectfully submitted this 14th day of September 2023,

| | |
|---|---|
| /s/ Thomas Maniotis, Esq. | /s/ Joseph D. McBride, Esq. |
| Thomas Maniotis, Esq. | Joseph D. McBride, Esq. |
| Florida Bar No. 122414 | NYS Bar No. 5445879 *Pro Hac Vice* |
| Equity Legal, PLLC | THE MCBRIDE LAW FIRM, PLLC |
| 5201 Blue Lagoon Drive, Floor 8 | 99 Park Avenue, 6th Floor |
| Miami, FL 33126 | New York, NY 10016 |
| p:321-313-8642 | p: (917) 757-9537 |
| e: tamaniots@equitylegal.net | e: jmcbride@mcbridelawnyc.com |
| *Attorneys for Plaintiffs:* | *Attorneys for Plaintiffs:* |
| *Andrew & Tristan Tate* | *Andrew & Tristan Tate* |

**CERTIFICATE OF GOOD FAITH CONFERRAL**

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on September 14th, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will, on the same day, electronically serve true and exact electronic copies on the persons below to their stated email addresses:

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.