UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
Case No.: 9:23-cv-81150-RLR

ANDREW TATE AND TRISTAN TATE,

    Plaintiffs

vs.

Jane Doe et al.,

    Defendants.
_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND**

**I.  Background and Procedural History**

Plaintiffs' filed this lawsuit against Defendants on July 11, 2023 in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County Civil Division, case No. 50-2023-CA-011904-XXXX-MB. Two of the five Defendants, June and John Doe, were served on July 17, 2023. No other Defendants have been served and a summons was never issued for Mary Doe. On August 7, 2023, June and John Doe, the only served Defendants, timely filed a motion for extension of time to respond to the Complaint in state court. It is unclear what Plaintiffs were referring to as "inconsequential papers" in their Motion for Remand (Dkt. 31 at 4), but counsel for Defendants also filed the necessary notice to make an appearance in the case at that time. On August 9, 2023, less than one month since filing their Complaint, Plaintiffs filed a Motion for Default Judgment against June and John Doe, in state court. On August 14, 2023, Defendants timely removed the case to the United States District Court for the Southern District of Florida.

Contrary to Plaintiffs' assertion, Defendants have not refused to respond to this lawsuit but have acted promptly to pursue their legal rights in its defense. Most relevant to this response, is the removal of the case to Federal Court, which Defendants believe is proper and necessary under the circumstances particularly with respect to Liam Doe's rights under Section 1442 and 1442(a). Notice of Removal was timely filed and done even before all Defendants were served.

Regarding service, counsel for the Plaintiffs have never requested a meet and confer to discuss service or waiver of service. Rather, when notified that Defendants' private info was made available to thousands, potentially millions, for download on Twitter/X, Plaintiffs' counsel included in their response a question about whether Defense counsel would accept service. *See* Exhibit A. Given Defendants concerns for their privacy and safety, that was not the appropriate time to raise the issue. Since then, Plaintiffs have raised the issue a total of three times in conjunction with more pressing matters unrelated to service and have not raised the issue since August 21, 2023. *Id.* Plaintiffs could have requested a meet and confer regarding the issue of service at any time if they were serious about resolving the issue. But they have not. In fact, since removal, it appears that Plaintiffs have made no efforts to serve any Defendants and since August 21, have not raised the issue of service with counsel. Furthermore, Plaintiffs have failed to comply with this Court's order requiring Plaintiffs to file a status report regarding service on the first business day of each calendar month. (Dkt. 11). Currently, only June and John Doe have been properly served in this case.

**II.     This Court has Jurisdiction under 28 U.S.C §§ 1442a and 1442.**

Removal is appropriate because Liam Doe is a member of the military[1] and because he is a federal employee. Section 1442a gives a right of removal to "a member of the armed forces of the United States" when he faces a civil suit "<u>on account of an act done under color of his office</u>. . . ." 28 U.S.C. § 1442a (emphasis added). Similarly, under Section 1442, "a civil action…that is commenced in a State Court…against …any officer (or person acting under that officer) of the United States or of any agency thereof…<u>relating to any act under color of such office</u>… may be removed by them to the district court of the United States for the district and division…wherein it is pending." 28 U.S.C. § 1442(a) and (a)(1) (emphasis added).

The standard for both forms of removal is essentially the same. *See Oesterling v. Am. Fitness, Inc., No. 8:08-CV-597-T-17MSS,* 2008 WL 11335138, at *2 (M.D. Fla. July 24, 2008) (applying same standard for both Sections); *State of Ga. v. Westlake,* 929 F. Supp. 1516, 1519 (M.D. Ga. 1996) (collecting cases noting common standard).

For both statutes (1) there must be a causal connection between the claim against the federal official and his official duties; and (2) the official must present a colorable federal defense. *Oesterling*, *supra* at *2. Both prongs are met here.

**A.  Plaintiffs target Liam Doe for acts he undertook under color of his office because there is a causal connection between the claims against him and his official role as a United States Marine Reserve.**

The "color of office" test focuses on the "causal connection" between the claims against the defendant and their official duties. *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). "[T]he removal statute is an incident of federal supremacy, and that one of its purposes was to provide a federal forum for cases where federal officials must raise defenses arising from their

---

[1] A reservist is a "member of the armed forces" for the purpose of § 1442a. *See Gilbar v. United States*, No. C-3-98-11, 1998 WL 1632693, at *3 (S.D. Ohio July 10, 1998) (Air Force Reservist member of the armed forces even though he was on inactive status on the date that these alleged torts occurred).

3

official duties." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). Accordingly, "the test for removal should be broader, not narrower, than the test for official immunity." *Id*.

"The phrase 'relating to' [in 1442(a)(1)] is broad and requires only a connection or association between the act in question and the federal office." *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (citation omitted). "The hurdle erected by this requirement is quite low." *Id*. (quotation omitted). In civil cases, it is sufficient for the defendant to show that his relationship to the plaintiff derived solely from his official duties." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427-28 (11th Cir. 1996).

In this case, Liam Doe's relationship to the Plaintiffs, who are suing him for defamation, is derived solely from his official duties. His only connection to them is because of his job. Their suit targets him for the report he made to the U.S. Embassy in Romania. He has testified that he made this report because it was his duty as a Marine Reserve. (1st Liam Doe Decl., Dkt. 21-2 ¶¶ 18-19.) His training required him to report to his chain of command and he did so. Doing nothing was not an option. Under these circumstances, the causal connection between the lawsuit against Liam Doe and his official duties is clear.

In *Willingham v. Morgan*, the causal-connection test was satisfied because the federal-official defendants' "'acts or (their) presence at the place in performance of (their) official duty constitute the basis, though mistaken or false, of the state prosecution.'" *Willingham*, 395 U.S. at 409 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926)). Plaintiffs' quote this language in their Motion for Remand, perhaps suggesting that the test is location based. (Dkt. 31 at 13.) To be clear, the test is not location based—it is duty based. Thus when "at least part of [a federal-official defendant's] defense is that he acted <u>within the scope of his federal duties</u>, that what he did was required of him by federal law, and that he did all federal law required. That defense raises a federal

4

question, which justifies removal." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1428 (11th Cir. 1996) (emphasis added).

Plaintiffs' arguments with regard to the color-of-office standard fall short because they either (1) lack relevant and persuasive authority; or (2) ignore the connection altogether my failing to counter—and in some instances—to address the facts that Liam Doe has presented in support of his request for removal.

### 1. The authorities cited by Plaintiffs do not preclude a causal connection here.

Plaintiffs argue that Liam Doe was not acting under color of his office. The only authorities they offer are two cases that deal with motor vehicle accidents. (Dkt. 31 at 13-14.)  To be sure, both cases demonstrate that the causal-connection test isn't satisfied just because a federal employee takes to the roads as a part of their duties. Everyone, federal employees included, must obey the traffic laws. *See Nass v. Mitchell*, 233 F.Supp. 414, 417 (D. MD 1964) ("the negligent operation of a government motor vehicle by a government employee or a member of the armed services while acting within the scope of his office or employment bears no such causal relationship to his official duties. . . ."); *and State of Oklahoma v. Willingham*, 143 F.Supp. 445, 448 (E.D. OK 1956) ("no law of the United States authorizes a rural mail carrier, while engaged in delivering mail on his route, to violate the state law enacted for the protection of those who use the highways."). But even in vehicular-operation scenarios, the causal-connection test can be satisfied where the federal employee's operation of a vehicle is itself required a required duty. *See, e.g.*, *Westlake*, 929 F. Supp. at 1520 ("Defendant does not contend that he was under orders to disobey local traffic laws or that the accident was the result of any order given to him by his superiors.").

Unlike the federal defendants in *Nass* and *State of Oklahoma*, the causal connection in this case is not based solely on Liam Doe's mere status as a federal employee. It is based on the nexus between his duty—following his training by reporting suspected cases of trafficking in persons—and the claims against him—defamation for reporting the suspected trafficking to the authorities. *See Howard v. Sikula*, 627 F. Supp. 497, 500 (S.D. Ohio 1986) (approving removal in state defamation action against reservist where "all of the contacts … relevant to the defamation claim occurred while these parties were performing duties at least apparently required by their capacities as Air Force Reservists."); *Stein-Sapir v. Birdsell*, 673 F.2d 165, 167 (6th Cir. 1982) (upholding removal for state libel/slander action against federal spokesperson for statements to the press).

Plaintiffs claim that Liam Doe's report to the authorities was not related to his official training. (Dkt. 31 at 14.) But this is just a conclusory assertion by Plaintiffs. They fail to rebut any of the testimony in Liam Doe's Declaration, which clearly states his report was both related to and required by his training. (Dkt. 21-2 ¶¶ 4, 6, 8, 14, 18-19.).[2]

Plaintiffs attempt to break the causal connection between Liam Doe's actions and his duty as conveyed through his training. They attach a PowerPoint presentation of a training on Combatting Trafficking in Persons (Dkt. 31-10) and claim that "DoD personnel are not to get directly involved and report any suspicions to their superior officer or to call or email the DoD Inspector General Hotline." (Dkt. 31 at 15.)

This is misses the mark for several reasons. First, the presentation attached by Plaintiffs is not the required training designed specifically for Marines that Liam Doe has taken on multiple occasions. *See* 2nd Liam Doe Decl. of ¶¶ 1-3 (attached). Liam Doe has seen the training that

---

[2] In their Motion for Remand, Plaintiffs repeatedly suggest that Liam Doe is not a Marine Reserve. (Dkt. 31 at 12, 14, 17.)  He is a Marine Reserve and Plaintiffs' unsupported suggestions otherwise do not rebut Liam Doe's testimony on this point. (Dkt. 21-2 ¶ 1.) Similarly, Plaintiffs inexplicably refer to Liam Doe by the wrong job title. (Dkt. 31 at 14 and 15.) As his Declaration makes clear, his title is Civil Affairs Reconnaissance Specialist. (Dkt. 21-2 ¶ 1.)

Plaintiffs attached. He has taken it before on a voluntary basis. But it is not the mandatory training for Marines that he is required to take periodically. *Id*. Second, even under the terms of training attached by Plaintiffs, Liam Doe acted appropriately. As one slide reads:



(Dkt. 31-10 at 32.) The slide makes clear that the role of trainees is to report "<u>anything</u> suspicious to your Chain of Command. . . " (emphasis added). Liam Doe was confronted with suspicious activity and reported it to his chain of command. (Dkt. 21-2 ¶¶ 13 and 14.) It is not reporting that the slide discourages (instead it is demanded); it is independent direct intervention as "trafficking situations are dangerous." (Dkt. 31-10 at 32.) This is further elucidated on the following slide, which includes the option "Confront the suspected traffickers" as an apparent incorrect answer in a review question. (*Id*. at 33.) Liam Doe did not act unilaterally. He worked through his chain of command; and this is consistent with the training slides relied upon by Plaintiffs. Third, it is telling that the training never once mentions or suggests that it is an option for DoD personnel to do nothing when they suspect sex trafficking. Far from supporting Plaintiffs' contentions, the training they attach to their Motion undermines them significantly by further demonstrating the importance of reporting suspected sex trafficking—not just in the Marines, but across the entire Department of Defense.

Plaintiffs attach and quote in part from an alleged message exchange between Liam Doe and Jane Doe and state that Liam Doe told others of the suspected sex trafficking. (Dkt. 31 at 15.) The text message in question does not state that Liam Doe told others outside of his Chain of Command, June and John Doe, or the U.S. Embassy of the suspected sex trafficking. (Dkt. 31-4 at 44.) Indeed, he did not. 2nd Liam Doe Decl. at ¶ 8. Moreover, throughout the entire course of the text conversation attached by Plaintiffs it is clear that Liam Doe is very concerned for Jane Doe's safety and frequently urges her to go to seek the protection of the U.S. Embassy. (Dkt. 31-4 at 43-50.) *And see*, 2nd Liam Doe Decl. ¶ 7.

The Plaintiffs argue that Liam Doe should have suspected that Jane Doe was lying and that he "proceeded to recklessly and with wanton disregard for the truth spread misinformation around the world. . . ." (Dkt. 31 at 15.) Again, Liam Doe consulted with his Chain of Command, spoke with Jane Doe's parents, and then called the U.S. Embassy. 2nd Liam Doe Decl. ¶ 8. He believed it was an active situation and that Jane Doe was in danger. (1st Decl. of Liam Doe, Dkt. 21-2 ¶¶ 18-19.) The Plaintiffs argument that Liam Doe should not have checked in with Jane Doe's parents in no way changes the fact that his suspicions of sex trafficking and his duty to act on those suspicions was a direct result of his training as a Marine Reserve. Plaintiffs raise an irrelevant distraction by claiming that Liam Doe "had a previous romantic relationship" with Jane Doe. (Dkt. 31 at 15.) At the time Jane Doe contacted Liam Doe from Romania, they had not spoken in several months. (Dkt. 21-2 ¶ 13.) Jane Doe's messages alarmed him and caused him to believe that she was in danger of being trafficked and that her life may be in danger. (*Id*.) Plaintiffs' claims about Liam Doe's personal life do not change the legal standard for removal under Sections 1442 and 1442a. At this stage, neither the Court nor Liam Doe is required to accept Plaintiffs' unsupported allegations of a personal "frolic" or actions taken "out of malice"

8

and the removal process is designed to provide Liam Doe with a forum to "present his version of the facts to a federal court." *Osborn v. Haley*, 549 U.S. 225, 249-50 (2007) (quoting *Willingham*, 395 U.S. at 407); *and see In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2020 WL 365617, at *4 (N.D. Fla. Jan. 22, 2020) ("Disputes about whether certain acts were specifically directed by the government, or outside the scope of Defendants' official authority, are properly resolved by federal, not state, courts.").

### B.  Liam Doe has several colorable federal defenses.

For the colorable federal defense requirement, the Supreme Court rejects a "narrow, grudging interpretation of the statute, recognizing that one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999) (quotation omitted) There is no requirement that an officer virtually "win his case before he can have it removed." *Id*. "A colorable defense is one that is plausible, which is to say that the defense is not immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2020 WL 365617, at *5 (N.D. Fla. Jan. 22, 2020) (quotations omitted). In this case Liam Doe has several federal defenses that are plausible and therefore meet the colorable standard.

### 1. Liam Doe has official immunity.

Official immunity is an "absolute" protection from suit for a federal officers. *Westfall v. Erwin*, 484 U.S. 292, 295 (1988).

> The central purpose of official immunity, promoting effective government, would not be furthered by shielding an official from state-law tort liability without regard to whether the alleged tortious conduct is discretionary in nature. When an official's conduct is not the product of independent judgment, the threat of liability cannot detrimentally inhibit that conduct. It is only when officials exercise decisionmaking

9

discretion that potential liability may shackle "the fearless, vigorous, and effective administration of policies of government."

*Id* at 296–97, (quoting *Barr v. Matteo*, 360 U.S. 564, 571 (1959). Accordingly, "the conduct of federal officials must be discretionary in nature and within the scope of employment before the official's conduct is absolutely immune from state tort liability. . . ." *Scott v. DeMenna*, 840 F. 2d 8, 9 (11th Cir. 1988).

In their Response to the Court's Order to Show Cause, Defendants detailed the ways in which Liam Doe's duty as a Marine Reserve to combat sex trafficking involves discretion. (Dkt. 21 at 17.) In their Motion for Remand, Plaintiffs fail to respond to any of those arguments. (Dkt 31 at 17.) Instead, Plaintiffs argue that the powerpoint of the generalized DoD training that they attached indicates that there is no discretion involved in combatting trafficking in persons. (*Id*.) Yet, even that training—which is not the specialized Marine training that Liam Doe is required to take—acknowledges that the reporting can take place to a variety of authorities—Chain of Command, the Office of the Inspector General, and a Trafficking Hotline—leaving it up to DoD personnel to select the reporting option. (Dkt. 31-10 31-33.) Tellingly, Plaintiffs ignore the article attached to Liam Doe's first Declaration highlighting and celebrating another Marine Reserve who acted quickly to report to report and respond to sex trafficking he encountered in daily life, including assisting local law enforcement with intervention. That Marine was commended throughout the Reserve Corps for his judgment. (Dkt. 21-2 at ¶¶ 10-12 and Ex. C.) The article is a strong example of how Marines are expected to exercise judgment and be proactive in the fight against sex trafficking. Liam Doe has presented a colorable federal defense for official immunity.

### 2. Liam Doe has qualified immunity.

In addition to official immunity, Liam Doe has a colorable federal defense under qualified immunity. Qualified immunity shields "[g]overnment officials performing discretionary functions

... from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1362 (S.D. Fla. 2016). Qualified immunity applies in two scenarios: "(1) the claimant fails to establish that the official violated her rights; or (2) the claimant establishes a violation of rights that are not 'clearly established.'" *Denson v. United States*, 574 F.3d 1318, 1338 (11th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009). "To receive qualified immunity, 'the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1362 (S.D. Fla. 2016)

Here, Liam Doe will have compelling arguments that his actions were within his discretionary authority as a Marine Reserve and that he has not violated the Plaintiffs rights. A good-faith report to law enforcement authorities is not actionable in defamation because it lacks malice. *See generally Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984) ("A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation."). Similarly, the Plaintiffs do not have a clearly established right to be free from criminal investigation based upon good-faith reports to the authorities.

Liam Doe has a colorable federal defense sounding in qualified immunity.

### 3. Federal Supremacy

Defendants noted Liam Doe's colorable federal defense for federal supremacy in their Response to the Court's Order to Show Cause. (Dkt. 21 at 17-18.) Plaintiffs did not address this defense in their Motion for Remand. (Dkt. 31.) Generally, "Conflict preemption occurs when state law actually conflicts with federal law because it is impossible to comply with both the state and federal requirements or because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1145–46 (11th Cir. 2017). Where a federal officer's actions "have some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law" a state law that unavoidably conflicts with that federal policy "has no effect." *Denson v. United States*, 574 F.3d 1318, 1348 (11th Cir. 2009). Liam Doe detailed the comprehensive federal policy in combatting trafficking in persons in his declaration. (Dkt. 21-2 ¶ 7.) Plaintiffs' state-law claims against Liam Doe have no validity. If they did, they would unavoidably conflict with the enacted and broadly applied federal policy against sex trafficking.

### 4. The claims against Liam Doe are excluded by 28 U.S.C. § 2679.

Section 2679 limits civil remedies against the United States resulting from "a negligent or wrongful act" of "any employee of the Government while acting within the scope of his office or employment…." 28 U.S.C. § 2679(b)(1). Any other civil action the federal employee "is precluded." *Id*. Upon certification of the Attorney General (or his designee) "that the defendant employee was acting within the scope of his office or employment at the time of the incident" any civil action "shall be deemed an action against the United States" which "shall be substituted as a

party." Moreover, the Attorney General's certification "shall conclusively establish scope of office or employment for purposes of removal." *Id*. at 2679(d)(1) and (2).[3]

"As applied to members of the United States military, "acting within the scope of his office or employment" is defined as "acting in the line of duty." 28 U.S.C. § 2671. For purposes of the FTCA, "acting in the line of duty," in turn, means acting within the scope of employment under the respondeat superior law of the place where the act or omission occurred. *St. Paul Guardian Ins. Co. v. United States*, 117 F. Supp. 2d 1349, 1354 (S.D. Fla. 2000)

The Eleventh Circuit addressed Section 2679 in the context of a state-court defamation suit that was brought against an Assistant United States Attorney (AUSA). *Nadler v. Mann*, 951 F.2d 301, 302 (11th Cir. 1992). The Plaintiff and Defendant were rival candidates for the same elected judicial office. *Id*. at 303. Shortly before a runoff election, a newspaper reported that the Plaintiff was the subject of a federal criminal investigation. After the Plaintiff was re-elected to the judicial seat, he sued the Defendant in state court alleging slander and defamation by the Defendant AUSA for initiating the investigation and leaking it to the press. *Id*. The Defendant AUSA removed under to 28 U.S.C. § 1442(a)(1) and pursuant to Section 2679, the United States certified that the Defendant was acting within the scope of his employment and was eventually substituted as the Defendant. *Id*. After the federal court dismissed the action, the Plaintiff appealed, challenging the certification that the Defendant AUSA was acting in the scope of his employment. *Id*. at 304.

Applying Florida law to the scope of employment determination, the Eleventh Circuit affirmed regarding the allegation that the Defendant was acting within his duties as an AUSA to "make an alleged violation of federal law known to whatever agency would be responsible for

---

[3] Pursuant to 18 U.S.C. § 2679(c) and 28 C.F.R. 50.15, Liam Doe has delivered the pleadings in this matter to his employer and is currently awaiting the scope of office or employment certification from the Attorney General's designee.

investigation of the matter." *Id*. at 305. However, as to the allegation that the Defendant AUSA leaked information about the investigation to the media, the Eleventh Circuit reversed because "an AUSA who leaks information to the press simply is not doing what his employment contemplated." *Id*. (quotation omitted). *Id*. at 306.

In this case, Liam Doe's actions of reporting suspected sex trafficking to his chain of command and eventually to the U.S. Embassy in Romania is entirely contemplated by his employment as a Marine Reserve. His mandated training repeatedly emphasizes the importance of reporting suspected sex trafficking. (Dkt. 21-2 ¶ 6.) Liam Doe's superior told him that contacting embassy was the best reporting option because "they were in the best position to contact Romanian authorities." (*Id*. ¶¶ 14 and 15.) Because the Embassy was closed, Liam Doe was connected with the Marine security detail, to whom he made the report after identifying himself and disclosing that he was a Marine. (*Id*. ¶ 15.) Liam Doe believes it was his duty as a Marine and federal employee to report his concerns for Jane Doe's safety immediately to address an emergent threat to her safety. (*Id*. ¶¶ 18, 19.)

This Court is the appropriate forum to adjudicate Liam Doe's scope of employment under Section 2679. *Oesterling*, *supra* at *2. Plaintiffs have alleged no facts that would establish that Liam Doe has exceeded the scope of his authority. "The Eleventh Circuit has held that discovery and an evidentiary hearing are unnecessary where a plaintiff alleges no facts to support his contention that a federal employee defendant acted outside the scope of employment at the time of the alleged wrongdoing."  *Bunyan v. United States*, No. 8:18-CV-2210-T-36JSS, 2019 WL 4644031, at *5 (M.D. Fla. Sept. 24, 2019) (citing *Glover v. Donahoe*, 626 F. App'x 926, 930 (11th Cir. 2015).

At the time of this filing, the determination of the United States as to certification remains pending. If, however, the United States does not eventually certify Liam Doe's scope of employment and is not substituted as the Defendant in this action, this Court may always address the application of Section 2679 further by conducting discovery and an evidentiary hearing and even allowing Plaintiffs to file a renewed Motion to Remand. *Bunyan*, at \*5; *Oesterling* at \*2.

Liam Doe has a colorable federal defense under Section 2679, further supporting removal under Sections 1442 and 1442a.

### III. Alternatively, this Court should order jurisdictional discovery to resolve the outstanding fact question regarding Plaintiffs' domicile for the purposes of diversity or alienage jurisdiction.

The Plaintiffs seem to entirely ignore the fact that Mary Doe is neither a citizen of the United States nor its resident in their Motion for Remand. Inexplicably, their motion states, " . . .every single Defendant in this case is a citizen of the state of Florida or committed a tortious act within the State of Florida." (Dkt. 31 at 20). However, this is in direct contradiction to the facts and Plaintiffs' complaint. First, as more thoroughly explained in Defendants' Response to the Court's Order to Show Cause, (Dkt. 21 at 5-6), June and John Doe and Liam Doe are improperly joined, and next, Jane Doe is not a resident or domiciliary of Florida. *See* Amended Notice of Removal, (Dkt. 22)[4]. And finally, Mary Doe is not a citizen of the United States nor resident of the United States, as the Plaintiffs acknowledge in their complaint, *see* Compl. at ¶ 5; *see also* Amended Notice of Removal, (Dkt. 22). And, there is not a single allegation relating to Mary Doe

---

[4] Defendants have not redacted the location of Jane Doe's residence in order to conceal this information from the Court, but rather to seal it from the public view for her protection. In accordance with Rule 5.4(b) and 7.1(3), Jane Doe filed an ex parte motion to the court to submit this information under seal, and redacted the information according to Rule 5.4(b) while awaiting the Court's Order on the motion to seal.

committing any acts, tortious or otherwise, in Florida[5]. *See* Compl. at ¶¶ 84-103, 126 – 129, 135-149.

The allegations against June and John Doe are so lacking they cannot possibly support a claim for relief. *See* Compl. at ¶¶ 46, 64, 79, 81-82, 94, 101. Furthermore, there is not a single fact alleged particular to John Doe. *Id.* The same is true for Liam Doe, whose whole fault, according to the Plaintiffs, rests on his report to the U.S. Embassy, *see* Compl. at ¶¶ 89-99, 101 116-125, which was made in good faith out of fear and concern for his friend and according to his duties as a Marine. *See* Liam Doe Declaration, (Dkt. 21-2). The Plaintiffs allege no more and have not even brought claims for defamation against Jane Doe, upon whose statements June and John Doe and Liam Doe relied. *see* Compl. at ¶¶ 112-149. Therefore, no causes of action for defamation can be sustained against June and John Doe or Liam Doe[6] and the sum of the allegations against them are conclusory and 'formulaic recitation[s] of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)).

Alternatively, for the same reasons, June and John Doe and Liam Doe could be dismissed as "dispensable non diverse part[ies]," which can "be dropped at any time." *Grupo Dataflux v. Atlas Glob. Group, L.P.*, 541 U.S. 567, 573, 588-89 (2004) (held that dispensable non-diverse parties can be dropped anytime when "minimal diversity" exists); *see also Rural Int'l Bank Ltd. v. Key Fin. Inv. Group LLC,* 16-22280-CIV, 2017 WL 3382788, at 4 (S.D. Fla. Aug. 7, 2017).

Considering all this, the crux of the diversity analysis rests on the citizenship and domicile of the Tate Brothers, Mary Doe, and Jane Doe. Jurisdictional discovery is necessary to

---

[5] Mary Doe has not been served and plans to file a motion to dismiss for lack of personal jurisdiction, under FRCP12(b)(2), and failure to state a claim upon which relief can be granted, under FRCP 12(b)(6).
[6] Defendants will brief these issues more fully in their forthcoming Motions to Dismiss.

complete this analysis because a material question of fact remains as to the Tate's domicile which is determined by a "totality of the circumstances." *See Bal Harbour Shops, LLC v. Saks Fifth Ave. LLC,* 1:20-CV-23504, 2022 WL 17733824, at *3 (S.D. Fla. Dec. 9, 2022) ("Moreover, once a person establishes domicile, it continues until he or she satisfies the mental and physical requirements of domicile in a new place. . . .Thus, a person can reside in one place, but be domiciled in another." (internal citations omitted)).

If jurisdictional discovery reveals the Tates have indeed maintained a U.S. domicile, there is a high likelihood of complete diversity between that U.S. state, and the domicile of Jane Doe (which is not Florida), as well as the obvious alienage jurisdiction arising from the foreign citizenship and domicile of Mary Doe. Although the Plaintiffs' allege they are stateless for the purposes of diversity jurisdiction, (Dkt. 31 at 9-10), and claim to have "no business in the United States," (Dkt. 37) their Complaint admits to holding a War Room[7] event in Miami, to which Plaintiff Tristan Tate invited Jane Doe to attend, and from this time spent in Florida began a relationship with Jane Doe. *See* Compl. at ¶¶ 43, 65. Additionally, the Tate-owned War Room, *see* Compl. at ¶ 120, 122, 125, recently held an event in Washington, D.C.,[8] the birthplace of Andrew Tate. (Dkt. 37, Decl. of Andrew Tate). These facts conflict with the Plaintiffs' Declarations and jurisdictional discovery could reveal that while the Tates' have not resided in the United States for many years, their frequent visits and business activity in the United States means they have maintained a U.S. domicile. *See King v. Cessna Aircraft Co.,* 505 F.3d 1160, 1171-72 (11th Cir. 2007).

This, along with the issue of obfuscation of domicile raised by Defendants in their Response to the Order to Show Cause, (Dkt. 21 at 4-5), constitute a fact question regarding the

---

[7] The War Room is the Tate Brothers' business, *see* Compl. at ¶ 120, 122, 125.
[8] *See* X, @Cobratate, https://twitter.com/Cobratate/status/1702642841640391126.

Tates' true domicile. And this Court has a "well-established duty to assess domicile based on the totality of the circumstances." *Bal Harbour Shops, LLC*, 1:20-CV-23504, 2022 WL 17733824, at 4 (S.D. Fla. Dec. 9, 2022).

Moreover, because there is an active criminal case in Romania where the Plaintiffs are charged with serious crimes[9], and where Jane Doe and Mary Doe are material witnesses against them, this case is distinguishable from others which have examined the "stateless" issue in a diversity action. *Contrast King*, 505 F.3d 1160 (11th Cir. 2007) (wrongful death action arising out of a plane crash in Italy that killed a US citizen). The principles underlying diversity and alienage jurisdiction, namely foreign relations and justice, call for at least a very close examination of the Plaintiffs' domicile to determine whether this Court has jurisdiction over this sensitive matter. *See* Debra Lyn Bassett, *Statutory Interpretation in the Context of Fed. Jurisdiction*, 76 Geo. Wash. L. Rev. 52, 61 (2007) ("Fairness and foreign peace appear to have been the motivating considerations behind the Framers' inclusion of alienage jurisdiction").

Therefore, the Defendants respectfully request that this Court find diversity or alienage jurisdiction is met, for the reasons explained here and in their Response to this Court's Order to Show Cause (Dkt. 21), or in the alternative, order jurisdictional discovery and an evidentiary hearing to resolve the outstanding fact question as to the Plaintiffs' true domicile.

## IV.  CONCLUSION

For the reasons stated above, the case is appropriately removed to this Court's jurisdiction and Defendants' respectfully request this Court to deny Plaintiffs' Motion for Remand.

Date: September 20, 2023

---

[9]  *See*  https://www.reuters.com/world/europe/romanian-prosecutors-change-human-trafficking-charge-against-andrew-tate-2023-06-13/; *see also* Romanian Indictment, which Defendants shall file as soon as the Court has ruled on the outstanding motion to file the indictment under seal.

By: /s/ Danielle Bianculli Pinter
Danielle Bianculli Pinter
Fla. Bar No. 120441
Benjamin W. Bull\*
Peter A. Gentala\*
Christen M. Price\*
Victoria Hirsh\*
**National Center on Sexual Exploitation**
1201 F. St., NW, Suite 200
Washington, DC 20004
dpinter@ncoselaw.org
bbull@ncose.com
pgentala@ncoselaw.org
cprice@ncoselaw.org
vhirsch@ncoselaw.org
Telephone: 202-393-7245

Christian W. Waugh [FBN 71093]
Mary A. Norberg [FBN 1032028]
Sofie Bayer [FBN 1039616]
**WAUGH PLLC**
201 E. Pine Street, Suite 315
Orlando, FL 32801
cwaugh@waugh.legal
mnorberg@waugh.legal
sbayer@waugh.legal

Telephone: 321-800-6008
Fax: 844-206-0245

Jillian Roth, Esq. [FBN 1036053]
**Laffey, Bucci & Kent, LLP**
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
jroth@laffeybuccikent.com
Telephone: 215-399-9255
Fax: 215-241-8700

*Attorneys for Defendants*

\*Admitted *pro hac vice*.

## **Certificate of Service**

I hereby certify that on September 20, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

## **SERVICE LIST**

Thomas Maniotis
Equity Legal, PLLC
5201 Blue Lagoon Dr., Flr. 8
Miami, FL 33126
321-313-8642
tamaniots@equitylegal.net

Joseph D. McBride
The McBride Law Firm, PLLC
99 Park Avenue, 6th Flr.
New York, NY 10016
917-757-9537
Jmcbridelawnyc.com

*Attorneys for Plaintiffs*