**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**Case No.: 9:23-cv-81150-RLR**

ANDREW TATE AND TRISTAN TATE,

     Plaintiffs,

v.

JANE DOE ET AL.,

     Defendants.

_____/


**DEFENDANTS LIAM DOE, JUNE DOE, AND JOHN DOE'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT, ANTI-SLAPP COUNTERCLAIM, AND
INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

     COMES NOW, Liam Doe, June Doe, and John Doe by and through the undersigned counsel, and respectfully move this Honorable court, under Fed. R. Civ. P. 12(b)(6) and Florida statute § 768.295, to dismiss this case, with prejudice, and award attorneys' fees.

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION ......................................................................................................................... 1

LEGAL STANDARD .................................................................................................................... 1

SUMMARY OF THE FACTS ....................................................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................................. 4

ARGUMENT ................................................................................................................................. 5

    I.     Because the Tates Are Public Figures, They Must Plead and Prove Defendants Were Motivated by Actual Malice. .................................................................................................5

    II.    The Complaint Falls Short of Pleading that John Doe, June Doe and Liam Doe Were Motivated by Actual Malice ...............................................................................................6

    III.   Defendants' Statements to the U.S. Embassy are Also Protected by Qualified Immunity, the Federal Supremacy Doctrine, and the Official Immunity Doctrine.................10

          *A.*   *June Doe and John Doe's Statements* ........................................................................ *10*

          *B.*   *Liam Doe's Statements* ........................................................................................... *12*

    IV.   All Claims in the Complaint Must Be Dismissed Pursuant to Florida's Statute Prohibiting Strategic Lawsuits Against Public Participation. ...................................................14

          *A.*   *Defendants Meet the Initial Burden to Show a Prima Facie Case that the Anti-SLAPP Statute Applies* ........................................................................................... *15*

CONCLUSION ............................................................................................................................19

## **TABLE OF AUTHORITIES**

**Statutes**

2023 Bill Text FL H.B. 537.................................................................................................18

Fla. Stat. § 768.295(1) ....................................................................................................17

Fla. Stat. § 768.295(2)(a)..................................................................................17, 18, 19

Fla. Stat. § 768.295(4) ..............................................................................1, 15, 17, 19

**Rules**

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................i

**Cases**

*Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591 (1906) ...................................................11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................2, 9

*Baird v. Mason Classical Acad., Inc.*, 317 So. 3d 264 (Fla. Dist. Ct. App. 2021)........................15

*Barr v. Matteo*, 360 U.S. 564 (1959)............................................................................13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................2, 9

*Berisha v. Lawson*, 378 F. Supp. 3d 1145 (S.D. Fla. 2018) ..........................................5

*Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310 (S.D. Fla. 2021) ...........................15

*Bose Corp. v. Consumers Union of U.S. Inc.*, 466 U.S. 485 (1984)...............................5

*Bush v. Lucas*, 647 F.2d 573 (5th Cir. 1981)................................................................13

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158 (2d Cir. 2006)....................18

*Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110 (S.D. Fla. 2021)..........................15, 16, 17

*Curry v. State*, 811 So. 2d 736 (Fla. Dist. Ct. App. 2002).......................................18, 19

*Curtis Pub. Co. v. Butts*, 388 U.S. 130, 163 (1967) ..................................................5, 7

*Davis v. McKenzie*, 2017 U.S. Dist. LEXIS 183519 (S.D. Fla. Nov. 3, 2017) ...........................15

*Denson v. United States*, 574 F.3d 1318 (11th Cir. 2009) ..........................................14

*Doe v. Daily News, L.P.*, 632 N.Y.S.2d 750 (N.Y. Sup. Ct. 1995) ...............................18

*Elliott v. Donegan*, 469 F. Supp. 3d 40 (E.D.N.Y 2020)..............................................18

*Gable v. Lewis,* 201 F.3d 769 (6th Cir. 2000) ............................................................19

*Gertz v. Welch, Inc.*, 418 U.S. 323 (1974)................................................................5, 6

*Godwin v. Michelini*, 2023 Fla. App. LEXIS 6215 (Dist. Ct. App. Sept. 6, 2023)....................16

*Gundel v. AV Homes, Inc.*, 264 So. 3d 304 (Fla. Dist. Ct. App. 2019) ..........................15

*Harding v. NCL (Bahamas) Ltd.*, 90 F. Supp. 3d 1305 (S.D. Fla. 2015) .......................................2

*Howard v. Lyons*, 360 U.S. 593 (1959) ...............................................................................13

*Howard v. Sikula*, 627 F. Supp. 497 (S.D. Ohio 1986) ...........................................................13

*Isaac v. Twitter, Inc.*, 557 F. Supp. 3d. 1251 (S.D. Fla. 2021).................................................15

*Jacobellis v. Ohio*, 378 U.S. 184 (1964) ................................................................................5

*Jacoby v. Cable News Network, Inc.* 537 F. Supp 3d 1303 (M.D. Fla. 2021)...............................7

*Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026 (D. Minn. 2010)..........................................19

*Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564 (E.D. Tex. 2003) ....................................................18

*Magre v. Charles*, 729 So. 2d 440 (Fla. Dist. Ct. App. 1999)...................................................11

*Malverty v. Equifax Info. Servs, L.L.C.*, 407 F. Supp. 3d 1257 (M.D. Fla. 2019).........................2

*Mastandrea v. Snow*, 333 So. 3d 326 (Fla. Ct. App. 2022).......................................................16

*Mazza v. Hendrick Hudson Cent. Sch. Dist.*, 942 F. Supp. 187 (S.D.N.Y. 1996).........................18

*McSwain v. World Fuel Servs. Corp.*, 2022 U.S. Dist. LEXIS 225352

   (S.D. Fla. Dec. 14, 2022) ...............................................................................................15

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) ...........................................7, 9, 10

*N.Y. Times Co. v. Sullivan,* 376 U.S. 254 (1964) ................................................................7, 9

*Nodar v. Galbreath*, 462 So. 2d 809 (Fla. 1984)................................................................11, 12

*Parekh v. CBS Corp.*, 820 F.App'x 827 (11th Cir. 2020) .........................................................16

*Rosanova v. Playboy Enters.*, 595 So. 2d 87 (5th Cir. 1978) ..................................................5, 7

*Saro Corp. v. Waterman Broad. Corp.*, 595 So. 2d 87 (Fla. Dist. Ct. App. 1992) .........................5

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ....................................................................7, 10

*Thomas v. Tampa Bay Downs, Inc.*, 761 So. 2d 401 (Fla. Dist. Ct. App. 2000)......................11, 12

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018) .............................................................5, 6, 7

*Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990).............................................................5

*United States v. Hylton*, 558 F. Supp. 872 (S.D. Tex. 1982)....................................................18

*Woods v. Evansville Press Co., Inc.*, 791 F.2d 480 (7th Cir. 1986) ..............................................5

*WPB Residents for Integrity in Gov't, Inc. v. Materio*, 284 So. 3d 555

   (Fla. Dist. Ct. App. 2019) ............................................................................................15

**Jurisprudence**

19 Fla.Jur.2d Defamation and Privacy § 58 (1980).............................................................11, 12

**Other**

Troy Myers, *Desantis Signs into Law Harsher Penalties for Sex Criminals*, Wear-TV, (May 26, 2023), https://weartv.com/news/local/governor-ron-desantis-signs-house-bill-537-tougher-punishments-sex-criminals-harsher-penalties-violent-offenders-anti-crime-public-safety-05-26-2023...................................................................................................................... 18

## INTRODUCTION

The present lawsuit is part of a larger series of events involving brothers Andrew and Tristan Tate, who are currently being prosecuted for sex trafficking in Romania. As stated in Defendants' Motion for Protective Order previously filed, [DE 29], the purpose of this litigation is to intimidate and harass Jane Doe and Mary Doe, witnesses against the Tates, into recanting their testimony.[1]

The Tates have <u>not</u> sued Jane Doe or Mary Doe for defamation, though they allege Jane Doe "falsely accused the Tate Brothers of human trafficking and false imprisonment" and stated "malicious falsehoods" to third parties to their detriment. Plaintiffs' Amended Complaint (herein after "Compl.") ¶¶ 89, 102. This is significant because it undermines the defamation claims against Jane Doe's parents and Liam Doe since they are accused of committing defamation by merely repeating the statements communicated to them by Jane Doe, to wit, that she was suffering "grave crimes against her by the Tate Brothers, including 'human traffick[ing]'" and "false imprisonment." Compl. ¶ 101 (brackets in original). Suing her parents and Liam Doe for defamation but not Jane Doe, under these facts, suggests the underlying potential claim against Jane Doe was too weak to raise, and the even more attenuated alleged defamation by her parents and Liam Doe should not have been brought in the first place. This is an unjust attempt to abuse the U.S. legal system to intimidate witnesses and undermine the criminal case against the Plaintiffs in Romania. Moreover, by bringing forth meritless claims primarily based on Defendant's protected speech under the First Amendment, Plaintiffs' pleadings constitute a strategic lawsuit against public participation, which violates Florida's statute prohibiting such lawsuits. Fla. Stat. § 768.295.

Therefore, because the Plaintiffs' Amended Complaint fails to state any claims upon which relief can be granted, and because it was brought in bad faith, it should be dismissed in its entirety, with prejudice, and attorneys' fees should be awarded to Defendants' pursuant to Fla. Stat. § 768.295(4).

## LEGAL STANDARD

---

[1] The facts contained in this Introduction are supported by Defs' Mem. of Law in Supp. of Mot. for Leave to Proceed Under Pseudonym and For Partial Seal and Protective Order and supporting declarations previously filed, and is incorporated by reference here. [DE 29].

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Harding v. NCL (Bahamas) Ltd*., 90 F. Supp. 3d 1305 (S.D. Fla. 2015). Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the Complaint has not shown that the pleader is entitled to relief. *Id.* A complaint's factual allegations must be accepted as true for purposes of a motion to dismiss, but this tenet is "inapplicable to legal conclusions." *Id.* at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *See Malverty v. Equifax Info. Servs*, *L.L.C.*, 407 F. Supp. 3d 1257 (M.D. Fla. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## SUMMARY OF THE FACTS

Ignoring conclusions, labels, and characterizations, the essential facts are straightforward. Tristan Tate met Jane Doe online around December 2021, and he invited her to meet in person at his War Room event in Miami. Plaintiffs' Amended Complaint (hereinafter "Compl.") ¶ 65. They spent two weeks together in Florida and began a romantic relationship. Compl. ¶ 65. Then, Tristan Tate invited Jane Doe to move to Romania, raised the issue on several occasions, offered to pay her passport fees, and ultimately paid for her plane ticket to Romania. Compl. Ex. B[2] [DE 31-4 at 51-56] (Tristan: "You're moving to Europe," "January you fly," "Okay?"). In April 2022, Jane Doe flew to Romania and was picked up from the airport by Tristan Tate. Compl. ¶ 70.

---

[2] None of the purported communications in Plaintiffs' Complaint, or accompanying Exhibits, have been properly authenticated, nor are they self-authenticating. Therefore, Defendants do not waive any right to object to them, including for lack of authentication. Additionally, Defendants will be moving to strike some of the communications contained in the Complaint and Exhibits. However, for the purposes of responding to the allegations in this Motion to Dismiss, Defendants will assume *arguendo* that the communications in Exhibit B are accurate, untampered with, and are communications between the individuals Plaintiffs' purport them to be. However, Defendants note that they are cherry-picked out of context in many instances and Defendants do not waive any right to raise objections to them based on the above (*e.g.*, not accurate, tampered with, not authenticated, etc.) at the appropriate time.

Then, while in Romania, Jane Doe became fearful about her situation at the Tates' compound, believing that human trafficking was occurring, and that she could not freely leave the property. Compl. ¶¶ 76, 89, 91–92. She worked out a plan with Mary Doe to sneak away without being noticed. Compl. ¶¶ 91–92, 94, and 98; *see also* Compl. Ex. B [DE 31-4 at 62-63]. Via WhatsApp, Jane Doe reached out to Marine Corps Sgt. Liam Doe, a friend in the U.S., and informed him of her situation. Compl. ¶ 89. Based on his exchanges with Jane Doe and using his Marine-Corps training in spotting human trafficking, Liam Doe became concerned that trafficking was occurring on the property. Compl. ¶¶ 96–97. He contacted his commanding officer who advised him to report the matter to the U.S. Embassy in Bucharest, Romania. Compl. ¶¶ 96–97. After reaching out to Jane Doe's parents, he contacted the Embassy. *See* Sgt. Liam Doe Declaration [DE 21-2]; Compl. ¶ 99. Around the same time, Jane Doe also expressed her fears to her parents who became very concerned for her safety. Compl. Ex. B [DE 31-4 at 62-65].

In the meantime, Jane Doe messaged Liam Doe several times asking him not to call the Embassy because she had already worked out a plan to leave the property without notice and was fearful of repercussions from the Tates and/or their associates.[3] Compl. ¶¶ 91–92, 94, 98, and 99. But Jane Doe never disavowed her exchange regarding human trafficking rather, she expressed fear of openly leaving.[4] Liam Doe believed it was his duty to call the Embassy because of his training, and direction from his commanding officer, and made the call. *See* Compl. ¶ 96 ("Be upset if you want honestly but having the US government came and save your ass in a position you put yourself in"; "I'm specifically trained for this we have protocols in place"; "It's my literal job."); *see also* Sgt. Liam Doe Declaration [DE 21-2] and Second Declaration of Sgt. Liam Doe [DE 47-2]. Then, around April 12, 2022, police raided the Tates' compound and Jane Doe and Mary Doe were removed to safety. Compl. ¶ 100.

---

[3] *See also* Compl. Ex. B [DE 31-4 at 44] (Jane Doe to Liam Doe: "They have mob ties . . . terrible f…ing people . . . . these guys are actually evil . . . "); *Id.* at 48 (Jane Doe to Liam Doe: "They will kill us.").

[4] *See* Compl. Ex. B [DE 31-4 at 47] (Jane Doe to Liam Doe: "i[']ve just been scare [sic]" . . . . this is super scary . . . . she's [Mary Doe] a Romanian citizen"); *compare id.* at 48 (Jane Doe to Liam Doe: "she has to come back here . . . . they will kill us") and *id* (Liam Doe to Jane Doe: "She[']s a human trafficking victim . . . . She[']ll be entitled to protection.").

## SUMMARY OF THE ARGUMENT

The Tates are "public figures" and therefore must demonstrate that June Doe and John Doe (the "parents") and Liam Doe were motivated by "actual malice." The Complaint's facts fail to demonstrate that Defendants were motivated by actual malice. Based on the facts alleged, including the quoted text messages in the Complaint and messages set forth in Exhibit B[5] of the Complaint, Defendants had grounds to believe that Jane Doe was in danger due to human trafficking at the compound and that she was constrained from freely leaving. Their communication to the U.S. Embassy was made in good faith and not motivated by any sort of malice. Jane Doe's request to them not to call the Embassy did not vitiate their reasonable belief regarding human trafficking because it was based on her fear of repercussions if the call was made (well founded in light of this Complaint), and that she had a secret plan to sneak out of the compound. Nor did Jane Doe disavow that human trafficking was occurring. Instead, while trying to dissuade Liam Doe from calling authorities, Jane Doe reinforced her belief that trafficking was occurring.[6]

Therefore, the Plaintiffs' Amended Complaint should be dismissed for four main reasons. First, because June and John Doe, and Liam Doe acted in good faith to protect Jane Doe and did not act with actual malice against Plaintiffs, the defamation claims against them, must fail. Second, the claims also fail because these Defendants' good faith reports to the U.S. Embassy for the welfare and protection of Jane Doe fall within Florida's qualified privilege doctrine blocking liability for defamation. Third, Liam Doe's statements are privileged under the federal supremacy doctrine and the official duty doctrine because he was acting according to, and within the scope of, his duties as a Marine Reserve Sergeant. And finally, all claims should be dismissed pursuant to Florida statute § 768.295, which prohibits meritless lawsuits for the purposes of stifling an individual's rights.

---

[5] *Supra* note 3.

[6] *See* Compl. Ex. B [DE 31-4 at 43] (Jane Doe to Liam Doe: "don[']t make any calls please . . . you have my location if something happens then we call?"); *Id.* at 44 (Jane Doe to Liam Doe: "but they know everyone . . . terrible f*cking people . . . I don[']t think they will notice this though. [W]e[']re leaving in the middle of the night . . .this was a stupid choice and [I] felt so awful before leaving but in a way maybe [I] came here to somehow help her too . . . these guys are actually evil . . .they make women cut themselves . . . and sell their bodies . . . and coerce them . . . and threaten them . . . saying if they talk about their secrets they might disappear or die . . ."); *Id.* at 47 ("we are less safe if we involve police"); *see also id.* at 62-65.

**ARGUMENT**

I.   <u>Because the Tates Are Public Figures, They Must Plead and Prove Defendants Were Motivated by Actual Malice.</u>

The "actual malice" standard applies to all three of Plaintiffs' defamation claims, including (claim II) "defamation per se," and (claim III) "commercial defamation." Where a defendant is a public figure, failing to plead and prove actual malice requires dismissal of a "defamation per se" claim. *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018); *Berisha v. Lawson*, 378 F. Supp. 3d 1145 (S.D. Fla. 2018). Regarding commercial defamation, the actual malice standard governs where the plaintiff is a business that comes within the concept of being a public figure or that is involved in a public issue as a matter of constitutional law. *Bose Corp. v. Consumers Union of U.S, Inc.*, 466 U.S. 485 (1984); *Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990); *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480 (7th Cir. 1986). Plaintiffs' failure to plead facts that Defendants were motivated by "actual malice" requires dismissal of all three defamation claims.

A "public figure" must demonstrate that an alleged defamatory statement was made with "actual malice" to plead a successful defamation complaint. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 163 (1967) (Warren, C.J., concurring); *and see Gertz v. Welch, Inc.*, 418 U.S. 323, 342 (1974). "Public figure status 'is a question of law to be determined by the court.'" *Turner v. Wells*, 879 F.3d 1254, 1271 (11th Cir. 2018) (quoting *Saro Corp. v. Waterman Broad. Corp.*, 595 So. 2d 87 (Fla. Dist. Ct. App. 1992)). A key criterion for determining public figure status is whether the individual "drew public attention to himself" and whether he "chose to put himself in the public arena." *Turner*, 879 F.3d at 1271 (finding that a football coach was a public figure). In *Rosanova v. Playboy Enters.*, the court observed that "the public figure concept has eluded a truly working definition, it falls within that class of legal abstractions where 'I know it when I see it.'" 580 F.2d 859, 860 (5th Cir. 1978) (quoting Justice Potter Stewart in *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)). In *Rosanova*, the court found a magazine publisher to be a public figure because he had been "the subject of published newspaper and other media reports of his activities" about the "nature of his reported associations and activities concerning organized crime." 580 F.2d at 860.

5

Here, the Tates are undeniably public figures. For starters, they are public figures based on their own descriptions of themselves in their Complaint. They "are a pair of . . . entrepreneurs, major social media influencers, and international businessmen." Compl. ¶¶ 13, 17, 18, and 19. They have an "international presence." Compl. ¶ 14. They "consult, advise, and generate income from multiple business ventures, generating revenues estimated in the hundreds of million dollars. They are respected thought leaders, business moguls, and motivational speakers across various industries." Compl. ¶ 21. "Young men, in particular, look to the Tate Brothers for hope, inspiration, and instruction." Compl. ¶ 21. They use "social media and travel" as a "distinguishing factor in their success." Relatedly:

> Their massive social media presence (previously in the tens of millions of followers, putting them in the top 1% of social media personalities in the world), coupled with direct interaction with their following and the ability to fly anywhere in the world at a moment's notice represents a first of its kind interaction between social media personalities and people in the real world. Nothing like it has ever been seen before.

Compl. at ¶ 23. They "first garnered press attention in 2008. Before becoming celebrity entrepreneurs, the Tate Brothers separately distinguished themselves in successful careers as professional kick boxers." Compl. ¶ 29. Tristan Tate "became a successful sports commentator and appeared on a British reality TV Show called *Shipwrecked Island* in 2011. In 2016, Andrew Tate appeared on a different British reality TV show called *Big Brother*. Their prominence has significantly increased over the past twelve months due to viral clips from the summer of 2022." Compl. ¶ 29.

The relevant public figure questions are these: do the Tate Brothers have "pervasive fame or notoriety"? *Gertz*, 418 U.S. at 351. Have they "voluntarily inject[ed] [them]selves…into a particular public controversy"? *Id.* Have they drawn "public attention to" themselves and have they chosen "to put" themselves "in the public arena"? *Turner*, 879 F.3d at 1271, 1272. The answer to all three questions, according to the Tates themselves, is an obvious "yes." They are public figures for all purposes. Accordingly, they must plead that each defendant was motivated by "actual malice" in making the statements at issue, which they have not done.

II.     <u>The Complaint Falls Short of Pleading that John Doe, June Doe and Liam Doe Were Motivated by Actual Malice.</u>

Although the argument here relates to "actual malice," it should not be lost that "truth" is "an absolute defense" to a claim of defamation. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 151 (1967). The "actual malice" standard was first enunciated in *N.Y. Times Co. v. Sullivan,* 376 U.S. 254 (1964). The Court held that the First and Fourteenth Amendments require a "public official" to allege and prove that a defamer acted with "actual malice" to obtain recovery. *Id.* A statement is made with "actual malice" only when uttered "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80. To prove actual malice, there must be a "high degree of awareness of [the communication's] probable falsity or . . . [that the speaker] in fact entertained serious doubts as to the truth of his publication." *Id.* In *St. Amant v. Thompson*, the Court added that the "actual malice" standard was a "subjective" one, and proving negligent behavior is not sufficient. 390 U.S. 727, 731 (1968) (*see also Rosanova*, 580 F.2d at 861–62). Rather it requires proof that the defendant "entertained serious doubts" about the truth or falsity of the statement. *St. Amant*, 390 U.S. at 731. As the Eleventh Circuit stated in *Turner v. Wells*:

> [T]o plead actual malice, Turner "must allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" This is a subjective test, focusing on whether the defendant "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false."

879 F.3d at 1273 (citations omitted). Since "[t]he test is not an objective one… the beliefs and actions of a reasonable person are irrelevant." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 704 (11th Cir. 2016). "Rather, we ask whether the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Jacoby v. Cable News Network*, *Inc.* 537 F. Supp 3d 1303, 1311 (M.D. Fla. 2021) (quoting *Michel*, 816 F.3d at 704).

The Complaint's three causes of action (I, II, and III) for defamation, Compl. ¶¶ 112–25, fail even to mention "actual malice" or "public figure" or the heightened pleading requirements imposed on public figure plaintiffs. Regarding June and John Doe, conclusory statements aside, there are no facts pled to plausibly support claims of defamation against them. In the 57-page Complaint, the parents are mentioned only in passing, with no specific facts alleged as to John

Doe. Compl. ¶¶ 46, 64, 79, 81, 82, 94, and 101. The Complaint alleges no facts indicating that June Doe or John Doe doubted whether Jane Doe was truly in danger from the Tates, or that they had any reason to disbelieve what Jane Doe or Liam Doe told them. In fact, the Complaint itself states that Jane Doe sent "distressing" messages to Liam Doe,[7] and that he informed her parents. Compl. ¶ 99. Furthermore, Exhibit B of Plaintiffs' Complaint demonstrates that June and John Doe were extremely worried for Jane Doe's safety. *See* Compl. Ex. B [DE 31-4 at 62–64]. These facts alone undermine any contention that the parents subjectively believed their statements to the Embassy were false, given their reasonable concern that their daughter was in trouble. This applies with equal force to Liam Doe.

As the Complaint alleges, after receiving "distressing" information from Jane Doe that both "she and Mary Doe were being 'human trafficked,'" Compl. ¶ 89, Liam Doe reported this information to the U.S. Embassy in Romania. Compl. ¶¶ 91, 112–25. That Jane Doe attempted to wave off Liam Doe and her parents from calling the Embassy was not based on a disavowal of the information relating to human trafficking, *see, e.g.*, Compl. ¶ 91 ("groomers and handlers" present), nor does it mean that Liam Doe did not believe human trafficking was occurring.[8] It

_____

[7] *See supra* note 8 (Jane Doe to Liam Doe: " but they know everyone . . . terrible f*cking people . . . I don[']t think they will notice this though. [W]e[']re leaving in the middle of the night . . . this was a stupid choice and [I] felt so awful before leaving but in a way maybe [I] came here to somehow help her too . . . these guys are actually evil . . . they make women cut themselves . . . and sell their bodies . . . and coerce them . . . and threaten them . . . saying if they talk about their secrets they might disappear or die . . .").

[8] *See* Compl. ¶¶ 96, 97; *see also* Compl. Ex. B [DE 31-4 at 44] (Liam Doe to Jane Doe: "Are you injured . . . If you can't make it to the Airport get to the embassy and remember that phrase."); *Id.* at 45 (Liam Doe to Jane Doe: "Your safest bet is to get to the embassy as an emergency involving an American citizen in Romania you can reach us via this number . . . ."; Jane Doe to Liam Doe: "[I]t[']s a house of 5 girls. 2 (girl that wants to leave with me) vs 3: the trafficked girls who are in ["]serious["] relationships with andrew tate. [T]hey all have tattoos on them that say ["]cobra tate["] or tate owned. . . . [I] think [I][']m super concerned because of all the stories we[']ve heard from the girls . . . . we have so much evidence though . . . . we can gather it and send it somewhere once we are away from here . . ."); *Id.* at 46; *Id.* at 47 (Liam Doe to Jane Doe: "The US governments involved now hate me if you want but at least they'll get you out safe"; Jane Doe to Liam Doe: "I've just been scare (sic) . . . This is super scary"); *Id.* at 48 (Jane Doe to Liam Doe: "she has to come back here . . . they will kill us"; Liam Doe to Jane Doe: "She[']s a human trafficking victim . . . . [S]he'll be entitled to protection."); *Id.* at 50 (Jane Doe to Liam Doe: "and this girl is equally important . . . need to make that clear . . . her safety is priority"; Liam Doe to Jane Doe: "She[']s a trafficking victim under international law she[']s a protected person.").

was because she was fearful of repercussions from Tate associates, Compl. ¶¶ 91, 99, and that she had a way of sneaking out of the compound unnoticed. Compl. ¶¶ 91, 92, and 98. The text messages show that Liam Doe believed the girls were being trafficked even while Jane Doe was trying to persuade him not to call the Embassy. *See supra* note 8; Compl. ¶¶ 96, 97. During these exchanges he told her he was "specifically trained for this [and] we have protocols in place." Compl. ¶ 96. "It's my literal job." Compl. ¶ 96, *see also* Liam Doe Decl. [DE 21-2 at ¶¶ 3–4, 6–7] (Liam Doe was trained to spot human trafficking). The fact that Jane Doe asked Liam Doe and her parents not to call the U.S. Embassy did not vitiate their well-grounded fears that human trafficking was happening at the Tate property and that Jane Doe was not free to leave without sneaking out. The text messages, particularly as cited in Plaintiffs' exhibits, make this clear. *See supra* notes 5–6, 8–10, and accompanying text.

At bottom, the sum of the allegations against the parents and Liam Doe are mostly legal conclusions, labels, and self-serving characterizations, unsupported even by the facts the Complaint alleges.[9] Compl. ¶¶ 101, and 112–25; *see Ashcroft*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555). Such allegations do not get the presumption of truth and are destined to fail. Here, there are simply no allegations of facts "sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Michel*, 816 F.3d at 702 (quoting *Sullivan*, 376 U.S. at 280). Exactly the opposite is true.

As to the parents, the reasonable inference is that they did what any responsible parents would do under these circumstances. The same is true of Liam Doe, who had specific training to spot human trafficking, was advised by Jane Doe that trafficking was occurring, and told by his commanding officer to notify the U.S. Embassy. Since this is a "subjective test" we can put ourselves in their place, and it is inconceivable that their actions or words were motivated by or constituted "actual malice." *Michel*, 816 F.3d at 702–03.

At most, the Complaint alleges Liam Doe received mixed messages from Jane Doe about whether and when it was advisable to involve the Embassy and Romanian police in the situation,

---

[9] Nor do the WhatsApp messages between Jane Doe and Liam Doe support the allegations of the Complaint. On the contrary, they directly undermine Plaintiffs' theory. *See* Compl. Ex. B [DE 31-4 at 43-50].

not whether the situation was dangerous. Plaintiffs ask the Court to infer that Liam Doe was legally obligated to forego his suspicions, even if they were reasonable, and to also ignore his legal and professional obligations. But Plaintiffs are not entitled to all inferences in their favor under the motion to dismiss standard, only reasonable inferences.

That Jane Doe had her own plans for sneaking out of the Tate's compound is an entirely different matter. Compl. ¶¶ 90, 92. Whether she welcomed the raid by Romanian police at that moment or not, the reasonable inference is that Liam Doe acted as duty commanded.[10] Additionally, the Tates' own statements concerning women, and history operating a webcam business, which was public information, provided good reason to be concerned that the Tates were involved in sex trafficking.[11] Applying the subjective test, Liam Doe did what he was supposed to do. There are no facts alleged establishing that he did not act in "good faith" or that he "was highly aware that the account was probably false." *Michel*, 816 F.3d at 702–03 (citing *St. Amant*, 390 U.S. at 731).

Accordingly, Plaintiffs have failed to allege that June Doe, John Doe, or Liam Doe acted in bad faith, or that they had any subjective belief that their statements to the Embassy about the Tates was a lie. Plaintiffs have not sufficiently alleged facts demonstrating "actual malice" as required to state a claim for defamation, and therefore all of the claims against them should be dismissed.

III.  Defendants' Statements to the U.S. Embassy are Also Protected by Qualified Immunity, the Federal Supremacy Doctrine, and the Official Immunity Doctrine.

A.  *June Doe and John Doe's Statements*

The defamation claims against June Doe and John Doe cannot succeed because their statements to the U.S. Embassy about their daughter were privileged under Florida defamation law. In reversing a defamation judgment against a parent for defaming a teacher, the Florida Supreme Court held: "The concern of a parent for the welfare of his child provides a privilege for the occasion of speaking to one having the power or duty to take action for the benefit of the

_____

[10] See Defs' Resp. to the Ct's Order to Show Cause [DE 21 at 14-17]; *see also* Declaration of Sgt. Liam Doe [DE 21-2].
[11] *See* Defs' Motion to Proceed under Pseudonym and for Protective Order, [DE 29 at 3-4]; *see also* Second Declaration of Sgt. Liam Doe [DE 47-2 at 2].

child." *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984). Parents' statements relating to their child's welfare are privileged under Florida law.

"A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation." *Id*. (citing 19 Fla.Jur.2d *Defamation and Privacy* § 58 (1980)). *See Abraham v. Baldwin,* 52 Fla. 151, 42 So. 591 (1906), *and Magre v. Charles*, 729 So. 2d 440, 442 (Fla. Dist. Ct. App. 1999) (holding an otherwise defamatory statement made about a doctor to a hospital cannot be basis for defamation judgment because the speaker is protected by the reporting privilege under Florida law). The parents obviously had an interest in Jane Doe's welfare and reason to believe it was in jeopardy. Thus, the parents' report to the U.S. Embassy about Jane Doe cannot be the basis of a defamation action and must be dismissed.

The only means of overcoming "qualified immunity" under Florida law is to "prove" that the speaker was motivated by "express malice." *Thomas v. Tampa Bay Downs, Inc.*, 761 So. 2d 401, 404 (Fla. Dist. Ct. App. 2000)**.** "In Florida, express malice sufficient to overcome" qualified privilege "exists 'where the primary motive for the statement is shown to be an intention to injure the plaintiff.'" *Id.* (citing *Nodar*, 462 So. 2d at 806.) "Evidence suggesting malice" includes "contemporaneous ongoing animosity between the parties." *Id.* at 405. But "[s]trong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position 'to gratify his malevolence.'" *Nodar*, 462 So. 2d at 810.

Though different but related standards, the same facts turning back an allegation of actual malice applies with equal force to "express malice." For the reasons it fails to establish that the parents[12] were motivated by "actual malice," the Complaint likewise fails in establishing "express malice" as that term is defined in Florida law. *Id.* The parents did what any responsible

---

[12] The Complaint also fails to establish express malice on behalf of Jane Doe. The Complaint demonstrates that Jane Doe's intent was the preservation of her own safety, and the safety of Mary Doe, not harming the Plaintiffs. And the complaint presents no evidence that Jane Doe engaged in improper methods.  *Id*. (improper methods consist of (1) acts proscribed by statute; (2) acts constituting separate independent torts; and (3) other ill-defined bad acts, such as deliberate misrepresentation).

parents would have done. After receiving information that their daughter was being sex trafficked in a foreign country, they notified the U.S. Embassy. This fact alone forecloses any reasonable conclusion that their "primary motive" was "an intention to injure the plaintiff." *Thomas*, 761 So. 2d at 404 (quoting *Nodar*, 462 So. 2d at 806). Indeed, according to the Complaint, Jane Doe's mother was previously positively disposed toward Tristan Tate, Compl. ¶¶ 81–82, badly undermining any claim that there was a "contemporaneous ongoing animosity between the parties." *Thomas*, 761 So. 2d at 405. Nor is there any showing of "[s]trong, angry, or intemperate words," which would not have been sufficient to show "express malice" in any event. *Nodar*, 462 So. 2d at 810. There was no "showing that" the parents used their "privileged position" "to gratify" their "malevolence" as required to demonstrate the requisite subjective state of mind. *Id.* Even the Complaint's many conclusions are bereft of anything proving that the parents' "primary motive" was "express malice." *Id.* at 806.

**B.  Liam Doe's Statements**

Like the parent's statements, Liam Doe's statements are also privileged under Florida's qualified immunity doctrine, as enunciated in *Nodar v. Galbreath* as discussed above. His "communication [was] made in good faith on…subject matter" he had an "interest" in, and one in "which he has a duty." *Id.* He made it "to a person having a corresponding interest or duty," the U.S. Embassy. Liam Doe's statements are therefore privileged from a claim of defamation. *Id.* at 809 (citing 19 Fla. Jur. 2d *Defamation and Privacy* § 58 (1980)).

As noted above, the only way to overcome this privilege is to plead and prove that he was motivated by "express malice," which Plaintiffs have not done. *See Nodar*, 462 So.2d at 810; *Thomas*, 761 So.2d at 405. His "primary motive" was not "to injure the plaintiff." *Nodar*, 462 So. 2d at 810–11; *Thomas*, 761 So. 2d at 404. Plaintiffs alleged no "contemporaneous ongoing animosity between the parties." *Thomas*, 761 So. 2d at 405. Plaintiffs do not allege that Liam Doe even knew the Tates. There were no "[s]trong, angry, or intemperate words" alleged to have passed between them, nor is there anything to suggest that Liam Doe used his "privileged position to gratify his malevolence." *Nodar*, 462 So. 2d at 810–11. Liam Doe's statements to protect Jane Doe were clearly made with good intentions—to help Jane Doe.[13] No other reasonable conclusion can be drawn.

---

[13] *Supra* note 10.

Liam Doe also has immunity from this defamation suit under the official duty immunity doctrine. In *Barr v. Matteo*, the Supreme Court held that a federal employee cannot be held liable for an otherwise defamatory statement made within the scope of his duties. 360 U.S. 564, 565 (1959). Because, the Court held, government officials should be free to exercise their duties unhampered by the fear of lawsuits. *Id.* at 571. Nor is this privilege limited to high public employees. It extends to all federal employees acting within the "outer perimeter" of their official duties. *Id.* at 572–73 ("We do not think that the principle announced … can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted…. The privilege is not a badge or emolument of exalted office…we cannot say that these functions become less important simply because they are exercised by officers of lower rank."); *see Howard v. Lyons*, 360 U.S. 593, 597 (1959); *Bush v. Lucas*, 647 F.2d 573, 574 (5th Cir. 1981) (holding that a public employee acting within his duties was immune from liability when alleged to have sent a defamatory letter).

In reporting the information about possible sex trafficking by the Tates to the U.S. Embassy, Liam Doe was acting directly within the scope of his duties. *Barr*, 360 U.S. at 573–74. As a Marine Corps Reserve Sergeant, he was instructed to always remain alert to the signs of human trafficking. He was directed to report anything suspicious. Decl. of Sgt. Liam Doe [DE 21-2 at ¶ 6]. Indeed, in an example communicated throughout the Marine Corps Reserves, another Reserve Marine who reported sex trafficking was commended publicly by his commanding officer for reporting civilian trafficking, because "his judgment and initiative in this situation are perfect examples of how Marines should feel about human trafficking." *Id.* at ¶ 11. Similarly, Liam Doe acted within the scope of authority as a Reserve Marine. The information he learned from Jane Doe constituted indicia of sex trafficking. He approached his chain of command for guidance and was advised to report it to the U.S. Embassy in Bucharest, which he did. *Id.* at ¶ 14; *See Howard v. Sikula*, 627 F. Supp. 497, 500 (S.D. Ohio 1986) (meeting the color of office standard when "all of the contacts between [Plaintiff] and Defendants relevant to the defamation claim occurred while these parties were performing duties at least apparently required by their capacities as Air Force Reservists").

Liam Doe also has immunity under the federal supremacy doctrine. Assuming, *arguendo*, that Plaintiffs can state a viable claim against Liam Doe for contacting the U.S. Embassy and

reporting human trafficking, any state-law liability is preempted by federal law. As the Eleventh Circuit has explained:

> [The] analysis examines whether the officer's acts have some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law. If the answer to these questions is yes, application of state law, to the extent it unavoidably conflicts with federal law, has no effect, as it would frustrate and impede the compelling federal interest of allowing federal officers to effectively discharge their duties. If the answer is no, state law may apply with full force, as no valid federal interest arises in protecting the ultra vires actions of a federal officer from liability.

*Denson v. United States*, 574 F.3d 1318, 1348 (11th Cir. 2009) (internal citations omitted).

Here, Liam Doe's acts have a tight nexus with federal law relating to fighting against human sex trafficking. Any state-law claims for liability for defamation run headlong into the federal policy of having zero tolerance for sex trafficking, and the Department of Defense's comprehensive training requiring the men and women of the armed forces throughout the world to recognize sex trafficking and report it to the appropriate authorities. *See* Liam Doe Decl. [DE 21-2 at ¶¶ 6–8, 11–12]. "[S]tate law liability simply cannot attach to the acts taken by federal officers in the course of their duties and committed in compliance with federal law, where such action was no more than what was necessary and proper for [the officer] to do under the circumstances, if application of state law would impede an essential federal function." *Denson*, 574 F.3d at 1349 (internal quotations omitted).

Here, the Tates' assertion that state law creates liability for defamation for reporting sex trafficking when the Tates themselves are being prosecuted for the alleged sex trafficking is not only utterly without merit, but is also barred by federal preemption. *Id.* at 1346 (The Supremacy Clause "serves to prevent state law…from interfering with or otherwise impeding federal officers as they perform their lawful duties."). Thus, as Liam Doe was acting within the scope of his duties as a Marine Reserve in reporting suspected sex trafficking to U.S. officials, his communications were privileged, and thus plaintiffs have failed to state a defamation claim against him.

IV.   <u>All Claims in the Complaint Must Be Dismissed Pursuant to Florida's Statute Prohibiting Strategic Lawsuits Against Public Participation.</u>

Strategic Lawsuits Against Public Participation (hereinafter "SLAPP lawsuits") are defined as claims "filed against a person or entity that [are] without merit and filed primarily

14

because the person or entity engaged in the exercise of a right protected by the First Amendment to the U.S. Constitution." *WPB Residents for Integrity in Gov't, Inc. v. Materio*, 284 So. 3d 555, 558 (Fla. Dist. Ct. App. 2019). Under Florida law, SLAPP lawsuits are strictly prohibited. Fla. Stat. § 768.295 (hereinafter "Florida Anti-SLAPP Statute" or "Anti-SLAPP Statute").

The case at bar meets all of the criteria set forth in the Florida Anti-SLAPP Statute. Courts have repeatedly ruled that meritless lawsuits, which seek to diminish the right to freedom of speech granted in the First Amendment, violate the Florida Anti-SLAPP Statute. In several cases, this Court dismissed lawsuits under Florida's statute—including matters in which claimants sought to silence critical speakers by alleging defamation, but were unable to establish a claim for relief. *See, e.g.*, *Davis v. McKenzie*, 2017 U.S. Dist. LEXIS 183519 (S.D. Fla. Nov. 3, 2017) (holding that an Anti-SLAPP motion to dismiss was proper when a plaintiff sued a news station for defamation for reporting on his sexual trafficking charges because, whether true or not, did not affect his reputation any more than his previously known history of sexual abuse). *See also Isaac v. Twitter*, *Inc.*, 557 F. Supp. 3d. 1251 (S.D. Fla. 2021); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110 (S.D. Fla. 2021); *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310 (S.D. Fla. 2021). This Court has also held that petitioning the government is protected under the Anti-SLAPP Statute. *McSwain v. World Fuel Servs. Corp.*, 2022 U.S. Dist. LEXIS 225352, at *16 (S.D. Fla. Dec. 14, 2022). Accordingly, pursuant to the Anti-SLAPP Statute, all causes of action shall be dismissed and Defendants shall be entitled to reasonable attorneys' fees. *Id.*; *see also* Fla. Stat. § 768.295(4).

> A. *Defendants Meet the Initial Burden to Show a Prima Facie Case that the Anti-SLAPP Statute Applies*.

Courts have employed a burden-shifting test to rule on motions to dismiss under the Florida Anti-SLAPP Statute. *Baird v. Mason Classical Acad., Inc.*, 317 So.3d 264, 268 (Fla. 2d Dist. Ct. App. 2021) (*citing Gundel v. AV Homes, Inc.*, 264 So. 3d 304, 312 (Fla. 2d Dist. Ct. App. 2019) (discussing that defendants bear the initial burden to demonstrate a prima facie case of the anti-SLAPP statute and the burden then shifts to the plaintiff's to demonstrate the claims were not primarily based on the First Amendment nor without merit)). For a motion to dismiss under the Florida Anti-SLAPP Statute, the initial burden is on the moving party to show a *prima facie* case that the anti-SLAPP statute applies. *Id.* Defendants meet the initial burden to show that the Anti-SLAPP Statute applies to this case because Plaintiffs' claims are frivolous and infringe

on Defendants' speech rights. *Id*. Next, the burden shifts to Plaintiffs to show that their claims are not primarily based on Defendants' First Amendment rights, which they are unable to do. *Id*. For these reasons, Defendants should prevail in their Anti-SLAPP claim.

A.          *Plaintiffs' Claims are Meritless.*

Defendants have established that all of the instant claims are meritless because Plaintiffs fail to articulate a factual basis for their allegations and are unable to satisfy the elements of any claim. *Mastandrea v. Snow*, 333 So. 3d 326, 327 (Fla. 1st Dist. Ct. App. 2022) (holding that "[i]n order for the anti-SLAPP statute to apply, the [moving party is] required to prove . . . [that the plaintiff] filed a meritless lawsuit"). Because Plaintiffs have failed to state a cause of action and the purpose of their suit is to retaliate against disfavored speech, this Court should grant Defendants' Anti-SLAPP claim. *See Parekh v. CBS Corp.*, 820 F.App'x 827, 826 (11th Cir. 2020) (upholding a district court's award of attorney's fees based on Florida's anti-SLAPP statute after it found that a plaintiff's claims were meritless for failing to sustain a defamation claim); *Corsi Newsmax Media, Inc.*, 519 F.Supp.3d 1110, 1127 (S.D. Fla. 2021) (holding defendants were entitled to attorney's fees under Florida's anti-SLAPP statute after finding the plaintiff's claim for defamation was meritless); *Godwin v. Michelini*, 2023 Fla. App. LEXIS 6215, at *2 (Dist. Ct. App. Sept. 6, 2023) (holding that the trial court erred in denying an Anti-SLAPP movant's motion to dismiss).

As established in this motion, and Jane Doe's motion to Dismiss, incorporated here by reference, all of Plaintiffs' claims are demonstrably frivolous and unsubstantiated by any factual allegations. This level of extreme frivolousness points to the fact that the sole reason this lawsuit was filed was in an effort to silence and harass Defendants in this case. *See infra* Parts I. through III. (establishing that Plaintiffs' claims are meritless). For the defamation claims, Plaintiffs are unable to allege any facts supporting the assertion that Defendants' statements were false or that any harm experienced was proximately caused by these statements. Compl. ¶¶ 112–25. For the false imprisonment claim, Plaintiffs fail to provide any factual support for the allegation that they were wrongfully imprisoned and that the alleged actions of Defendants were the proximate cause of the imprisonment. Compl. ¶¶ 126–29. For the tortious interference with a business relationship claim, Plaintiffs do not provide any factual support for the claim that any business relationship existed, that Defendants' actions caused an interference with the alleged business relationships, and that any harm was actually suffered. Compl. ¶¶ 131–34. For the civil

16

conspiracy claim, there is no factual support for the allegation that any conspiracy occurred, that any underlying tort occurred, and that they suffered damages as a result of Defendants' alleged conduct. Compl. ¶¶ 136–39. Finally, for the intentional and negligent infliction of emotional distress claims, claimants fail to establish any factual support for the allegations that Defendants' conduct was intentional, reckless, or negligent, that Defendants' conduct caused emotional distress, or that the alleged emotional distress is evidenced by some identifiable harm. Compl. ¶¶ 141–49. As Plaintiffs' claims are entirely unfounded, Defendants have a right under Fla. Stat. § 768.295(4) to an "expeditious resolution" of this matter as a violation of the Anti-SLAPP statute.

B.        *Plaintiffs' Claims are Based on Defendants' First Amendment Right Speech and Petition Rights.*

Plaintiffs' claims infringe on Defendants' exercise of their constitutional rights, in violation of the Anti-SLAPP Statute's prohibition on lawsuits that are "inconsistent with the right of persons to exercise such constitutional rights of free speech in connection with public issues." Fla. Stat. § 768.295(1). "Free speech in connection with public issues" is defined broadly as "any written or oral statement that is protected under applicable law and is made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a). The term "governmental entity" is similarly expansive in its scope, defined as any entity of "the state, including the executive, legislative, and the judicial branches of government and the independent establishments of the state, counties, municipalities, corporations primarily acting as instrumentalities of the state, counties, or municipalities, districts, authorities, boards, commissions, or any agencies thereof." *Id.* Accordingly, Defendants' statements are protected for two reasons. First, statements pertaining to issues of public concern—including sexual abuse, exploitation, or similar misconduct—are protected. Second, statements or allegations made to government officials—in this case to both embassy staff and law enforcement officers—are shielded.

Florida's Anti-SLAPP Statute protects "free speech in connection with public issues" and discussions about gender mistreatment in any form are a matter of public concern. Fla. Stat. Ann. §768.295(1); *Corsi*, 519 F.Supp.3d 1110 (S.D. Fla. 2021) (awarding attorney's fees under Florida's anti-SLAPP statute after finding the plaintiff's claim for defamation was meritless and

the defendant's statements were in connection with a public issue protected by the First Amendment). Discussion of gender violence is undoubtedly a social and political issue and is constitutionally protected. *See, e.g.*, *Mazza v. Hendrick Hudson Cent. Sch. Dist.*, 942 F. Supp. 187, 194 (S.D.N.Y. 1996) ("The right to speak out on political and social issues is a clearly established fundamental constitutional right."); *Doe v. Daily News, L.P.*, 632 N.Y.S.2d 750, 752 (N.Y. Sup. Ct. 1995) ("There is no question that violence towards women and rape in particular is a matter of paramount public concern."); *Elliott v. Donegan*, 469 F. Supp. 3d 40, 53 (E.D.N.Y 2020) (holding that "discussions regarding consent, power, or sex," including about #MeToo, are matters of public interest). Defendants' statements all relate to sexual abuse, gender exploitation, and human trafficking. These are also not only matters of social import, but are also "under consideration or review by a governmental entity." Fla. Stat. Ann. §768.295(2)(a); *see also Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 164 (2d Cir. 2006) ("[S]tate laws . . . criminalizing sexual assault . . . underscore the public's concern on this topic."). For example, Florida recently enacted House Bill 537 which eliminated the possibility of gain-time for persons convicted of sexual offenses. *See* 2023 Bill Text FL H.B. 537; *see also* Troy Myers, *Desantis Signs into Law Harsher Penalties for Sex Criminals*, WEAR-TV, (May 26, 2023), https://weartv.com/news/local/governor-ron-desantis-signs-house-bill-537-tougher-punishments-sex-criminals-harsher-penalties-violent-offenders-anti-crime-public-safety-05-26-2023 ("The new bill . . . is part of a broader legislative plan announced earlier this year by DeSantis with the goal of strengthening public safety.").

To the extent Defendants' statements were made directly to law enforcement or embassy officials, or were passed along to law enforcement and other governmental officials by third parties, these reports fall within the scope of Florida's Anti-SLAPP Statute. Police officers and State Department personnel are unquestionably government officials. *See Curry v. State*, 811 So. 2d 736, 743 (Fla. Dist. Ct. App. 2002) ("[C]omplaints to law enforcement agencies are a protected constitutional activity."). Courts in other jurisdictions have routinely held that statements to police are protected under the First Amendment. *See Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564, 568 (E.D. Tex. 2003) ("There is no doubt that filing a legitimate criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right."); *see also United States v. Hylton*, 558 F. Supp. 872, 874 (S.D. Tex. 1982) ("There can be no doubt that the filing of a legitimate criminal complaint with local law enforcement officials

18

constitutes an exercise of the first amendment right."). Here, Defendants' direct or secondary efforts to register a complaint with law enforcement authorities is an exercise of their petition rights. *See Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1045 (D. Minn. 2010) ("A victim's complaint that she has been assaulted plainly constitutes a grievance, and asking police to investigate or otherwise take action against the alleged perpetrator of the assault is plainly a form of petitioning the government for a redress of that grievance."). Furthermore, the criminal investigation into Plaintiffs and their conduct is "an issue under consideration or review" by government agents. Fla. Stat. §768.295(2)(a); *see Curry*, 811 So. 2d at 743 (*citing Gable v. Lewis,* 201 F.3d 769 (6th Cir. 2000) (concluding complaints "to nonlegislative and nonjudicial public agencies like a police department constitutes petitioning activity protected by the petition clause").

Plaintiffs seek to use the justice system to diminish Defendants' First Amendment rights—exactly the practice the Florida legislature sought to prohibit when passing the Anti-SLAPP Statute. Permitting these claims to proceed would not only cause irreparable harm to Defendants, but also send a dangerous message to perpetrators of sexual violence that the legal system is an effective tool for silencing their victims. Thus, the Court should dismiss all claims with prejudice, grant Defendants' Anti-SLAPP counterclaim, and grant Defendants' request for attorneys' fees pursuant to Fla. Stat. § 768.295(4).

## CONCLUSION

For the foregoing reasons, June Doe, John Doe, and Liam Doe respectfully request that the Court dismiss Plaintiffs' Amended Complaint, and the claims alleged against them, with prejudice, and grant Defendants' Anti-SLAPP counterclaim, and grant Defendants' request for attorneys' fees pursuant to Fla. Stat. § 768.295(4).

Respectfully Submitted,

Date: September 24, 2023

By:    /s/ Danielle Bianculli Pinter

Danielle Bianculli Pinter
[FBN 120441]

19

Benjamin W. Bull*
Peter A. Gentala*
Christen M. Price*
Victoria Hirsch*
 National Center on Sexual
 Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
dpinter@ncoselaw.org
bbull@ncose.com
pgentala@ncoselaw.org
cprice@ncoselaw.org
vhirsch@ncoselaw.org
Telephone: 202-393-7245


Jennifer Safstrom**
[FBN 1019759]
First Amendment Clinic
Vanderbilt Law School
131 21st Ave South
Nashville, TN 37203
Telephone: 615-322-4964
jennifer.safstrom@vanderbilt.edu
Vanderbilt First Amendment
Clinic Students, including Juliana
Strobing, substantially assisted
with the preparation of this brief.


Christian W. Waugh [FBN
71093]
Mary A. Norberg [FBN 1032028]
Sofie Bayer [FBN 1039616]
WAUGH PLLC
201 East Pine Street, Suite 315
Orlando, FL 32801
cwaugh@waugh.legal
mnorberg@waugh.legal
sbayer@waugh.legal
Telephone: 321-800-6008
Fax: 844-206-0245

*Attorneys for Defendants*
*Admitted pro hac vice.
**Request for admission filed.

## Certificate of Service

I hereby certify that on September 24, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

SERVICE LIST

Thomas Maniotis
Equity Legal, PLLC
5201 Blue Lagoon Dr., Flr. 8
Miami, FL 33126
321-313-8642
tamaniots@equitylegal.net

Joseph D. McBride
The McBride Law Firm, PLLC
99 Park Avenue, 6th Flr.
New York, NY 10016
917-757-9537
Jmcbridelawnyc.com

*Attorneys for Plaintiffs*

21