**UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF
FLORIDA WEST PALM BEACH
DIVISION
Case No.: 9:23-cv-81150-RLR**

ANDREW TATE AND TRISTAN TATE,

      Plaintiffs

vs.

JANE DOE, et al.,

      Defendants.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO JANE DOE'S MOTION TO DISMISS

      Plaintiffs, ANDREW TATE AND TRISTAN TATE, by and through the undersigned counsel, file this Response in Opposition to Defendant JANE DOE'S ("Defendant Doe") Motion to Dismiss for the grounds stated below.

### TABLE OF CONTENTS

Introduction ................................................................................................................................ 1

II. Legal Standard ........................................................................................................................ 3

    I.    Plaintiffs' Claim for False Imprisonment Sufficiently Satisfies the Minimum Plausibility Standard ........................................................................................................................... 4

    II.    Plaintiffs' Claim for Tortious Interference With A Business Relationship Sufficiently Satisfies the Minimum Plausibility Standard .............................................................................. 9

    III.    Defendant Doe Had Knowledge Of An Alleged Business Relationship ......................... 11

    IV.    Defendant Doe Intentionally Interfered With Plaintiff's Business Relationship And Her Actions Were The Direct Cause Of Such Tortious Interference ............................................. 12

    V.    The Plaintiffs have sufficiently pleaded Intentional Infliction of Emotional Distress. .... 14

    VI.    The Complaint Establishes the Prima Facie Elements for Negligent Infliction of Emotional Distress ................................................................................................................... 16

**Introduction**

Defendant Doe's Motion to Dismiss: a relentless assault on the truth and law—is the latest installment in a series of frivolous filings by Defendant that grossly distort the facts of this case. The Defense knows that when analyzing a motion to dismiss, this Honorable Court is bound to accept the factual allegations in the complaint as true while reading the complaint in a light most favorable to the plaintiffs.  To overcome this, the Defense has broken the local rules by arguing facts improperly incorporated by reference. This Honorable Court would commit reversible error if it dismissed the complaint based on extraneous matters. Even so, the Defense has spent considerable time citing news articles and videos as evidence to contradict the complaint in a futile effort to tempt this Honorable Court to make an illegal ruling.  The Defense appears to believe in this strategy so much that on October 5, 2024, in Bucharest, Romania, attorney Jillian Roth, in referring to this case, explicitly stated to the Romanian Press that: ***"The Federal Judge in the United States, in her opinion, herself, upon review of the evidence submitted, called the women victims."*** Plaintiffs know that such a statement is untrue and contradicts this Court's order calling the Defendants "alleged victims." However, we must point out that such statements undermine and disparage the judicial process.

It is a fact that Black men are disproportionately convicted after being accused by women of crimes involving sexual advances and threats of violence.[1]  Andrew and Tristan Tate are two men of African American descent who have been falsely accused of crimes they did not commit by a woman with a history of perjuring herself. Two men who have vociferously proclaimed their innocence since the time of their arrest. The National Registry of Exonerations contains throngs of men who have suffered heartbreaking loss stemming from the kind of false allegations that have been levied against Andrew and Tristan Tate.[2]  Loss resulting from culturally incompetent arguments that criminalize minority speech patterns and play on age-old stereotypes.[3]. These tiresome, antiquated tactics deployed by defense counsel may have been effective weapons in courts of segregation, but they have no place in today's world or—this Honorable Court.

---

[1] See From "Emmett Till to Pervis Payne — Black Men in America Are Still Killed for Crimes They Didn't Commit" @ https://innocenceproject.org/emmett-till-birthday-pervis-payne-innocent-black-men-slavery-racism/.
[2] See:  The University of Michigan's National Registry of Exonerations @ https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx.
[3] See Race and Wrongful Convictions in the United States:  The number of exonerations we consider has grown by almost 70%  @ https://www.law.umich.edu/special/exoneration/Documents/Race%20Report%20Preview.pdf.

1

Andrew and Tristan Tate are American citizens who are the product of a broken home. They are not college-educated. Andrew is a Muslim, and Tristan is a Romanian Orthodox Christian. Each takes their respective faiths seriously.  Both brothers were born and raised in circumstances that statistically indicate that they easily could have chosen a life of crime—but did not. Plaintiffs have risen to the heights of success many people dream of attaining because they consciously decided to use the circumstances under which they were born as fuel for the fire of personal achievement. Their charitable efforts, from TATE PLEDGE alone, have helped more than one million impoverished people in over fourteen countries worldwide.[4]  Some of their online remarks may sometimes sound like Howard Stern. And their religious conversions have inspired many to give faith a chance.  None of that, or the litany of extrinsic material the defense has cited in its Motion to Dismiss, has to do with anything with the causes of action laid out within the four corners of this Complaint.

The four corners of our well-pled Complaint outline a tragic and troubling history of a troubled adult woman who weaponized the Justice System as a youth.  Indeed, society may have failed to save Defendant Doe from the harsh reality of an unfair upbringing—but that is no excuse or justification for her actions.  Disadvantaged youth who exhibit patterns of criminal behavior as teenagers often receive jail sentences as adults. A disadvantaged youth may be a mitigating factor at sentencing. It is, however, no excuse nor justification for torts or crimes committed by adults. Our Complaint makes clear that Defendant Doe was an adult woman when she met Tristan Tate at a War Room event in Miami, Florida, and then solicited Tristan Tate to move to Romania, where she spent a total of six days before making a series of false reports first that resulted in a fully armed, highly trained SWAT team descending upon the Tate Estate in April of 2022. Swatting is the act of falsely reporting a serious law enforcement emergency, resulting in a SWAT team descending upon a residence, creating a risk of injury and death.  That is exactly what happened in this case, with SWAT officers going as far as to threaten to shoot a family dog that perceived the aggressive and brutal raid as a threat to the owners, Iasmina Pencov and Beatrice Anghel. Swatting, often described as terrorism[5], is a felony under Federal and Florida State Law, punishable by up to 20 years of prison.  Defendant Doe fraudulently accused Plaintiffs, resulting

[4] See: *Tate Pledge Impact Statistics*, https://cobratate.com/pledge (last visited Oct. 23, 2023).
[5] See: Matthew James Enzweiler, Swatting Political Discourse: A Domestic Terrorism Threat, 90 Notre Dame Law Review 2001(August, 2015), https://scholarship.law.nd.edu/ndlr/vol90/iss5/9/.

2

in their being swatted and incarcerated.  The plaintiffs' personal lives and professional reputations were severely damaged as a result, as were those other home occupants whose lives were irreversibly traumatized by the police raids. Plaintiffs demand justice.

## II. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly* citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim tests the complaint's sufficiency—it does not reach the case's merits. *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984). In *Ashcroft v. Iqbal*, the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Under the Supreme Court's ruling in *Bell Atlantic Corp. v. Twombly*, a pleading rife with "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." Nor will "a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 557).

When analyzing a motion to dismiss, the Court accepts factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir. 1988). The Court limits its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); see also *GSW, Inc. v. Long Cty., Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). In making its determination, the Court must consider whether a claim is plausible on its face. Importantly, the Court's review cannot exceed the Complaint's four corners and exhibits. *Newberry Square Fla. Laundromat, LLC*, supra at 589 (Fla. 1st DCA 2020). Where a motion to dismiss rests on facts outside the scope of the allegations contained in the complaint, the trial court commits reversible error in dismissing the complaint based on those extraneous matters." *Hewett-Kier Constr., Inc. v. Lemuel Ramos & Assocs., Inc.*, 775 So. 2d 373, 375 (Fla. 4th DCA 2000). The Court, therefore, cannot consider news articles and videos as evidence to contradict the complaint because such determinations are properly reserved for a jury.  Neither can the Court deem meritorious threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, as proof that a plaintiff did not plausibly establish each one of their

claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet the standard of plausibility").

To survive a Motion to Dismiss, a complaint must contain sufficient factual allegations that would entitle the pleader to the relief sought if determined to be true. Therefore, a complaint cannot be dismissed when its corners contain facts that are sufficient to satisfy the minimum plausibility pleading standard for each cause of action independently. *Id*.

False imprisonment in Florida is defined as "'the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty." *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir.2006) (quoting *Escambia Cnty. Sch. Bd. v. Bragg*, 680 So.2d 571, 572 (Fla. 1st Dist.Ct.App.1996)). "In a false imprisonment action, the plaintiff is required only to 'establish imprisonment contrary to his will and the unlawfulness of the detention.'" *Id*. (quoting *Rivers v. Dillards Dep't Store, Inc.*, 698 So.2d 1328, 1331 (Fla. 1st Dist.Ct.App.1997)). There is, however, an exception. In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim and (2) its authenticity is not challenged. *Id*. (quoting *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir.2010)).

## I.    Plaintiffs' Claim for False Imprisonment Sufficiently Satisfies the Minimum Plausibility Standard

Under Florida law, to establish a claim for false imprisonment, the plaintiff must establish: "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' ... 4) which is unreasonable and unwarranted under the circumstances." *Archer v. City of Winter Haven*, 846 F. App'x 759, 763 (11th Cir. 2021). Moreover, the Florida Supreme Court has held that "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Id* citing *Johnson*, 19 So. 2d at 700.

Defendant Doe argues that the Romanian Police's act of detaining Plaintiffs was lawful and cites *Johnson v. Barnes & Noble Booksellers, Inc.*, FL's 11th Cir. (2006) as precedent and expects the inquiry to end there. Defendant Doe is reticent to compare the underlying facts to the instant matter because *Johnson* speaks to reasonable temporary detention by law enforcement pursuant to misdemeanor theft allegations. The instant matter, however, centers upon something

entirely different: Defendant Doe's illegal swatting of Plaintiffs that resulted in their unlawful detention and deprivation of liberty. A direct result of the Defendant's illegal tortious act and premeditated lies to influence a police investigation and procure the Plaintiffs' confinement.

Congress has defined swatting as "the use of the telephone system, or any other means of communication, to knowingly make a false report that a person or persons are in imminent danger of serious bodily injury or death, and/or that a criminal offense has been committed, with the intent to trigger a response by a law enforcement agency."[6]

According to the Department of Justice, swatting implicates Federal interests,[7] and the DOJ has successfully prosecuted swatters nationwide. *See*, e.g., *United States v. Tollis*, No. 3:15-cr-00110 (D. Conn. 2015); *United States v. Neff*, No. 3:11-cr-00152 (N.D. Tex. 2013); United States v. Hanshaw, No. 4:13-CR40018 (D. Mass. 2013); *United States v. Rosoff*, No. 3:07-cr-00196 (N.D. Tex. 2008). Swatting scenarios can vary greatly; consequently, charging options are highly fact-dependent. In most cases, swatting violates the interstate threats statutes and/or the hoax statute. *See* 18 U.S.C. §§ 875, 844(e), 1038 (2015).

18 U.S.C. § 1038 criminalizes false information and hoaxes: "Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place" that would constitute a violation of certain other statutes. Violations of section 1038 carry up to 5 years of imprisonment, up to 20 years imprisonment if serious bodily injury results, and up to life imprisonment if death results. Swatting is classified as a third-degree felony in Florida, punishable by up to 5 years in prison and civil fines. Swatting is a first-degree felony, punishable by up to 30 years in prison in more serious cases.

Our Complaint establishes at the length that Defendant Doe caused her friend and lover, Liam Doe, whom she believed was a Marine and, in her view, someone with the requisite authority to manage allegations of human trafficking,[8] to "call the [United States] embassy in Romania"

---

[6] See H.R. 2031, Anti-Swatting Act of 2015 (August 4, 2016), https://www.cbo.gov/publication/51868.

[7] See United States Attorney's Bulletin: Cyber Misbehavior: Investigating and Prosecuting "Swatting" Crimes" (64 Cyber Misbehavior 1) (May 2016), https://www.justice.gov/usao/file/851856/download.

[8] The Defendant's argument that "she did not contact law enforcement directly or influence their investigation" (Mot. to Dismiss at 3) is seriously undermined by their repeated insistence that Liam Doe is a "Marine Reservist"; that he had a "duty as a Marine Reserve" to report instances of human trafficking, as well as "to report to his chain of command and he did so." [Dkt. 51 at 3-4]. Moreover, they insist that "the **causal connection between the lawsuit against Liam Doe and his official duties is clear**." [Dkt. 51 at 4] [Emphasis added.]. Thus, Defendant's constant

5

(Compl. at 96). Our Complaint also demonstrates that Defendant Doe sent messages to the other defendants in this case, alleging that Doe was being held against her will and trafficked. The reasonable inference here is simple. Defendant Doe contacted her loved ones and someone she believed to be associated with the US Government. Multiple conversations occurred regarding contacting the United States Embassy to rescue Defendant Doe from a fictional human trafficking hostage situation. The evidence proffered in our Complaint clearly shows that Defendant Doe and Defendant Mary Doe were always free to leave. Therefore, Defendant Doe intentionally and wrongfully weaponized the United States Government and its partners in Romanian Law Enforcement against Plaintiffs for an illegal purpose.

The United States Government and its partners in Romanian Law Enforcement acted on fraudulent emergency intelligence that originated with Defendant Doe. Plaintiffs were swatted on (April 12, 2022 (Compl. at 100)), when a fully armed Romanian Swat Team descended upon the home rented by Iasmina Pencov and Beatrice Anghel and then the home owned by the Tate Brothers. The Plaintiffs' lives were put at grave risk during this event, as well as the lives of Iasmina Pencov and Beatrice Anghel who have detailed in their affidavits that they are not victims of human trafficking or any other crime DE 31-4, Ex. H. The Plaintiffs and innocent bystanders are lucky that they were not shot or killed during the Romanian Swat Team's raid. Cash and assets totaling approximately five million dollars were wrongfully seized from the Plaintiffs' Estate and are now estimated to be over twelve million dollars in seized assets from the Plaintiffs' Estate. The plaintiffs were jailed and then imprisoned without due process. The Plaintiffs spent extended periods in solitary confinement in squalid conditions during the pendency of their incarceration. Next, they were jailed under house arrest and remain to this day on some form of restricted mobility. The false allegations, subsequent swatting, corresponding arrest, wrongful incarceration, and current deprivation of the Plaintiffs' liberty are clearly against their will. Plaintiffs have suffered personal and professional damages as a result.

The imminent threat of harm to Plaintiffs' professional and business lives is ongoing. For instance, Defendant Doe initially conspired with family and friends to effectuate her corrupt purpose. She swore to DIICOT that her allegations were true and then later testified to the veracity

---

assertions that Liam Doe was a military official whose duties included reporting human trafficking, which he dutifully executed upon being ordered by Defendant Doe, demonstrates that she did both "instigate" and "contact law enforcement directly" pursuant to *Archer*'s test for wrongful detainment. *Archer*, 846 Fed. App'x at 764.

of her fraudulent accusations in a Romanian Court, where she encouraged Plaintiff's incarceration. The plaintiffs have a recording of Defendant Doe's false statements made to a Romanian Judge on April 12, 2023. In the audio recording, Defendant Doe also makes a series of new fraudulent allegations, such as that Andrew and Tristan Tate have ties to the KGB and other Mafia organizations. Defendant Doe explained to the Romanian Court that she was qualified to make these determinations because she was born in Kazakhstan and could simply spot people like these.[9] Defendant Doe makes a disconcerting statement about a set of facts that she does not know whatsoever: "This is a theory," but "they groom women… whether it is for 2 to 5 years… 10 years to become drug runners for them." At that moment, a third Person can be heard in the courtroom informing, presumably the translator or judge, that Defendant Doe is mistaken because those facts are related to another case. This obviously raises questions about Defendant Doe's testimony being improperly coached to falsely testify to the Romanian Judge. Defendant Doe further alleged to the Romanian Judge that she was prohibited from paying for her food. This is a lie because Defendant Doe's text messages clearly indicate that she and Mary Doe ordered food through third-party delivery services, such as Glovo.[10] Defendant Doe alleged that she was not allowed to pay for her food, suggesting that she was required to repay through sexual exploitation. None of this is true, and any reasonable-minded person can understand that these statements were made to encourage the Romanian Court to deprive Plaintiffs of their freedom.

Strikingly, Defendant Doe makes another presumably coached statement to the Romanian Court regarding the Romanian Prosecution's "Lover Boy" theory regarding Andrew and Tristan Tate: "I can explain how this is trafficking and not just sexual exploitation." "Under the definition of human trafficking, there are three types of human trafficking." "The trafficking which this fits under and described as is debt bondage… You build the relationship with somebody as these two men have said everywhere publicly…" "They move you to Romania—they do everything they can to convince you to move to Romania." These statements clearly contradict the text messages between Tristan Tate and Defendant Doe. As plaintiffs have thoroughly outlined in the Complaint, Tristan Tate even asked Defendant Doe if she wanted to leave the United States. See Compl. at 68

---

[9] In Defendant Doe's request to make the brothers look as terrible as possible, she did not take into account that the KGB been disbanded since 1991. See also KGB, https://en.wikipedia.org/wiki/KGB#:~:text=The%20Committee%20for%20State%20Security,1954%20until%20%203% 20December%201991.

[10] See DE 31-4, Pgs. 28-34. (Text Messages between Defendant Doe and Mary Doe).

("In fact, T.Tate on several occasions did just the opposite, and questioned her motives by asking: 'do you really want to leave the USA?' T. Tate believed that E. Gabbey already lived quite well in Florida, since he was under the impression that she came from a wealthy family. T. Tate therefore made efforts to ground E. Gabbey's dreams about Romania in realistic expectations")[11].

Defendants further claim that Plaintiffs did not "actually detain the Tate Brothers." Mot. to Dismiss at 3. Further, Defendant Doe asserts that she "did not 'instigate' the other's arrest by law enforcement," because, citing *Archer*, "she did not contact law enforcement directly or influence their investigation." Mot. to Dismiss. at 3. This is an unacceptable misapplication of both the facts and the law. As discussed above and elaborated in the Complaint, the Tate Brothers "were unlawfully incarcerated and wrongfully detained for months as a direct result of the human trafficking and baseless allegations lodged against them by Defendant Doe and Mary Doe and disseminated by the other Defendants." Compl. at 128. The Tate Brothers were first swatted and then imprisoned without due process, where they spent extended periods in solitary confinement in squalid conditions. Next, they were jailed, then put on house arrest, and remain to this day on some form of restricted mobility as a direct result of Defendant Doe's allegations. This chain of events is easily proven by the multitude of Defendant Doe's text messages cited in our Complaint: "we are writing a moving asap" (Compl. at 87); "I am not so concerned. Tristan doesn't really care if I leave" (Id. at 94); "we played our role really good today" (Id. at 98); "don't make any calls [to the U.S. Embassy] please. I want to go to London lol". (Id. at 91). At some point, Defendant Doe attempts to backtrack on her claims of human trafficking, — but the gun had been fired; the bullet left the chamber, and the damage was already done. "I wish I could take it back" (Compl. at 97).

Defendant Doe clearly lied to law enforcement, a Romanian Judge, friends, and family members, Liam Doe, and with malicious purpose. She purposefully influenced authorities to obtain the arrest and incarceration of Andrew Tate and Tristan Tate. Lying to law enforcement and courts of law is in no way covered under qualified immunity or any other immunity. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (denying qualified immunity where defendants forwarded a known false confession to prosecutors). Unlike Defendants who have "not

---

[11] See DE 31-4, Pgs. 16-7.

seen the evidence,[12]" Plaintiffs are in possession of copious false, malicious, and downright ridiculous statements made by the Defendant, Jane Doe.[13]

## II.   Plaintiffs' Claim for Tortious Interference With A Business Relationship Sufficiently Satisfies the Minimum Plausibility Standard

Our Complaint demonstrates that Defendant Doe actively used the Seeking Arrangements website before meeting Tristan Tate. Seeking Arrangements is a dating website specifically created to match women seeking to use romantic relationships for upward mobility, "sugar babies" with affluent men called "sugar daddies."  This fact was not included in our complaint to shame Defendant Doe, but to demonstrate that she had been pursuing affluent men, like Tristan Tate, long before she met Tristan Tate at War Room event in Miami, Florida. Our Complaint also makes clear that Defendant Doe was an adult woman when she met Tristan and solicited Tristan Tate to move to Romania, where she spent a total of six days before accusing Tristan and Andrew Tate of human trafficking.

Bizarrely, Defendant makes the sweeping assertion that the Tate Brothers are "public figures," thereby requiring Plaintiffs to prove that Defendant Doe acted with "actual malice," when she committed tortious interference with their business relationships, satisfying the standard of fault from *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 686 (1964). However, the problem here is that **Defendant offers hardly any support to support this claim** (Dkt. 51 at 4).  Instead, she runs roughshod over the Southern District of Florida's Local Rules by "incorporat[ing] by reference" the arguments made from other motions, which are erroneous for at least two critical reasons.

First, being that "actual malice" is the highest standard of fault for defamation-related torts, it requires an exhaustive analysis, not just a throwaway sentence followed by a conclusory statement of law, to fully meet *Twombly* and *Iqbal*'s plausibility pleading standard to dismiss a motion.  See Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009).  Our Complaint, in addition to offering more than enough sufficient facts to establish that Defendant Doe tortiously interfered with the Tate Brothers' business

---

[12] Ms. Roth stating to the media in Romania "we have not seen the evidence," *See* https://drive.google.com/file/d/1lZvJgmO17ec4A8KrQWALHeYMcSny6Cjz/view?usp=drive_link
[13] These additional statements are intended to be included in an Amended Complaint when it is appropriate to seek leave of court. However, it is not the purpose of a complaint to try and outline the entire case and facts, but only facts that would make only such cause of actions plausible.

relationships, offers additional – direct and circumstantial – facts[14] that go a long way towards establishing that the Tate Brothers, at least at the time in which the events bringing forth this civil action took place, arguably qualified as limited-purpose public figures,[15] or even private figures,[16] under Florida law.

Second, and more importantly, Defendant notes a distinction between "actual" and "express malice" in the section that discusses tortious interference with a business relationship. Dkt. 51 at 5.  Defendant Doe then makes another bald-faced conclusory statement that "[a] claim of tortious interference with a business relationship must satisfy the 'actual malice' standard of *N.Y. Times v. Sullivan*.  376 U.S. 254, 279-80 (1964).  But that landmark Supreme Court decision deals with the **rights of American public officials to sue for defamation**; critically, nowhere in

---

[14] Evidence for the Tate Brothers' meeting one of the lesser standards of proof for defamation-related torts is elaborated all throughout our Complaint.  The following are just a few examples:

- "Unfortunately, their [social media] following, previously amassed across Twitter, Instagram, Facebook, and YouTube, was wiped out due to the spurious false allegations underpinning the allegations in this Complaint."  Compl. at 23.
- "Their losses due to this interruption are in the tens of millions of dollars."  Compl. at 23.
- "Their prominence has significantly increased over the past twelve months due to the viral internet clips from the summer of 2022."  Compl. at 29.  Importantly, the Tate Brothers went viral, and achieved internet fame, after the events of this lawsuit took place, which were in late 2021 and early 2022. See Compl. at 64-66.

[15] The United States Supreme Court has given the label "limited-purpose" public figures to "individuals who 'have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved.'"  *Gertz v. Robert Welch Inc.,* 418 U.S. 323 (U.S. 1974).  To the extent the "actual malice" standard attaches to such persons, it only extends as far as defamatory statements involving matters germane to the topics about which they are considered public figures, and nothing outside that scope.  See *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988).  Facts that would establish the Tate Brothers as limited-purpose public figures are discussed in part in footnote 4, and at much greater length throughout Plaintiffs' Complaint.  The human trafficking allegations lodged against the Tate Brothers by Defendant Doe are decisively not germane to the reasons to which they are, if at all, known to be public-figures: namely, as "entrepreneurs and social media influencers with an international following."

[16] In distinguishing between "limited public figures" and "private figures" for the purposes of a defamation claim, the Eleventh Circuit laid out the following two criteria: (1) "public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy"; and, more importantly, (2) public figures typically "voluntarily expose themselves to increased risk of injury from defamatory falsehoods."  *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (citing *Silvester*, 839 F.2d at 1494).  Here, as stipulated at great length in our Complaint, the Tate Brothers only became internet famous many months after the events giving rise to this action occurred.  Compl. at 29.  Moreover, as a result of Defendant Doe's false allegations, the Tate Brothers' ***entire*** social media following – including "Twitter, Instagram, Facebook, and YouTube [were] wiped out," restricting the scope of their media access – and, importantly, severely undercutting their ability to counteract false statements which characterizes public figures.  Compl. at 23.  In the months that followed, once the Tate Brothers were falsely imprisoned, their reach was reduced even further: "they languished behind bars for months under egregious conditions of confinement that included long stints of prolonged solitary confinement" in which they had little to no access to proper medical care and legal counsel, let alone any ability whatsoever to counteract false statements about themselves in the media.  Hence, there is a strong case to believe the Tate Brothers were private individuals, at least during the events germane to this lawsuit, and that Defendant Doe was wrong to jump the gun and call them "public figures," especially without any evidence to support such a sweeping allegation.

that decision is the relevant tort even mentioned.  In an accompanying footnote, Defendant claims their reasons for bringing up the distinction are "incorporated by reference," in the "Memorandum to Dismiss Defamation claims by June and John Doe." Still, as already discussed, such discussion patently circumvents the 20-page limit stipulated in the Local Rules and is thereby irrelevant.  Dkt. 51 at 5.  Local Rule 7.1(c)(2).

However, even if it were relevant, the prima facie elements for the claim tortious interference with a business relationship that Defendant Doe delineates **do not distinguish between public and private figures like in a defamation claim**.  Instead, Defendant alleges that Plaintiffs "do not assert (1) the existence of an advantageous business relationship under which Plaintiffs have legal rights; (2) that Defendant Doe knew about the business relationship; (3) Defendant Doe intentional and unjustified interference with that relationship; and (4) damages. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)."  Dkt. 51 at 5.

### III.    Defendant Doe Had Knowledge Of An Alleged Business Relationship

Defendant asserts, wrongly, that "Plaintiffs give no details of any business relationship with which Defendant Doe allegedly interfered."  Dkt. 51 at 5.  In fact, Plainitffs provides plenty of evidence in our Complaint supporting a business relationship claim.  The Complaint refers to both the *War Room* and *Hustlers University*, Compl. at 125, wherein the Plaintiffs have an identifiable agreement to promote these organizations through live events, online and digital marketing, and other forms of publicity.  Decl. at 31, Ex. C.  Moreover, our Complaint states, "T. Tate found [Defendant Doe] interesting and invited her to a **Tate affiliated War Room event** taking place in Miami during December 2021."  Compl. at 65.  Further, the Complaint includes text exchanges between [Defendant Doe] and her mother, Florida June Doe, where Defendant Doe demonstrated knowledge of the Tate Brothers' War Room affiliation: "…I also have an **amazing friend, Tristan**, that's coming [to Florida] from **Romania** to host a **big business conference**."  Compl. at 64, 79.  Also, one of Defendant Doe's motivations to travel to Bucharest in the first place, at least originally, as detailed in the Complaint, was to draw upon the Tate Brothers' Romanian network "to further her online presence."  Compl. at 66.

11

**IV.    Defendant Doe Intentionally Interfered With Plaintiff's Business Relationship And Her Actions Were The Direct Cause Of Such Tortious Interference**

Defendant Doe further claims that Plaintiffs failed "to allege both (1) any action by Defendant Doe – much less any action that can be construed as intentional interference in Plaintiffs' business relationships; and (2) any causal link between the purported actions taken by Defendant Doe and any damages suffered by Plaintiffs."  Defendant Doe then states that "if a defendant acted not solely with malice, but also to protect their own interests in mind, then the court will not assign liability."  Importantly, Defendant Doe goes outside the four corners of the Complaint yet again, by referencing a news article from the BBC, claiming that Andrew Tate is a "self-proclaimed misogynist influencer," as "evidence" that Defendant Doe acted to protect her own interests, and did not act with malice.

Several obvious errors are afoot here.  One, there is no "malice" prong to asserting a prima facie case for tortious interference.  The prima facie elements a Plaintiff must prove to succeed on a claim for tortious interference of a business relationship under Florida law are as follows: (1) the **existence** of a business relationship; (2) that defendant had **knowledge** of the relationship; (3) the defendant **intentionally and unjustifiably interfered** with the relationship; and (4) the plaintiff suffered **damage** as a result." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1238 (S.D. Fla. 2015) (citing *Williams*, 2011 WL 4368980 at *12 (citing *Gregg v. U.S. Indus*., Inc., 887 F.2d 1462, 1473 (11th Cir.1989); *Tamiami Trail Tours, Inc. v. J.C. Cotton*, 463 So.2d 1126, 1127 (Fla.1985)). See also Compl. at 131.  Her reliance on a showing of "malice" as a prerequisite to establish tortious interference is another conclusory statement that is not supported by any relevant legal authorities whatsoever.[17]

In the unlikely event that malice was relevant, however, the Complaint does more than enough to show that Defendant Doe wanted to destroy the Tate Brothers' lawful businesses and render damages to them due to her tortious actions.  In addition to her trail of past diabolical exploits, evidence for Defendant Doe's intent to interfere with their businesses is observed in the

---

[17] To support her ridiculous claim, Defendant Doe cites a forty-three-year-old case from the Third District of Florida, outside our jurisdiction, that makes reference to a case from 1923 in which a Florida District Court ruled that a showing of "some harboring of personal malice," combined with some other motivating reason for protecting one's interests, would not hold the Defendant liable in tort.  *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1226 (Fla. Dist. Ct. App. 1980). This is the only supporting authority, which appears to implicate a factual scenario that predates the tort itself, and to the extent these facts cited are related, they fall outside our jurisdiction.

fact that she conscripted Mary Doe, another visitor, and conspired with her to defraud the Tate Brothers of €200,000.00.  Compl. at 85.  Indeed, the Complaint includes text messages in which Defendant Doe tells her co-conspirator to "try to get $ from andrew," and then to "cover [your] tracks" upon execution.[18]  Compl. at 85-86.  Once that failed, Defendant Doe decided to pivot, claiming she was being "human trafficked," an extremely serious criminal felony that Defendant Doe deliberately chose for the severe personal and professional consequences that would necessarily follow from it.  The Complaint goes to great lengths to establish that Defendant Doe was **patently *not*** being human trafficked: (i) Tristan Tate attempted to talk Defendant Doe out of coming to Romania (Compl. at 68); (ii) Tristan Tate and Defendant Doe had consensual intercourse on the night of her arrival (Compl. at 72); Defendant Doe was never restricted in her movements or confined to one place during her six-day-long stay in Bucharest (Compl. at 72); Defendant Doe was only able to conscript one other woman visitor, Mary Doe, to go along with her scheme (Compl. at 84); Defendant Doe lied about being a human trafficking victim but thought her performance "Hollywood worthy" (Compl. at 87); among countless other examples. Despite all of this, Defendants take a various set of phases to try to misconstrue that Tristan Tate was somehow forcing Defendant Doe to come to Romania.

Nevertheless, Defendant Doe proceeded to contact her friend, Liam Doe, who was also a military officer, and lied to him about the human trafficking allegations.  But upon realizing the crisis she directly caused, thereafter instructed him to not report her allegations to the United States Embassy in Romania – advice, which Liam Doe ignored and proceeded to do so anyway.  Compl. at 91.  Defendant Doe published these unfounded and egregious allegations, not only to Liam Doe, but to her parents, June Doe and John Doe as well, who are Florida residents.  These allegations directly caused a police raid by Romanian authorities that led to the Tate Brothers' arrest, and subsequent wrongful incarceration and wrongful detainment.  Compl. at 100-101.

---

[18] Defendant Doe claims that the Plaintiffs are unable to show an actionably underlying tort or wrong to form the basis of their conspiracy.  Compl. at 8-9.  This is flatly wrong.  The Complaint details how Defendant Doe and Mary Doe conspired to obtain money from the Plaintiffs by false pretenses, as well as intentionally inflicting emotional distress upon them.  Compl. at 137-139.  Moreover, as explained herein, both parties involved conspired to falsely imprison the Tate Brothers and obtain money from them by being labeled victims, that would allow them to sue and be handsomely compensated.  Indeed, Defendant Doe was a professional courtesan – prior to meet the Tate Brothers, she had a well-documented history of romantic conquests, as explained in our Complaint, proof of which is found on her reliance on such websites like "OnlyFans" and "TikTok" as a "webcam model" (Compl. at 66), among her numerous romantic conquests and having thoroughly mastered the art of manipulation (Compl. 37-42).

Lastly, Defendant Doe's false allegations of human trafficking directly caused, in addition to untold physical pain and emotional distress to the Tate Brothers, millions of dollars in damages to their various business affiliations – both economic and reputational damages which are expressly stipulated in our Complaint, in an amount exceeding $5,000,000.00 to be proven at trial. Compl. at 24-25, 134.

**V.     The Plaintiffs have sufficiently pleaded Intentional Infliction of Emotional Distress.**

A claim for IIED consists of the following elements: "(1) the wrongdoer's conduct was intentional or reckless; ... (2) the conduct was outrageous; that is, as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Williams v. City of Minneola*, 619 So.2d 983, 986 (Fla. 5th Dist.Ct.App.1993); *See Also Hart v. U.S.*, 894 F.2d 1539, 1548 (11th Cir.1990) (citing *Metro. Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla.1985)). Whether conduct is sufficiently "outrageous" to state a claim for IIED is a question of law for the Court to decide. *See Medina v. United Christian Evangelistic Ass'n*, No. 08–22111–CV–Cooke, 2009 WL 653857, at *4, 2009 U.S. Dist. Lexis 19515, at *12 (S.D.Fla. Mar. 9, 2009); *Ponton v. Scarfone*, 468 So.2d 1009, 1011 (Fla. 4th Dist.Ct.App.1985).

The Complaint clearly shows that Defendant Doe's conduct was intentional and reckless. She has a long history of wrongfully accusing men of misconduct after inducing men into romantic relationships under false pretenses. The Complaint demonstrates through her statements and video evidence that Defendant Doe was free to leave the Tate Estate at any time. The evidence shows that she published messages to Florida stating that she was being human trafficked, resulting in the Plaintiffs being swatted and incarcerated. The Complaint shows that she lied in open court— not for the first time as thoroughly detailed in another lawsuit filed against Jane Doe by Kenneth Fisher.[19] In that lawsuit, which is Exhibit A to Plaintiffs' Complaint, details text messages between Mr. Fisher and Jane Doe wherein Jane Doe admits to "a completely false narrative" to obtain a restraining order against him. As stated above, Defense Counsel recently held a press conference in Romania reiterating Defendant Doe's litany of false allegations, resulting in new restrictions for

---

[19] DE 31-4, Ex. A.

the Plaintiffs. Defendant Doe's actions were and continue to be purposeful, malicious, reckless—and ongoing.

Defendant Doe's conduct is outrageous and extreme to the point of going beyond all possible bounds of decency. Her conduct is atrocious and utterly intolerable in a civilized community. It is a fact that Black men are disproportionately convicted after being accused by women of crimes involving sexual advances and threats of violence.[20] Andrew and Tristan Tate are of African American descent and falsely accused of heinous crimes they did not commit by a woman with a history of perjuring herself in court.[21] Two men who have vociferously proclaimed their innocence since the time of their arrest. The National Registry of Exonerations contains throngs of men who have suffered heartbreaking loss stemming from the kind of false allegations and culturally incompetent arguments that have criminalized minority speech patterns and play on age-old stereotypes. The kind of filth that's been levied against Andrew and Tristan Tate.[22]

Defendant Doe has gone to great lengths to silence Plaintiffs' voices because she fully realizes that any reasonable Floridian would arouse their resentment against her and exclaim, "This is Outrageous!" after hearing these facts of this Complaint openly recited. *Merrick v. Radisson Hotels Int'l, Inc.*, 06–cv–01591–T–24TGW (SCB), 2007 WL 1576361, at *4 (M.D.Fla. May 30, 2007); *See Also McCarson*, 467 So.2d at 278–79. Defendant Doe, again, tries to use impermissible news articles and interviews to claim that the Plaintiffs did not suffer severe emotional distress. Again, this is not proper for the court to take into consideration and would be properly reserved for a jury.

Defendant Doe has irreparably tarnished Plaintiffs' achievements, ruined their professional reputations, and caused them permanent physical and emotional harm because (a) they have been stripped of their good standing in their community and will forever be associated with human trafficking. (b) A fully armed swat team raided their home, subjecting them to the risk of serious violence and death. (c) Assets and cash worth an estimated five million dollars were taken from

---

[20] See Samuel Gross, et al., *Race and Wrongful Convictions in the United States 2022*, National Registry of Exonerations (September 2022) ("The number of exonerations we consider has grown by almost 70%."), https://www.law.umich.edu/special/exoneration/Documents/Race%20Report%20Preview.pdf.

[21] See Daniele Selby, From "Emmett Till to Pervis Payne — Black Men in America Are Still Killed for Crimes They Didn't Commit," Innocence Project (July 25, 2020), https://innocenceproject.org/emmett-till-birthday-pervis-payne-innocent-black-men-slavery-racism/.

[22] See: The University of Michigan's National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last visited Oct. 23, 2023).

them. (d) They were incarcerated in squalid conditions in a dangerous prison. (e) They were subjected to long periods of solitary confinement. (f) Each of them witnessed all the above things happen to their brother and best friend, which in turn has exacerbated and compounded their physiological, psychological, and emotional suffering. It is entirely reasonable to state that the only thing that could have caused them more harm would have been watching their brother seriously injured while being swatted or killed while in jail. (g) The harm they are enduring is ongoing.

## VI.   The Complaint Establishes the Prima Facie Elements for Negligent Infliction of Emotional Distress

Under Florida law, a plaintiff must show four elements to satisfy a claim for NIED: (i) the plaintiff must suffer a discernible physical injury; (ii) the psychological trauma must cause the physical injury; (iii) the plaintiff must be involved in the event causing the negligent injury; and (iv) the plaintiff must have a close personal relationship to the directly injured person. *LeGrande v. Emmanuel*, 889 So. 2d 991, 994 (Fla. Dist. Ct. App. 2004).

For reasons stated in the IIED section, Andrew and Tristan Tate both suffered from a number of physical injuries caused by Defendant Doe's actions. Defendant Doe's claim that Plaintiffs' NIED claim fails because the "Tates did not suffer a physical injury," as required by the "impact rule." Dkt. at 18—is flatly wrong. Our Complaint alleges more than just mental anguish or psychological trauma – but physical symptoms directly caused by the psychological harm Defendant Doe inflicted: severe chest pain, chronic insomnia, breathlessness, weight loss, and various other severe infections affecting vital organs because of the squalid conditions they endured while incarcerated together and that they observed each other enduring.  Compl. at 144. Defendant Doe's false allegations of human trafficking were the actual and proximate cause of their incarceration and physical injuries.  Therefore, the "impact" requirement was met.

Defendant's claim that nothing in our Complaint supports "a finding that Defendant Doe acted negligently," and that "everything she did was perfectly reasonable."  Dkt. at 18 is utterly ridiculous.  Simply put, Defendant Doe is detached from reality if she sincerely believes lodging false allegations of human trafficking constitutes "perfectly reasonable" behavior.  Defendant further hedges a bit by claiming "if she had any duty, it was not to protect the Tates, it was to protect herself and perhaps Mary Doe, who was being trafficked." Dkt. at 19. Putting to one side the Defendant's distorted understanding of that duty, Defendant Doe emphatically did have a duty

16

to tell the truth to investigators and not fabricate a single detail, such as seeing KGB agents at the Tate Brothers' War Room event in Miami.[23]

The Defendants are trying to force the Plaintiffs to try their entire case in the complaint and not simply plead facts sufficient to establish a cause of action. Defendants try to bolster their positions by using red herrings, such as news articles and other extraneous materials clearly outside the four corners of this complaint, to tempt this Honorable Court to decide issues properly reserved for a trier of fact.

## VII.   CONCLUSION

Defendant Doe's Motion to Dismiss is rife with threadbare factual allegations, conclusory statements, and violations of the Local Rules. If this Court does not remand this matter and even considers this Motion to Dismiss, Plaintiffs are prepared, should the Court deem it necessary, to add more information supporting the cause of action in the Amended Complaint. Plaintiffs are also prepared to add additional causes of action through a motion for leave to amend the Amended Complaint. However, the Plaintiffs have not moved, nor should this be construed as the Plaintiffs asking this Honorable Court for leave to amend the Amend Complaint.

When read in a light most favorable to the Plaintiffs, the Complaint clearly demonstrates that Defendant Doe harmed the Plaintiffs in a way that entitles the Plaintiffs to damages. Defendant Doe's actions and the parade of horribles that followed from them, including, but not limited to, the swatting, arrest, incarceration, and involuntary deprivation of the Plaintiffs' liberty, have been sufficiently pleaded to satisfy the plausibility requirement for each tort alleged. Necessitating, as a matter of law, the Complaint's survival regarding Defendant Doe's Motion to Dismiss.

WHEREFORE, Plaintiffs ask this Honorable Court to deny Defendant, Defendant Doe's Motion to Dismiss and for any other relief this Court deems just and proper.

---

[23] https://drive.google.com/file/d/1kCodEPcH6R-kIA5_qykBHG2EZoz0EN4g/view?usp=drive_link

Respectfully submitted this 24ᵗʰ day of October 2023.


/s/ Thomas Maniotis, Esq.                    s/ Joseph D. McBride, Esq.
Thomas Maniotis, Esq.                        Joseph D. McBride, Esq.
Florida Bar No. 122414                       NYS Bar No. 5445879 *Pro Hac Vice*
Equity Legal, PLLC                           THE MCBRIDE LAW FIRM, PLLC
5201 Blue Lagoon Drive, Floor 8              99 Park Avenue, 6th Floor
Miami, FL 33126                              New York, NY 10016
p:321-313-8642                               p: (917) 757-9537
e: tamaniots@equitylegal.net                 e: jmcbride@mcbridelawnyc.com
*Attorneys for Plaintiffs:*                   *Attorneys for Plaintiffs:*
*Andrew & Tristan Tate*                       *Andrew & Tristan Tate*

### CERTIFICATE OF GOOD FAITH CONFERRAL

Pursuant to Local Rule 7.1(a)(3), I hereby certify that I conferred with counsel for Defendants, who oppose the relief sought in this Motion and Reply.

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.

### CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 24th, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will, on the same day, electronically serve true and exact electronic copies on the persons below to their stated email addresses.

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.

**SERVICE LIST:**

Danielle Marie Bianculli
National Center on Sexual Exploitation
1201 F Street NW
Washington, DC 20004
202-393-7245
Email: dpinter@ncoselaw.org
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Sofie Tiffany Bayer
Waugh Grant
201 E. Pine St
Suite 315
Orlando, FL 32801
3218006008
Fax: 8442060245
Email: sbayer@waugh.legal
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Benjamin W. Bull
National Center on Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: bbull@ncose.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Christen M. Price
National Center on Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: cprice@ncoselaw.org
PRO HAC VICE
ATTORNEY TO BE NOTICED

Mary Norberg
Waugh Grant, PLLC
201 E. Pine Street, Suite 315
Orlando, FL 32801
(321) 800-6008
Email: mnorberg@waughgrant.com

19

ATTORNEY TO BE NOTICED

Peter A. Gentala
National Center of Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: pgentala@ncoselaw.org
PRO HAC VICE
ATTORNEY TO BE NOTICED

Victoria Hirsch
National Center on Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: vhirsch@ncoselaw.org
PRO HAC VICE
ATTORNEY TO BE NOTICED

Christian W Waugh
Waugh PLLC
201 E. Pine Street
Suite 315
Orlando, FL 32801
321-800-6008
Email: cwaugh@waughgrant.com
ATTORNEY TO BE NOTICED

Jillian Patricia Roth
Laffey, Bucci, Kent, LLP
1100 Ludlow St.
Suite 300
Philadelphia, PA 19107
2153999255
Email: jroth@lbk-law.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED