**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA WEST PALM BEACH DIVISION**
**Case No.: 9:23-cv-81150-RLR**

ANDREW TATE AND TRISTAN TATE,

     Plaintiffs

vs.

JANE DOE, et al.,

     Defendants.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO LIAM DOE, JUNE DOE, AND JOHN DOE'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT, ANTI-SLAPP COUNTERCLAIM, AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Plaintiffs, ANDREW TATE AND TRISTAN TATE, by and through the undersigned counsel, file this Response in Opposition to LIAM DOE, JUNE DOE, AND JOHN DOE's Motion to Dismiss, for the grounds stated below.

## TABLE OF CONTENTS

Introduction ........................................................................................................................................ 1

Legal Standard .................................................................................................................................... 3

Legal Analysis ..................................................................................................................................... 3

   I.    Defendants go outside the four corners of the Complaint by alleging that Andrew and Tristan Tate qualify as "public figures" for a Defamation claim. .. 3

   II.   Defendants misapply the law in claiming that Plaintiffs fail to show that Defendants were motivated by actual malice to a defamation claim. However, even if that misapplied fault standard were on point, the Complaint more than meets the plausibility stadard to show sufficient facts for Defendants' actual malice. 7

   III.   Defendants' statements to the U.S. Embassy are not protected by qualified immunity or another privilege because no mutuality of interest existed between Defendants and Jane Doe. To otherwise grant the privilege would constitute an abuse of that privilege and even if the privilege claim were viable, plaintiffs have shown by a preponderance of evidence that Defendants acted with express malice in reporting their daughter's defamatory statements. .............................. 11

     a.   June Doe and John Doe's Statements ................................................................................ 11

   IV.   Defendants' statements also fail the federal supremacy doctrine because the law is the same in state and federal court against lying with impunity to state actors, and therefore, preemption does not apply. .............................................................................. 14

     a.   Liam Doe's Statements ....................................................................................................... 14

   V.   Florida's Statute Prohibiting Strategic Lawsuits Against Public Participation does not apply here because the Tate Brothers are victims who have suffered serious economic, physical, and reputational damages from Defendants' defamation and other torts. Mreover, the Tate Brothers have filed this lawsuit in a good-faith effort to seek remedy for the real harms they suffered – and continue to face – and for no other reason. ............................................................................... 17

     a.   Defendants fail to meet the initial burden to show a prima facie case that the anti-SLAPP statute applies, and therefore this Court should deny Defendants' request and seek attorneys' fees and other costs pursuant to Florida law as a result of this flagrant violation. .................................................... 17

CONCLUSION .................................................................................................................................. 20

**Introduction**

Defendant Liam Doe, June Doe, and John Doe's Motion to Dismiss: a relentless assault on the truth and law—is the latest installment in a series of frivolous filings by the Defendant that grossly distort the facts of this case. The Defense knows that when analyzing a motion to dismiss, this Honorable Court is bound to accept the factual allegations in the complaint as true while reading the complaint in a light most favorable to the plaintiffs.  To overcome this, the Defense has broken the local rules by arguing facts improperly incorporated by reference. This Honorable Court would commit reversible error if it dismissed the Complaint based on extraneous matters. Even so, the Defense has spent considerable time citing news articles and videos as evidence to contradict the complaint in a futile effort to tempt this Honorable Court to make an illegal ruling. The Defense appears to believe in this strategy so much that on October 5, 2024, in Bucharest, Romania, attorney Jillian Roth, in referring to this case, explicitly stated to the Romanian Press that: ***"The Federal Judge in the United States, in her opinion, herself, upon review of the evidence submitted, called the women victims."***[1]

Plaintiffs, of course, know that such a statement is untrue and contradicts this Court's order calling the Defendants "alleged victims." However, we must point out that such statements undermine and disparage the judicial process.

It is a fact that Black men are disproportionately convicted after being accused by women of crimes involving sexual advances and threats of violence.[2] Andrew and Tristan Tate are two black men falsely accused of heinous crimes by a woman with a history of perjuring herself in court. Two men who have vociferously proclaimed their innocence since the time of their arrest. The National Registry of Exonerations contains throngs of examples of men who have suffered heartbreaking loss stemming from the kind of false allegations against Andrew and Tristan Tate.[3] Loss stemming from culturally incompetent arguments that criminalize minority speech patterns

---

[1] See https://drive.google.com/file/d/10-Sna5_UQ8hgs4g7WQz3WhKR_Juac_fV/view?usp=share_link
[2] See Daniele Selby, *From Emmett Till to Pervis Payne – Black Men in America Are Still Killed for Crimes They Didn't Commit*, Innocence Project (July 25, 2020), https://innocenceproject.org/emmett-till-birthday-pervis-payne-innocent-black-men-slavery-racism/.
[3] See The University of Michigan's National Registry of Exonerations (last visited October 24, 2023), https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx.

and play on age-old stereotypes.[4] The rhetoric of racism may have been an effective weapon in courts of segregation, but it has no place in today's world or—this Honorable Court.

Andrew and Tristan Tate are American citizens who are the product of a broken home. Both brothers were born and raised in circumstances that statistically indicate that they easily could have chosen a life of crime—but did not. Their charitable efforts, from TATE PLEDGE alone, have helped more than one million impoverished people in over fourteen countries worldwide.[5] Some of their online remarks may sometimes sound like Howard Stern. And their religious conversions have inspired many to give faith a chance. None of that, or the litany of extrinsic material the defense has cited in its Motion to Dismiss, has to do with anything with the causes of action laid out within the four corners of this Complaint.

The four corners of our well-pled Complaint outline a tragic and troubling history of a troubled adult woman who weaponized the Justice System as a youth. Indeed, society may have failed to save Defendant Doe from the harsh reality of an unfair upbringing—but that is no excuse for her actions. A disadvantaged youth may be a mitigating factor at sentencing. It is, however, no excuse or justification for torts or crimes committed by adults. Our Complaint makes clear that Defendant Doe was an adult woman when she met Tristan Tate in Miami, Florida, and then solicited Tristan Tate to move to Romania, where she spent six days before making a series of false reports first that resulted in a fully armed highly trained SWAT team descending upon the Tate Estate in April 2022. Swatting is the act of falsely reporting a serious law enforcement emergency, resulting in a SWAT team descending upon a residence, creating a risk of injury and death. That is exactly what happened in this case, with SWAT officers threatening to shoot a family dog that perceived the aggressive and brutal raid as a threat to the owners Iasmina Pencov and Beatrice Anghel. Swatting, often described as an act of terrorism[6], is a felony under Federal and Florida State Law, punishable by up to 20 years of prison. Defendant Doe's fraudulent accused Plaintiffs, resulting in their being swatted and incarcerated. The plaintiffs' personal lives and

---

[4] See Race and Wrongful Convictions in the United States: The number of exonerations we consider has grown by almost 70% @ https://www.law.umich.edu/special/exoneration/Documents/Race%20Report%20Preview.pdf.
[5] See: *Tate Pledge Impact Statistics*, https://cobratate.com/pledge (last visited Oct. 23, 2023).
[6] See *Swatting*, Wikipedia (last visited October 24, 2023),
https://en.wikipedia.org/wiki/Swatting#:~:text=Advocates%20have%20called%20for%20swatting,punishable%20by%20fine%20or%20imprisonment ("Advocates have called for swatting to be described as terrorism due to its use to intimidate and create the risk of injury or death.").

professional reputations were severely damaged as a result, as were those other occupants of the home that have been irreversibly traumatized by the police raids. Plaintiffs demand justice.

**Legal Standard**

Under Florida's Rules of Civil Procedure, to survive a Motion to Dismiss, the Complaint must contain sufficient factual allegations that would entitle the pleader to the relief sought if determined to be true. The Court must consider whether the claims are plausible on its face, and the Court's review cannot exceed the Complaint's four corners and exhibits. *Newberry Square Fla. Laundromat, LLC v. Jim's Coin Laundry & Dry Cleaners*, Inc., 296 So. 3d 584, 589 (Fla. Dist. Ct. App. 2020). In other words, the Court cannot consider extrinsic materials, such as uncorroborated media sources susceptible to mistranslation and misinformation, as "evidence" to contradict the Complaint and make legal determinations that are properly reserved for a jury to decide. Moreover, the Court should not consider threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, as proof that Plaintiffs did not plausibly establish each of our tort claims, as Jane Doe does in her Motion to Dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet the standard of plausibility).

This is particularly true where, as here, overwhelming facts were already pleaded that go above and beyond just the bare minimum plausibility pleading standard to establish each cause of action independently. Jane Doe's Motion to Dismiss is woefully lacking in its legal claims and factual assumptions, and thus for reasons further elaborated below, should be denied by this Honorable Court.

**Legal Analysis**

I.  **Defendants go outside the four corners of the Complaint by alleging that Andrew and Tristan Tate qualify as "public figures" for a Defamation claim.**

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly* citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A Federal Rule of Civil Procedure

3

12(b)(6) motion to dismiss for failure to state a claim tests the complaint's sufficiency—it does not reach the case's merits. *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984).

In *Ashcroft v. Iqbal*, the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. Under the Supreme Court's ruling in *Bell Atlantic Corp. v. Twombly*, a pleading rife with 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 557).

When analyzing a motion to dismiss, the Court accepts factual allegations as true and construes the complaint in the light most favorable to the plaintiff. SEC v. ESM Group, Inc., 835 F.2d 270, 272 (11th Cir. 1988). The Court limits its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); see also GSW, Inc. v. Long Cty., Ga., 999 F.2d 1508, 1510 (11th Cir. 1993). In making its determination, the Court must consider whether a claim is plausible on its face. **Importantly, the Court's review cannot exceed the Complaint's four corners and exhibits** [emphasis added]. *Newberry Square Fla. Laundromat, LLC*, supra at 589 (Fla. 1st DCA 2020). Where a motion to dismiss rests on facts outside the scope of the allegations contained in the complaint, the trial court commits reversible error in dismissing the complaint based on those extraneous matters.' " *Hewett-Kier Constr., Inc. v. Lemuel Ramos & Assocs., Inc.*, 775 So. 2d 373, 375 (Fla. 4th DCA 2000).

Here, Defendants wrongly declare that Plaintiffs qualify as "public figures." Their conclusory statement is based on extrinsic information that goes beyond the scope of the allegations in the complaint. Information that this Honorable Court should exclude from consideration. *Newberry Square Fla. Laundromat, LLC*, supra at 589 (Fla. 1st DCA 2020). Moreover, whether someone constitutes a public figure is a question of law to be determined by the Court, not the Defendants. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("Determining whether an individual is a public figure—and thus subject to the actual malice analysis—is a question of law for the court to decide."). Therefore, the Court should deny the Defendants' motion to dismiss because it asserted conclusory statements of law that went beyond the four corners of the complaint and whose determination was properly reserved for the court.

4

However, even if the Court were to find that Defendants could make such conclusory statements of law, without foundation, Defendants have still failed to meet the prima facie elements to show that Plaintiffs were public figures, or for that matter, even limited-purpose public figures. In *Gertz v. Robert Welch, Inc.*, the Supreme Court held that individuals who "occupy positions of such persuasive power and influence" should be considered public figures. 418 U.S. 323, 345, 94 S. Ct. 2997, 3009, 41 L. Ed. 2d 789 (1974). The Court also said that "those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id*. If an individual is deemed a public figure, the actual malice standard of fault applies. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 686 (1964). In *New York Times v. Sullivan*, the Supreme Court held that to prove actual malice for defamation, the plaintiff must show that the defendant had "knowledge that [the defamatory statement] was false" or acted "with reckless disregard of whether it was false or not." *Id* at 726.

The United States Supreme Court has given the label "limited-purpose" public figures to "individuals who 'have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved.'" *Gertz v. Robert Welch Inc.*, 418 U.S. 323 (U.S. 1974). To the extent the "actual malice" standard attaches to limited-purpose public figures, it only extends as far as defamatory statements involving matters germane to the topics about which they are considered public figures, and nothing outside that scope. See *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988).

In distinguishing between "limited public figures" and "private figures" for a defamation claim, the Eleventh Circuit laid out the following two criteria: (1) "public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy"; and, more importantly, (2) public figures typically "voluntarily expose themselves to increased risk of injury from defamatory falsehoods." *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (citing *Silvester*, 839 F.2d at 1494). Examples of "all-purpose" public figures include instantly and universally recognizable movie stars, like Tom Cruise, elite professional athletes that are recognizable beyond their sports, like Michael Jordan, and the heads of major corporations, like Elon Musk or Bill Gates. The passage of time does not cause this class of individuals to lose their public figure status as long as the original source of their fame is of continued interest to the public.

By contrast, individuals who deliberately shape debate on particular public issues, especially those who use the media to influence that debate, are routinely classified as "limited-purpose" public figures by courts. Limited-purpose public figures are not like star athletes, immediately recognizable by the general public, in the caliber of Michael Jordan, but rather, individuals who have distinguished themselves in a particular field, like Bryce Harper or Dave Portnoy, making them "public figures" specific to Major League Baseball and Internet Pizza Reviews, but not generally recognizable beyond those realms to the wider public.

Here, as elaborated at great length in our Complaint, the Tate brothers became "Internet-famous[7]" many months after the events giving rise to this action occurred. Compl. at 29. Moreover, because of Jane Doe's false allegations, the Tate Brothers' *entire* social media following – including "Twitter, Instagram, Facebook, and YouTube [were] wiped out," restricting the scope of their media access – and, importantly, severely undercutting their ability to counteract false statements which characterize public figures. Compl. at 23. In the months that followed, once the Tate Brothers were falsely imprisoned, their reach was reduced even further: "they languished behind bars for months under egregious conditions of confinement that included long stints of prolonged solitary confinement" in which they had little to no access to proper medical care and legal counsel, let alone any ability whatsoever to counteract false statements about themselves in the media. Compl. at 107. Hence, there are strong grounds that the Tate Brothers would qualify as limited-purpose or even private figures, particularly during the events germane to this lawsuit, and that Defendants were wrong to jump the gun and call them "public figures" without any evidence whatsoever to support their sweeping allegation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to meet the standard of plausibility).

---

[7]See Wikipedia, "Internet Celebrity" (last visited Oct. 24th, 2023),
https://en.wikipedia.org/wiki/Internet_celebrity#:~:text=An%20internet%20celebrity%20(also%20referred,and%20 notability%20on%20the%20Internet. ("An internet celebrity (also referred to as a social media influencer, social media personality, internet personality, or influencer) is an individual who has acquired or developed their fame and notability on the Internet.").

6

II.     **Defendants misapply the law in claiming that Plaintiffs fail to show that Defendants were motivated by actual malice to a defamation claim.  However, even if that misapplied fault standard were on point, the Complaint more than meets the plausibility standard to show sufficient facts for Defendants' actual malice.**

As previously stated, the Supreme Court has held that public figures are those individuals who "occupy positions of such persuasive power and influence" in society.  418 U.S. 323, 345, 94 S. Ct. 2997, 3009, 41 L. Ed. 2d 789 (1974).  The Supreme Court has also assigned the label of "limited-purpose" public figures to "individuals who 'have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved.'"  *Gertz v. Robert Welch Inc.*, 418 U.S. 323 (U.S. 1974).  Whether an individual constitutes a public figure is a question of law to be decided by the court.  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("Determining whether an individual is a public figure—and thus subject to the actual malice analysis—is a question of law for the court to decide.").

Where a court finds an individual to qualify as a public figure, plaintiffs must show that defendants acted with actual malice for the purposes of a defamation claim.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 686 (1964).  In *New York Times Co. v. Sullivan*, the Supreme Court defined actual malice as "knowledge that [the defamatory statement] was false," or acted "with reckless disregard of whether it was false or not."  *Id*.  For individuals found to be "limited-purpose" public figures, the Eleventh Circuit has circumscribed actual malice only to defamatory statements involving matters germane to the topics about which they are considered public figures, and nothing outside that scope.  See *Silvester v. Am. Broad. Companies*, Inc., 839 F.2d 1491, 1494 (11th Cir. 1988).  Importantly, the test for actual malice is subjective, and courts focus on "whether the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'"  *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (internal citations omitted).

As already discussed above, Defendants were wrong to call Plaintiffs public figures, which is a question of law to be decided by the court, not by either party. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).  Accordingly, the actual malice standard of fault does not apply here.  It would thus be inappropriate for the court to accept the Defendants' claims at face value without first conducting its own analysis to make a determination of whether the plaintiffs

qualify as public figures, which requires a showing of actual malice first.  *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So.2d 841, 845 (Fla. Dist. Ct. App. 2002) (stating that public figure status "is a question of law to be determined by the court") (quoting *Saro Corp. v. Waterman Broad. Corp*., 595 So.2d 87, 89 (Fla. Dist. Ct. App. 1992)).

Assuming arguendo, that plaintiffs would still need to prove defendants acted with actual malice in order to establish a viable defamation claim, there are more than sufficient facts pleaded both within Plaintiff's Complaint and, if necessary, to be later added to the Amended Complaint,[8] that would "give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " Id. *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (quoting *Sullivan*, 376 U.S. at 280, 84 S.Ct. at 726).

First, within Plaintiffs' Complaint, Jane Doe caused her friend and former lover, Liam Doe, whom she believed was a Marine, and, in her misguided view, someone whom she trusted to have authority to manage allegations of human trafficking, to "call the [United States] embassy in Romania." Compl. at 96.  Jane Doe had no issue leaving the Tate Estate, because, on multiple occasions, she admitted to her own parents that "I am not so concerned [about leaving]. Tristan doesn't really care if I leave" (Compl. at 94).  Indeed, she admitted as much, "I don't think [the Tate brothers] care that much if we leave anyways, **which is why I feel okay**."  [Emphasis added] Id.

Moreover, our Complaint explains in detail how Jane Doe had left the Estate on several occasions during her short, six-day visitation to shop, go sight-seeing, and attend a birthday party.  Compl. at 76.  This is confirmed by widely-released CCTV footage, which shows both Jane Doe and Mary Doe freely leaving the Estate, without encumbrance, to go shopping at the local mall, order pizza dinner, and numerous other reasons.  Compl. at 75.  The released CCTV footage, which is accessible across the internet, shows Jane Doe and other visitors freely entering and exiting the Tate Estate at their leisure, providing more reason that Liam Doe had knowledge that Jane Doe was lying about these allegations all along.  Compl. at 92.

---

[8] If this Court does not remand this matter and even considers this Motion to Dismiss, Plaintiffs are prepared, should the Court deem it necessary, to add more information supporting the cause of action in the Amended Complaint. Plaintiffs are also prepared to add additional causes of action by way of a motion for leave to amend the Amended Complaint. However, Plaintiffs have not moved, nor should this be construed as Plaintiffs asking this Honorable Court for leave to amend the Amend Complaint, which may submit Plaintiffs to the jurisdiction of this Court that is actively being contested by way of Motion to Remand.

Plainitffs Complaint also details Jane Doe's manipulating and scheming after she falsely accused the Tate brothers of human trafficking.  For instance, in a text conversation with Liam Doe, replicated in our Complaint, Jane Doe questions Liam Doe if he called the United States Embassy.  Compl. at 96.  She then enters into a panic: "be honest please"; "apparently marines are after me?" "that's what my mom just called on the phone screaming."  *Id*.  Following these messages, Jane Doe immediately goes on the defensive and accuses Liam Doe of having "compromised my [safety]," to which she follows up with a sarcastic "thanks."  *Id*.

Then, Liam Doe admits to having contacted one of his military friends and reaching out to the Embassy: "Yeah I called Neves and did what he said to do" (Compl. at 96) – triggered by her earlier call to do so.   But once she realizes this, Jane Doe retaliates and becomes defensive, saying "goodbye [Liam Doe]" and "i just wanted to go to London."  Compl. at 91.  At this point, Jane Doe attempts to backtrack on her claims of human trafficking to Liam Doe, realizing they might interrupt her two-week vacation in London and the French Riviera.  Compl. at 90.

Jane Doe likewise admits via text message to Liam Doe that she had failed to recruit other women staying at the Tate Estate – and presumably other alleged human trafficking victims – from joining her in making these allegations against the Tate Brothers: not because they were fearful of retaliation, or some other lie, but because they were there as guests, freely capable of leaving whenever they so desired – importantly, because of the fact that they were not human trafficking victims ("it's only me and one girl that want to leave").  Compl. at 96.

Soon after making these allegations, Jane Doe obtained buyer's remorse, admitting to Liam Doe that "I wish I could take it back." Compl. at 97.  Jane Doe admitted on multiple occasions that this entire scheme was all just part of a source of amusement for her, reiterates multiple times that her overarching goal all along was "to go to [L]ondon." Compl. at 96.  Indeed, the reasons she made up these allegations in the first place was to find a quick and convenient excuse to leave Romania and finally start the European adventure she had been romanticizing about for months previously. Id.  Jane Doe admitted all of this and more, as recounted in the Complaint.  The Complaint at least meets – and likely surpasses – the standard of plausibility that Liam Doe had knowledge, or at the bare minimum, acted with reckless disregard as to the truth or falsity of Jane Doe's statements, when he proceeded to defame the Tate brothers.  Liam Doe had knowledge or, at least, should have known of Jane Doe's longstanding predisposition to being a "pathological liar," Compl. at 46, which she admitted directly in text messages to him regarding her false

allegations of human trafficking.  Compl. at 91.  Therefore, even if a showing of actual malice were required, the Complaint establishes sufficient facts to show that Liam Doe acted knowingly or with reckless disregard for the truth of the statement when he defamed the Tate brothers, imputing that requisite standard of fault to his actions.

Upon information and belief, Jane Doe's parents, John and June Doe, despite knowing that Jane Doe was lying, still went along with her scheming for their own selfish purposes, demonstrating malice.  For instance, in response to Jane Doe getting upset about the U.S Embassy in Romania being contacted and wanting to go on vacation to London, rather than sounding like a concerned parent, John Doe told Jane Doe "okay, I am going to bed now."  DE 31-4, Ex. B, pgs. 26-27.

The following exchange between Jane Doe and June Doe, which occurred in the midst of the alleged "human trafficking," proves that Jane Doe was not a trafficking victim.  The exchange does prove that June Doe and John Doe knew that Jane Doe's allegations were false when they reported the lies, and defamed the Tate brothers – a fact made worse by the Defendants' subsequent actions, in which they failed to take corrective measures to remedy their daughter's lies:

- June Doe: "Go to hell [Jane] with yr [your] arrogance and bullshit Go to wupwupland or Bangkok or bora bora Who is stopping you? The whole American embassy is on alert Shame on you."

- Jane Doe: "Fuck you both [June Doe and John Doe]… you are ignorant… fuck off."

- June Doe: "K **Do not bother with me personally anymore No need for this shit**." (*June Doe then exits the 'WhatsApp' chat*.)

  DE 31-4, Ex. B, Pgs. 26-7.

Even with this information available as exhibits, attorneys for the Defendants claim to this Court that June Doe and John Doe have immunity as worried parents of a nearly 21-year-old daughter, which the facts clearly prove otherwise.  The facts that have been pleaded show that Defendants published the defamatory statement with knowledge or with reckless disregard for the truth, and, therefore, acted with actual malice.

In the likelier alternative, Plaintiffs will not have to show an actual malice standard of fault because the Tate brothers, being niche internet celebrities, and not universally recognizable public figures like Michael Jordan or Joe Biden, will qualify under the lesser category as "limited-purpose public figures."  The Tate brothers more aptly qualify as limited-purpose public figures for the

following reasons: despite being internet celebrities, they are still not generally well-known household names. Their celebrity is limited to the internet, and a niche corner of the internet at that. Indeed, the fact that they were censored across virtually every mainstream platform (Compl. at 23), is proof of the fact that their reach and status as public figures is highly limited to the niche field of male-empowerment, which the general public is largely still oblivious to. The two elements that distinguish an individual as a limited-purpose, rather than all-purpose, public figure are: (i) One who voluntarily becomes a key figure in a particular controversy, or (ii) One who has gained prominence in a particular, limited field, but whose celebrity has not reached an all-encompassing level. See *Gertz v. Robert Welch Inc.*, 418 U.S. 323 (1972). The Tate brothers' status and influence satisfies both prongs. They have voluntarily become key figures in anti-vaccine and male-empowerment controversies, by being outspoken figures on the internet on behalf of both causes. In addition, their notoriety has been limited to the internet, and specifically, websites such as Rumble and Tiktok, which are niche and not known to the general public at an "all-encompassing level," required for all-purpose public figures. As such, Plaintiffs need not prove actual malice standard because the Tate brothers best qualify as limited-purpose public figures, or even private figures.

III.   **Defendants' statements to the U.S. Embassy are not protected by qualified immunity or another privilege because no mutuality of interest existed between Defendants and Jane Doe. To otherwise grant the privilege would constitute an abuse of that privilege, and even if the privilege claim were viable, plaintiffs have shown by a preponderance of evidence that Defendants acted with express malice in reporting their daughter's defamatory statements.**

a.   **June Doe and John Doe's Statements**

Under Florida law, courts have stated that "a qualified privilege is a question of law for the court to decide only if the circumstances surrounding the communication are undisputed or so clear under the evidence as to be unquestionable." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1264 (S.D. Fla. 2004). Florida courts have recognized a qualified privilege in cases involving a "mutuality of interest in the statement between the speaker and listener." *Id* at 1264. Two requirements are needed to find a qualified privilege based on mutuality of interest:

11

"(a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused." *Id*.

Further, Florida courts have recognized the following as essential elements of the qualified privilege: "(1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner." *Id* citing *Thomas v. Tampa Bay Downs, Inc.*, 761 So.2d 401, 404 (Fla. 2d DCA 2000).

Importantly, where a qualified privilege may be found, a plaintiff may overcome such a privilege with a showing of "express malice." *Nodar v. Galbreath*, 462 So. 2d 803, 810 (Fla. 1984). In *Nodar*, the Supreme Court of Florida explained that express malice is found wherever the speaker, in making a defamatory statement, is "motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege." *Id* at 811. Moreover, "[s]trong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position 'to gratify his malevolence.'" *Id*.

Also important, the court stated that the elements and standard of proof required to show express malice differ from actual malice. *Id* at 806. Unlike in cases of actual malice, which require a showing of knowledge or reckless disregard of the truth or falsity with clear and convincing evidence, the standard of proof for express malice is much lower: plaintiff need only show it by a preponderance of evidence, "the ordinary standard of proof in civil cases." *Id* at 807.

Here, in likening their situation to *Nodar*, Defendants wrongly attempt to prove that their statements should fall under the qualified privilege because they were interested in their child's welfare and had "reason to believe it was in jeopardy." DE 50 at 11. There are a few issues with this logic. First, the circumstances giving rise to the asserted privilege are not "unquestionable." The reasons are myriad: as noted before, Defendants did not seem, based on the evidence, to be acting out of the interest of their child. DE 31-4. After hearing Jane Doe's lies, they instead told her to "go to hell" with her "bullshit." DE 31-4. Moreover, June Doe told her daughter, when Jane Doe reported the alleged human trafficking directly to her parents, to "not bother with me personally anymore. No need for this shit." DE 31-4. DE 31-4, Ex. B, Pgs. 26-27.

Separately, but equally relevant is that unlike the child in *Nadar*, who was of high school age and thus a minor, Jane Doe was an adult when she reported these false allegations. See *Nodar*

*v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984).   Therefore, there are strong grounds that the supposed child welfare interest, to the extent one existed here, did not ascribe to the Defendants the same conditional privilege that was found for the parent in *Nodar*, because of the lack of mutuality of interest between speaker and listener.

June and John Doe had deep knowledge of Jane Doe's extensive history of falsely reporting behavior to press outlets.   For instance, in 2016, as a 15-year-old, Jane Doe was reported missing to local authorities in Delray Beach, Florida, which June and John Doe obviously had knowledge about, as proven in a Facebook post. [9]   Upon information and belief, Jane Doe had actually been vacationing during the time in which she was reported missing.   This replicated the exact same tactic she would use several years later in Romania, when she alleged human trafficking to law enforcement authorities as an excuse to go on vacation in London and on the French Riviera. Compl. at 84.   Our Complaint details other examples of June Doe and John Doe's knowledge about their daughter's true circumstances, as well as her history of being, as Jane Doe admitted in her own words, "a pathological liar."   Compl. at 46.   For example, the Complaint includes conversations whereby Jane Doe disclosed to June Doe about the circumstances in which she met Tristan Tate in South Florida ("I also have an amazing friend, Tristan, that's coming here from Romania to host a big business conference") (Compl. at 79); wherein June Doe encouraged the relationship, and subsequent trip ("Awesome plans! Makes me dream?") (Compl. at 81); and even had direct knowledge that of Jane Doe's scheme "to go to the UK" from the start.  *Id*.

And, as previously stated, once June and John Doe got wind of their daughter's human trafficking allegations, rather than expressing concern, as any reasonable, loving, and caring parent would do, they instead told their daughter to "not bother me personally anymore.  No need for this shit." DE 31-4, Ex. B, Pgs. 26-7. Only two possible explanations can be drawn from this reaction: (i) June and John Doe are not the "incredible people" who "saved [their daughter] from a life of abuse," as Jane Doe described in a text message, reproduced in our Complaint at 46, or, (ii) the likeliest explanation, June and John Doe knew that their daughter was yet again scheming and lying, and their reaction was the reaction of any sensible parent who knew their daughter was a "pathological liar."   Thus, the fact that they proceeded to report the allegations to governmental

---

[9] See Facebook Post Concerning Del Ray PD's ABP on Missing Fifteen-Year-Old Jane Doe,
https://drive.google.com/file/d/16PTPZp-53Gbq5rThPSj1NTD1LyFZwVgi/view?usp=drive_link

authorities anyway, is at its most generous reading, extremely reckless behavior; the parents are as much as anyone liable for the egregious damages caused to the Tate brothers.

Even if a conditional privilege were found here based on a mutuality of interest between the Defendants and their non-minor child, its application to these facts would likely constitute an abuse of the privilege, and therefore fail to hold up. This is supported by not only their dismissive statements discussed above, but also the fact that they proceeded to report their daughter's defamatory statements to the U.S. Embassy anyway – knowing full well their daughter's pathological propensity to lie – which Defendants outright admit in their Motion to Dismiss. DE 50 at 11. As such, Defendants admit to making a disclosure to a third party, which disclosure was knowingly false, and therefore satisfying the prima facie case for defamation.

Last, even if the court were to find a conditional privilege on point here, there are likely sufficient facts that the parents acted with express malice in knowingly reporting Jane Doe's false statements to the U.S. Embassy, which vitiates any claim of qualified immunity. As established, Defendants knew their daughter was lying, though proceeded to report Jane Doe's defamatory statements anyway. DE 50 at 11. Moreover, they failed to take any corrective measures to limit the harm caused by their defamation. Compl. at 101. Plaintiffs plead sufficient facts to establish with a preponderance of evidence that Defendants acted with express malice. Accordingly, Defendants' claim to a conditional privilege fails because no mutuality of interest existed between Defendants and Jane Doe, and to otherwise grant the privilege would constitute an abuse of that privilege. Even to the extent a viable claim to qualified immunity were found, Defendants would still fail because they acted with express malice, which vitiates any claim to an otherwise valid qualified immunity privilege.

IV.     **Defendants' statements also fail the federal supremacy doctrine because the law is the same in state and federal court against lying with impunity to state actors, and therefore, preemption does not apply.**

a.  **Liam Doe's Statements**

In *Barr v. Matteo*, the Supreme Court elaborated the principle of absolute privilege, upholding the privilege to protect a federal employee from liability for defamation made within the scope of his duties. *Barr v. Matteo*, 360 U.S. 564, 574, 79 S. Ct. 1335, 1341, 3 L. Ed. 2d 1434

(1959). Defendants similarly argue here that Liam Doe "was acting directly within the scope of his duties," when he reported Jane Doe's defamatory statement to the United States Embassy.  DE 50 at 13.

But as we have argued, Defendant was not acting within the scope of his duties when he reported Jane Doe's defamatory statement.  DE 31 at 6.  Instead, Defendant was acting at his own discretion, and not per the requirements of his official training.  DE 31 at 9.  Indeed, Defendant's own training manuals do not even refer to the charge of human trafficking, let alone establish any mandatory reporting requirements that would indicate reporting known lies of human trafficking fell within Defendant's scope of duties as an alleged Marine Reservist.  DE 31 at 9.

Indeed, the Complaint details Liam Doe's knowledge that Jane Doe was lying, such as the text exchange recounting Jane Doe's insistence to "take [the false allegations] back."  Compl. at 97.  At another point, Jane Doe communicates again via text to Liam Doe that she was part of a much larger human trafficking operation carried out by the Tate brothers involving many women.  Compl. at 96.  Importantly, however, Jane Doe communicates to Liam Doe that no other girl besides herself and Mary Doe "wanted to leave" the Tate brothers' estate.  Compl. at 96.  This statement alone should have alerted Liam Doe that he was being lied to, and yet, despite having knowledge of Jane Doe's lies, still communicated her defamation with reckless disregard for the truth or falsity of their statements to the U.S. Embassy.  Compl. at 91.  Therefore, the court should find that Liam Doe was not acting within the scope of his military duties when he reported Jane Doe's defamation to the United States Embassy.

Defendant's argument that Liam Doe has immunity under the federal supremacy also fails. In *Caterpillar Inc. v. Williams*, the Supreme Court held that the "presence or absence of federal-question jurisdiction that will support removal is governed by the "well-pleaded complaint rule," under which federal jurisdiction exists only when a federal question is presented on the face of the properly pleaded complaint."  482 U.S. 386, 392, 107 S. Ct. 2425, 2429, 96 L. Ed. 2d 318 (1987). The Court held that ordinarily "a case may not be removed on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the complaint, and even if both parties concede that the federal defense is the only question truly at issue."  482 U.S. 386, 393, 107 S. Ct. 2425, 2430, 96 L. Ed. 2d 318 (1987).  A case may only be removed to federal court on the basis of preemption where an area of state law has been completely pre-empted, which

means that it was considered preempted from its inception, at the time the well-pleaded complaint rule applies. *Id*.

Similarly, the Eleventh Circuit elaborated the exception to the well-pleaded complaint rule, which allows a narrow range of cases to be removed from state to federal court on the basis of preemption alone, where Congress "has so fully legislated an area of law such that a plaintiff's state law claims … are 'necessarily federal in character' and removable based on federal question jurisdiction." *Ervast v. Flexible Prod. Co.*, 346 F.3d 1007, 1012 (11th Cir. 2003).   Federal preemption is ordinarily a federal defense. *Id*.  Because it is a federal defense, it does not appear on the face of a well-pleaded complaint, and therefore, does not authorize removal to federal court. *Id*.

As such, the court should not even give credence to any federal supremacy doctrine theory claiming that federal law preempts "any state-law claims for liability," because those federal claims, if they are valid, were not "presented on the face of the properly pleaded complaint."  In other words, much like the *Ervast* holding wherein the court found that certain claims were based in state law, and hence not completely preempted by federal law, here there is similarly no ground for complete preemption that would establish a viable claim for removal to federal court.  In other words, the Defendants' preemption claim, and not a federal question pled originally in the Complaint, is the guiding basis for a putative theory of Defendants' federal supremacy doctrine analysis.  DE 50 at 13-14.  Even if Defendants are correct in saying that "Liam Doe's acts have a tight nexus with federal law relating to fighting against human trafficking," they fail to show that federal law completely preempts state law here.

Indeed, Defendant does not even explain which federal law is controlling that would allow the Plaintiffs to form a discernible, let alone sufficient, theory of federal preemption.  Instead, Defendants merely allude to the federal government's "zero tolerance for sex trafficking" and the "Department of Defense's comprehensive training," without naming a specific statute or basis of federal question liability.  DE 50 at 13-14.  Accordingly, Defendant's federal supremacy doctrine theory fails because Defendants have failed to show that their claims arise from a federal question pleaded in the original Complaint, other than preemption itself, which is insufficient grounds for removal, that would completely preempt state law under the well-pleaded complaint rule.

V.      **Florida's Statute Prohibiting Strategic Lawsuits Against Public Participation does not apply here because the Tate Brothers are victims who have suffered serious economic, physical, and reputational damages from Defendants' defamation and other torts.  Moreover, the Tate Brothers have filed this lawsuit in a good-faith effort to seek remedy for the real harms they suffered – and continue to face – and for no other reason.**

a.   **Defendants fail to meet the initial burden to show a prima facie case that the anti-SLAPP statute applies, and therefore this Court should deny Defendants' request and seek attorneys' fees and other costs pursuant to Florida law because of this flagrant violation.**

Strategic Lawsuits Against Public Participation (hereinafter "SLAPP" lawsuits) are meritless lawsuits filed "'primarily because' the person or entity engaged in the exercise of a right protected by the First Amendment to the U.S. Constitution." *WPB Residents for Integrity in Gov't, Inc. v. Materio*, 284 So. 3d 555, 558 (Fla. Dist. Ct. App. 2019); § 768.295(3), Fla. Stat.  Under Florida state law, SLAPP lawsuits are strictly prohibited because they constitute a violation of a fundamental state interest – namely, an interest to preserve fundamental rights guaranteed by the First Amendment.  Fla. Stat. Ann. § 768.295 (West) (finding that public policy prohibits SLAPP suits because they violate with the rights of individuals to exercise rights under the First Amendment in connection with public issues).  Florida courts consider two factors to decide whether a suit violates its anti-SLAPP statute: (1) the suit must primarily be meritless, and (2) primarily caused by the target's protected speech.  § 768.295(3).

Florida's anti-SLAPP statute prohibits lawsuits intended to stifle "speech in connection with a public issue."  § 768.295(a).  The statue defines "public issues" to mean: (i) "any issue under consideration or review by a governmental entity," or (ii) "is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work."  *Id*.  In Bongino, the South District court held that "at bottom, Florida's statute is a garden variety fee shifting provision, which the Florida legislature enacted to accomplish a 'fundamental state policy'—deterring SLAPP suits. Fla. Stat. § 768.295(1)."  LLC, 477 F. Supp. 3d 1310, 1323 (S.D. Fla. 2020).  In short, Florida's anti-SLAPP

statute directs SLAPP targets to use the procedural mechanisms for a motion to dismiss to test the merits of the filer's claim.  *Id*.

To that end, Defendants have not even met the initial burden to show a prima facie case that the anti-SLAPP statute applies here.  The burden of proof for a Fed. R. Civ. P. 12(b)(6) motion to dismiss is, as discussed elsewhere, "sufficient facts."  *Chalwest (Holdings) Ltd. v. Ellis*, 924 F.2d 1011, 1014 (11th Cir. 1991) ("the court must deny the motion if the plaintiff can present plausible evidence tending to show that the court has jurisdiction").  As argued above, Plaintiffs have more than met the plausibility pleading standard to deny Defendant's motion to dismiss – and by extension, their anti-SLAPP claim, on procedural grounds.

However, assuming arguendo that Defendants can overcome their initial burden, Plaintiffs have shown that their claims are not based on Defendants' speech rights, or any other right protected under the First Amendment.  Rather, they filed this lawsuit to seek redress and compensation for reckless and intentional harms against them, which confined them to a jail cell and house arrest in Romania for almost the last year, and cost them millions in income and rendered significant harm to their reputation.  *See* Compl. at 25, 108.  Defendants have demonstrated a propensity, however, to say anything that will help them avoid liability in this case, even if it means misleading the court and contradicting their own motions, which they have done all throughout the course of this proceeding.

Here, Defendants have cited that courts have repeatedly ruled that meritless lawsuits, which seek to diminish the right to freedom of speech granted by the First Amendment, violate Florida's anti-SLAPP statute.  DE 50 at 15.  Moreover, Defendants claim that this Honorable Court has dismissed lawsuits under Florida's statute, including matters in which claimant sought to silence critical speakers by alleging defamation, but were unable to establish a claim for relief.  Defendants cite *Davis v. McKenzie*, 2017 U.S. Dist. LEXIS 183519 (S.D. Fla. Nov. 3, 2017) as the reputed basis for this claim.

But Defendants' construction patently does not apply to these facts, as there are many text messages, some of which have already been discussed, that give the inference of reckless disregard by Liam Doe arbitrarily ignoring some of Jane Doe's texts, such as her pleas to retract the statement, while favoring others.[10]  Moreover, strong evidence has already been introduced

---

[10] See the following exchange, copied from the Complaint at 91

showing Liam Doe directly ignoring protocols of his office and chain of command, which is discussed throughout this motion, the Complaint, and in previous motions.  We also would like to remind the Court that it would be inappropriate to take "judicial notice" of *BBC* and *Rolling Stone* news articles as evidence, which is extrinsic evidence that falls outside the four corners of the Complaint and are in direct violation of not just the case law cited, but every established norm, rule, and procedure for judicial notice of every jurisdiction conceivable.  *Newberry Square Fla. Laundromat, LLC*, supra at 589 (Fla. Dist. Ct. App. 2020) ("It is axiomatic that on a motion to dismiss, 'the trial court must confine its review to the four corners of the complaint, draw all inferences in favor of the pleader, and accept as true all well-pleaded allegations.'").

Moreover, to the extent Liam Doe's statements implicate an asserted anti-SLAPP interest concerning a free speech or some other constitutional right related to a public concern, the governmental entity at issue here is the U.S. Embassy in Romania.  In other words, the Embassy is a *federal*, not *state*, entity, which falls outside the jurisdiction of the relevant statute – and is not, as Defendants state without evidence, a term whose definition "is … expansive in scope." 768.295(b)("'government entity' **means the state**, including the executive, legislative, and the judicial branches of government and the independent establishments of the state, counties, municipalities, corporations primarily acting as instrumentalities of the state, counties, or municipalities, districts, authorities, boards, commissions, or any agencies thereof.").

It is one matter to raise issues of sexual exploitation and abuse as a potential public concern under the statute.  It is another matter entirely to falsely accuse an individual of the crime of human

---

Jane Doe: hard thing is getting out the house.
Jane Doe: there's three other girls besides her and i. they are groomers and handlers
Jane Doe: if they see us leave they call the brothers then brothers call airports and stop us from leaving
Liam Doe: Embassy of the United States
Liam Doe: Hold on to your passport and go there there's a USMC security detail
Liam Doe: **Say I am an American an I'm in danger**
Jane Doe: I bought us tix for 6 or so am we would leave in the middle of the night
Jane Doe: tomorrow 6 am
Martelly: Stand by I'm gonna makes call
Jane Doe: **don't make any calls please**
Jane Doe: **I want to go to London lol**
Jane Doe: I can let you know how Tuesday goes
Jane Doe: you have my location
Jane Doe: if something happens then we call?
Liam Doe: fine, be safe
Liam Doe: Slightest hint of danger
Jane Doe: **i think I'll be able to get to London, then I'll fly back to fl after two weeks there**
Jane Doe: if I don't call or text Tuesday, something happened E. Gabbey: **but it's unlikely** [Emphasis Added.]

trafficking, which exists in a completely different realm that is entirely unrelated to, and should not be conflated with, the former.  No legislation, privilege, or statute exists that protects an individual from knowingly defaming the character of another – particularly with accusations this egregious, at a scale that has resulted in millions in damages, incarceration, censorship, denial of fundamental rights, reputational injuries, and a wrongful house arrest, among a litany of other injuries.  Compl. at 23, 115.  The Plaintiffs filed this lawsuit in an attempt to clear their names, brands, reputations, and make themselves whole again, as is their right as American citizens.  For this reason, Defendant's anti-SLAPP claims are meritless, and the Court should deny all such claims and reward Plaintiffs for attorney fees and all other costs to which they are entitled under 768.295(4).  ("The court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section.")

## CONCLUSION

Defendants' Motion to Dismiss is rife with threadbare factual allegations, conclusory statements, and violations of the Local Rules. If this Court does not remand this matter and even considers this Motion to Dismiss, Plaintiffs are prepared, should the Court deem it necessary, to add more information supporting the cause of action in the Amended Complaint. Plaintiffs are also prepared to add additional causes of action through a motion for leave to amend the Amended Complaint. However, the Plaintiffs have not moved, nor should this be construed as the Plaintiffs asking this Honorable Court for leave to amend the Amend Complaint.

When read in a light most favorable to the Plaintiffs, the Complaint clearly demonstrates that Defendant Jane Doe harmed the Plaintiffs in a way that entitles the Plaintiffs to damages. Defendants' actions and the parade of horribles that followed from them, including, but not limited to, the swatting, arrest, incarceration, and involuntary deprivation of the Plaintiffs' liberty, have been sufficiently pleaded to satisfy the plausibility requirement for each tort alleged and Defendants are not entitled to any type of immunity. Necessitating, as a matter of law, the Complaint's survival regarding Defendants' Motion to Dismiss.

WHEREFORE, Plaintiffs ask this Honorable Court to deny Defendant, Defendants' Motion to Dismiss and for any other relief this Court deems just and proper.

Respectfully submitted this 24th day of October 2023.

/s/ Thomas Maniotis, Esq.                    s/ Joseph D. McBride, Esq.
Thomas Maniotis, Esq.                        Joseph D. McBride, Esq.
Florida Bar No. 122414                       NYS Bar No. 5445879 *Pro Hac Vice*
Equity Legal, PLLC                           THE MCBRIDE LAW FIRM, PLLC
5201 Blue Lagoon Drive, Floor 8              99 Park Avenue, 6th Floor
Miami, FL 33126                              New York, NY 10016
p:321-313-8642                               p: (917) 757-9537
e: tamaniots@equitylegal.net                 e: jmcbride@mcbridelawnyc.com
*Attorneys for Plaintiffs:*                  *Attorneys for Plaintiffs:*
*Andrew & Tristan Tate*                      *Andrew & Tristan Tate*

## CERTIFICATE OF GOOD FAITH CONFERRAL

Pursuant to Local Rule 7.1(a)(3), I hereby certify that I conferred with counsel for Defendants, who oppose the relief sought in this Motion and Reply.

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 24th, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will, on the same day, electronically serve true and exact electronic copies on the persons below to their stated email addresses.

/s/ Thomas Maniotis, Esq.
Thomas Maniotis, Esq.

**SERVICE LIST:**

Danielle Marie Bianculli
National Center on Sexual Exploitation
1201 F Street NW
Washington, DC 20004
202-393-7245
Email: dpinter@ncoselaw.org
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Sofie Tiffany Bayer
Waugh Grant
201 E. Pine St
Suite 315
Orlando, FL 32801
3218006008
Fax: 8442060245
Email: sbayer@waugh.legal
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

Benjamin W. Bull
National Center on Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: bbull@ncose.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

Christen M. Price
National Center on Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: cprice@ncoselaw.org
PRO HAC VICE
ATTORNEY TO BE NOTICED

Mary Norberg
Waugh Grant, PLLC
201 E. Pine Street, Suite 315
Orlando, FL 32801
(321) 800-6008
Email: mnorberg@waughgrant.com

ATTORNEY TO BE NOTICED

Peter A. Gentala
National Center of Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: pgentala@ncoselaw.org
PRO HAC VICE
ATTORNEY TO BE NOTICED

Victoria Hirsch
National Center on Sexual Exploitation
1201 F. St., NW, Suite 200
Washington, DC 20004
202-393-7245
Email: vhirsch@ncoselaw.org
PRO HAC VICE
ATTORNEY TO BE NOTICED

Christian W Waugh
Waugh PLLC
201 E. Pine Street
Suite 315
Orlando, FL 32801
321-800-6008
Email: cwaugh@waughgrant.com
ATTORNEY TO BE NOTICED

Jillian Patricia Roth
Laffey, Bucci, Kent, LLP
1100 Ludlow St.
Suite 300
Philadelphia, PA 19107
2153999255
Email: jroth@lbk-law.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED