**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:23-CV-81150-ROSENBERG/REINHART**

ANDREW TATE & TRISTAN TATE,

     Plaintiffs,

v.

Jane Doe, et al.,

     Defendants.

                                /

## ORDER DISMISSING DEFENDANT LIAM DOE AND REMANDING CASE

**THIS CAUSE** is before the Court on the Plaintiffs' Motion to Remand, DE 31; John Doe, June Doe, and Liam Doe's Motion to Dismiss, DE 50; Jane Doe's Motion to Dismiss, DE 51; and Mary Doe's Motion to Dismiss, DE 52. The Motions have been fully briefed. For the reasons set forth below, the Plaintiffs' Motion to Remand is **DENIED**[1]; John Doe, June Doe, and Liam Doe's Motion to Dismiss is **GRANTED IN PART** as to Liam Doe and **DENIED WITHOUT PREJUDICE** as to John Doe and June Doe; Jane Doe's Motion to Dismiss is **DENIED WITHOUT PREJUDICE**; and Mary Doe's Motion to Dismiss is **DENIED WITHOUT PREJUDICE**. The Court **DISMISSES** Liam Doe from this suit **WITH PREJUDICE** and **REMANDS** this case to the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

---

[1] The Court nonetheless exercises its discretion to remand the case because it dismisses Liam Doe and thus the Court loses subject matter jurisdiction over the suit.

## I.     Procedural History

On July 11, 2023, the Plaintiffs, Andrew and Tristan Tate,[2] filed an Amended Complaint in state court alleging state law claims such as defamation, false imprisonment, tortious interference of a business relationship, civil conspiracy, and negligent infliction of emotional distress. *See* DE 1-1.  The Plaintiffs raise those claims against the Defendants for their roles in providing evidence that initiated the Romanian government's current investigation and prosecution of the Plaintiffs for human trafficking. *See id*.  On August 14, 2023, the Defendants filed a Notice of Removal, asserting that the Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332, which governs diverse parties asserting state law claims in federal court. DE 1. Following review of the Notice, the Court issued an Order to Show Cause, requesting the domiciles of the Plaintiffs and two Defendants. DE 6.  On August 25, 2023, the Defendants filed an Amended Notice of Removal and a Response to the Court's Order. *See* DE 21 and 22.  In the Amended Notice of Removal, the Defendants proposed two additional bases for subject matter jurisdiction. DE 22 at 3–4.  The Plaintiffs filed a Motion to Remand in response to the Amended Notice of Removal. *See* DE 31.  On September 24, 2023, the Defendants filed three Motions to Dismiss. DE 50, 51, 52.

## II.     Plaintiff's Motion to Remand

The Court begins with the arguments regarding the Court's jurisdiction.  The Defendants argue that there are three grounds for subject matter jurisdiction in this case:   diversity jurisdiction pursuant to 28 U.S.C. § 1332; armed forces jurisdiction under 28 U.S.C. § 1442(a),

---

[2] The Amended Complaint attempts twice to include the Tate brothers' "various businesses, including the War Room and Hustlers University" as additional plaintiffs in this suit. DE 1-1 at ¶¶ 48, 132.  But the named and unnamed companies are not listed in the Amended Complaint's caption or description about the parties in the Amended Complaint. DE 1-1.  Nor did the Plaintiffs include the named and unnamed companies as parties in the case's Civil Cover Sheet. *Id*.  Since the *represented* Plaintiffs have not included the business entities as parties pursuant to Fed. R. Civ. P. 10(a), have not included them in the Amended Complaint's description of the parties, and have continued to ignore the business entities in subsequent filings, the Court construes the Amended Complaint as brought only by Andrew and Tristan Tate.

due to the inclusion of Sergeant Liam Doe, a member of the U.S. Marine Corps Reserves; and public official jurisdiction under 28 U.S.C. § 1442, again as a result of the inclusion of Sergeant Doe. DE 31.

### A. Legal Standard

As the removing parties, the Defendants bear the burden of establishing subject matter jurisdiction, and if a "court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Beavers v. A.O. Smith Elec. Prods. Co.*, 265 F. App'x 772, 779 (11th Cir. 2008) ("Federal courts are courts of limited jurisdiction and have the duty to inquire into whether they have subject-matter jurisdiction."). Courts must also construe removal statutes narrowly, "with doubts resolved against removal." *Allen v. Christenberry*, 327 F.3d 1290, 1293 (11th Cir. 2003). As the Supreme Court has held: "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941) (quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934)).

### B. Diversity Jurisdiction

Diversity jurisdiction pursuant to 28 U.S.C. § 1332 requires complete diversity between plaintiffs and defendants. *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1557 (11th Cir. 1989). In suits against a U.S. citizen, a plaintiff who is "[a] United States citizen with no domicile in any state of this country is 'stateless' and cannot satisfy the complete diversity requirement." *King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1170 (11th Cir. 2007) (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 828, (1989)). Since at least one Defendant is a U.S. citizen, complete diversity is not satisfied if the Plaintiffs are domiciled

abroad.  Understanding that the Plaintiffs' domiciles are potentially dispositive to the presence of complete diversity, the Defendants assert the need for an evidentiary hearing on the Plaintiffs' domicile.

"For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1341 (11th Cir. 2011) (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989)).  Stated differently, "[a] person's domicile is the place of his 'true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom.'" *McCormick v. Aderholt*, 293 F.3d 1254, 1257–58 (11th Cir. 2002) (quoting *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974)).

To resolve the question of a plaintiff's domicile, district courts have broad discretion and can use "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Sunseri v. Macro Cellular Partners*, 412 F.3d 1247, 1250 (11th Cir. 2005) (quoting *Washington v. Norton Mfg., Inc.*, 588 F.2d 441, 443 (5th Cir. 1979)).  When the question turns on a credibility determination between theories of domicile, "the proper exercise of discretion may be to hold an evidentiary hearing." *Id.*

Here, there is not a credibility determination to be made and thus, the Court declines the Defendant's request for an evidentiary hearing.  The Plaintiffs claim that they are not domiciled in any state within the United States, and they have supported their position with evidence in the record.  The Defendants, on the other hand, have not rebutted the Plaintiffs' evidence.  Without identifying a state of domicile, the Defendants argue the Plaintiffs might be domiciled in the United States because they were born in the United States, have intentionally moved around often to evade being subject to any one country's laws, are international businessmen, and met

one of the Defendants when the Plaintiffs were in Florida for a month on a business trip. DE 21 at 2–7.   None of these assertions contradict what the Plaintiffs state in their pleadings or affidavits.

The Plaintiffs state that they are dual citizens of the United States and the United Kingdom. DE 37-1 at 1; DE 37-2 at 1.  Though they were both born in the United States— Andrew Tate in Washington, D.C. and Tristan Tate in Chicago, Illinois— their parents moved them around the U.S. Midwest until they moved to live with their mother full-time in the United Kingdom after their parents' divorce. DE 37-1 at 1; DE 37-2 at 1.  In their Amended Complaint, the Plaintiffs state they chose to become "full-time residents of Romania" in 2015 due to their connection to its culture and values. DE 1-1 at 14.  Though the Plaintiffs note they have "previously owned properties globally and regularly travel[ed] to different countries for business and recreation," *id.* at 13, they both allege that they have not been U.S. residents since their parents' divorce, and they currently own no real estate in the United States. DE 37-1 at 1-2; DE 37-2 at 1-2.

The Defendants rely upon what they argue to be an analogous case, *King v. Cessna Aircraft, Co.,* in which the Eleventh Circuit found that the district court could properly conclude that a deceased woman who was born and raised in California still maintained domicile there. 505 F.3d 1160, 1172 (11th Cir. 2007).  In this case, the Eleventh Circuit credited the following facts to support the decedent's domicile in California: the decedent's stints abroad were for her career, she returned frequently to California while living abroad, and she always intended to return according to her parents' testimony. *Id.* (noting that "King may have left the 'when' of her return open, she had decided the 'whether' of it, and in this context whether is what matters").

By contrast, the Plaintiffs have not been full-time U.S. residents since they were children, and, even then, their childhood domicile was in the U.S. Midwest. Their next domicile was in the United Kingdom. And since 2015, the Plaintiffs have used Romania as their home base, returning to Romania after temporary stints of absence. A work trip to Miami or other U.S. cities would not establish a new domicile; according to *King*, traveling for career purposes does not establish domicile when a person intends to remain elsewhere. *See id.* The evidence before the Court is that the Plaintiffs, though U.S. citizens, are domiciled abroad in Romania. Because Plaintiffs can only have one domicile and that domicile is in Romania, they do not have a domicile in the United States. That conclusion makes the Plaintiffs stateless under *King* and, hence, unable to satisfy complete diversity requirements pursuant to 28 U.S.C. § 1332.

## C. Armed Forces Jurisdiction

The Defendants also assert that the Plaintiffs' claims against Liam Doe, a Civil Affairs Reconnaissance Specialist Sergeant in the United States Marine Corps on Reserve status since June 6, 2020, provide subject matter jurisdiction pursuant to 28 USC § 1442a. The statute provides, in relevant part:

> A civil or criminal prosecution in a court of a State of the United States against a member of the armed forces of the United States on account of an act done under color of his office or status, . . . , may at any time before the trial or final hearing thereof be removed for trial into the district court of the United States for the district where it is pending in the manner prescribed by law, and it shall thereupon be entered on the docket of the district court, which shall proceed as if the cause had been originally commenced therein and shall have full power to hear and determine the cause.

28 U.S.C.A. § 1442a (West).

As a threshold matter, the Court considers whether a Marine Corps Reservist qualifies under this statute. Title 28 of the U.S. Code provides no definition for "member of the armed forces of the United States." Courts have referred to Title 10 of the U.S. Code, entitled "Armed

6

Forces," for guidance. *See, e.g.*, *Howard v. Sikula*, 627 F. Supp. 497, 499 (S.D. Ohio 1986) (discussing subject matter jurisdiction pursuant to 28 U.S.C.A. § 1442a for a member of the Air Force Reserves).  Congress has defined the Armed Forces to include "the Army, Navy, Air Force, Marine Corps, Space Force, and Coast Guard," 10 U.S.C.A. § 101 (West), and the Marine Corps to include "the Regular Marine Corps, the Fleet Marine Corps Reserve, and the Marine Corps Reserve." 10 U.S.C.A. § 8001 (West).  Like in *Howard*, the Court finds that Sergeant Doe is a member of the U.S. Armed Forces.

28 U.S.C. § 1442a requires the suit against the member of the Armed Forces to be "on account of an act done under color of his office or status."  Due to the dearth of cases analyzing this jurisdictional statute's requirements, courts have borrowed from analysis of similar language in 28 U.S.C. § 1442(a),[3] a removal statute conferring federal jurisdiction in certain cases against federal officials. *See, e.g.*, *State of Fla. v. Simanonok*, 850 F.2d 1429, 1430 (11th Cir. 1988) (The defendant based removal on 28 U.S.C. § 1442a, but the Eleventh Circuit used a color of office analysis from *Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926), which is a case arising under 28 U.S.C. § 1442(a)); *State of Georgia v. Westlake*, 929 F. Supp 1516, 1518–19 (M.D. Ga. 1996) (listing multiple 28 U.S.C. § 1442a cases that borrow the 28 U.S.C. § 1442(a) color of office analysis).  Therefore, the Court concludes it can use the more abundant precedent interpreting 28 U.S.C. § 1442(a) to determine whether 28 U.S.C. § 1442a applies.

Importantly, the standard for interpreting Armed Force Removal is not the strict construction standard applicable to removals.  Instead, the Supreme Court has emphasized that

---

[3] Section 1442(a) states, in relevant part:
(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a) represents Congress' decision "that federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  Therefore: "This policy should not be frustrated by a narrow, grudging interpretation" of the removal statute. *Id.*  The same policy justification is present here for 28 U.S.C. § 1442a. *See State of Georgia v. Westlake*, 929 F. Supp. 1516, 1520 (M.D. Ga. 1996) (considering the policy rationales and concluding "[t]he federal government has an acute interest in protecting the individual for acts taken pursuant to properly bestowed federal authority").

### 1.  Causal Connection Under Asserted Official Authority

A successful color of office claim requires "a causal connection between what the officer has done under asserted official authority" and the suit against him. *See Mesa v. California*, 489 U.S. 121, 131 (1989) (quoting *State of Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926)).  In civil suits, it is "sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties." *Willingham v. Morgan*, 395 U.S. 402, 409 (1969).  Put simply, "[i]t is enough that his acts or his presence at the place in performance of his official duty constitute the basis" of the suit against him. *Soper*, 270 U.S. at 33.  But say, at time of seeking removal, the petitioner cannot indisputably prove that they were on duty and not engaged in "some kind of 'frolic of their own' in relation to respondent"? *Willingham*, 395 U.S. at 409.  "[T]hen they should have the opportunity to present their version of the facts to a federal, not a state, court." *Id.* (ultimately holding that the Court of Appeals "erred when it held that petitioners had not adequately demonstrated a right to have their case decided in the federal courts").  Having a federal defendant defend themselves in federal court "is exactly what the removal statute was designed to accomplish." *Id.*

8

The Court concludes, based on a review of the full record, that Sergeant Doe's actions have a potential causal connection with his performance of an official duty. The Plaintiffs' Amended Complaint states Jane Doe texted Sergeant Doe that she was being "human trafficked," and his alleged defamatory act was in communicating Jane Doe's message to the U.S. Embassy in Romania "and/or several other third parties." DE 1-1 at ¶ 45. In an affidavit, Sergeant Doe clarified that he called his immediate superior in the Marine Corps Reserves about Jane Doe's situation and was given the contact information for the U.S. Embassy in Romania, through which he ultimately relayed Jane Doe's claims to another Marine who was part of the security detail for that embassy. DE 21-2 at 3–4. Then, when U.S. Embassy personnel followed up on his report, he provided more information. *Id.* at 4. The issue here is one of a Marine's communication with other Marines and U.S. government officials about suspected human trafficking.

The Defendants argue this act involves Sergeant Doe's official duties by asserting that one of his duties was to report suspicions of human trafficking, and that in reporting his suspicions to the U.S. Embassy in Romania, he carried out that duty. DE 21 at 13. The Plaintiffs respond that Sergeant Doe's actions were not official duties because "they did not contribute to the efficient operation of the United States Marine Corps" nor were "related to his official training and title of Field Artillery Cannoneer." DE 31 at 14. They argue that Sergeant Doe's status as a Marine "does not give him the ability to recklessly defame," analogizing this situation to cases where federal government employees who violated state law in operating government vehicles negligently failed in trying to assert removal jurisdiction. *Id.* But, unlike those cases, the instant case involves a U.S. government employee who claims that if he violated state law, he had a directive from a superior officer or federal policy to do so. *See State of Oklahoma v. Willingham*, 143 F. Supp. 445, 448 (E.D. OK 1956) ("[N]o law of the United States authorizes a

9

rural mail carrier, while engaged in delivering mail on his route, to violate the state law enacted for the protection of those who use the highways."); *State of Georgia v. Westlake*, 929 F. Supp. 1516, 1519 (M.D. Ga. 1996) ("Defendant does not contend that he was under orders to disobey local traffic laws or that the accident was the result of any order given to him by his superiors.").

The parties agree that Sergeant Doe was trained in accordance with the U.S. government's strong policy against trafficking in persons (TIP) and that the Department of Defense (DoD) protocol required reporting suspicions to his superior officer first.  Sergeant Doe avers that he receives training to this effect every nine months and is required to report suspicions of TIP. DE 21-2 at 1-2.  The Plaintiffs presented a DoD PowerPoint presentation instructing DoD personnel: "If you suspect a trafficking in persons situation, REPORT IT IMMEDIATELY TO THE APPROPRIATE AUTHORITY. Report to: Chain of Command, Department of Defense Inspector General . . . , National Human Trafficking Resource Center." DE 31-10 at 31.[4]  The next slide further emphasizes that the training participant's role is to "[r]eport anything suspicious that [he or she] see[s] to [his or her] Chain of Command" and to "Never act ALONE." *Id.* at 31.  Sergeant Doe followed that policy, reporting his suspicions to his superior officer who told him to reach out to U.S. government personnel located geographically closer to Jane Doe.  Although the Court cannot ascertain conclusively whether Sergeant Doe was on duty when he made the report, the strong directives from the DoD would suggest that reservists should not wait until they are on duty to report suspicions of TIP.

Following the permissive standard set forth by the Supreme Court as to the causal connection between an official's action and duties, the Court finds these facts are sufficient to

---

[4] The Court notes that slide 17 of the DoD Presentation discusses the effects of human trafficking on the DoD's "[m]isson [r]eadiness," specifically noting that human trafficking is used to fund enemy groups and provide child soldiers, and that human traffickers target service employees and may be military contractors. DE 31-10 at 17.  But it is clear from the language on slide 31, that the DoD sees its personnel as reporting trafficking wherever encountered.

show a potential causal connection between the defamation allegations and Sergeant Doe's authority as a member of the Armed Forces.

### 2. *Existence of a Colorable Federal Defense*

The Supreme Court also requires a person asserting they were acting under the color of office to put forth a federal defense. *Mesa v. California*, 489 U.S. 121, 131 (1989).  Indeed, "[o]ne of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  Claimants need not raise "a clearly sustainable defense," merely "a colorable defense arising out of their duty to enforce federal law." *Id.* at 407.  Congress intended that an officer "need not win his case before he can have it removed" but that the validity of the federal defense be tried in federal court. *Id.*

At this stage of the litigation, the Court need only consider whether decide Liam Doe has plausibly raised a federal defense. *See Ruppel v. CBS Corp.*, 701 F.3d 1176, 1182 (7th Cir. 2012) ("The validity of the defense will present 'complex issues, but the propriety of removal does not depend on the answers.' *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994).  Instead, the claimed defense need only be 'plausible.' *Id.*").  The Defendants assert four federal defenses relating to Liam Doe's actions: official immunity, qualified immunity, federal supremacy immunity, and immunity under 28 U.S.C. § 2679. DE 21 at 16-18, DE 47 9-15.  Sergeant Doe need only assert one plausible federal defense, so the Court begins its analysis with qualified immunity.

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667

11

F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To receive the doctrine's protection, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004).  Somewhat misnamed, the term "discretionary authority" includes "actions that do not necessarily involve an element of choice." *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995).  More accurately, "discretionary authority" considers "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  Once the public official has met his or her burden, the burden shifts to a plaintiff to show that the doctrine is inapplicable because the facts alleged show the public official "violated a constitutional right" and that "the right violated was clearly established." *Id.*

The Plaintiffs' sole argument that Sergeant Doe's assertion of qualified immunity is implausible is that the U.S. Air Force's requirement to report human trafficking makes an action under that requirement non-discretionary. DE 53 at 9-10.  But whether a public official must carry out a certain act does not dispose of whether he acted within his discretionary authority. *See McCoy*, 47 F.3d at 407.  Further, Sergeant Doe retained discretion in deciding whether the information he received from Jane Doe qualified as constituting human trafficking.  Sergeant Doe argues that his report of suspected human trafficking according to procedure was within his duties and through appropriate means.  The Court finds this to be a plausible assertion such that Sergeant Doe's qualified immunity defense should be litigated in federal court.

Since Sergeant Doe has at least one plausible federal immunity defense, the Court has jurisdiction pursuant to 28 USC § 1442a.[5]  Thus, the Court **DENIES** the Plaintiffs' Motion to Remand.

### III.    Sergeant Liam Doe's Motion to Dismiss

Since the presence of Sergeant Doe as a defendant provides the Court with jurisdiction, the Court next analyzes Sergeant Doe's 12(b)(6) Motion for the Plaintiffs' failure to state a claim against him.  The Court concludes that Sergeant Doe's allegedly defamatory statements are shielded by qualified immunity under Florida law, and thus the Court **DISMISSES WITH PREJUDICE** the claims against him.  Because the Court declines to exercise supplemental jurisdiction over the remaining state-law claims in the Amended Complaint, the Court **REMANDS** the case to the state court and **DISMISSES** all other pending motions **WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION**.

#### A.  The Parties' Arguments

The Plaintiffs allege claims of defamation, defamation per se, and commercial defamation against Sergeant Doe for his comments to John Doe, June Doe, and various U.S. government employees at the U.S. Embassy in Romania and elsewhere. DE 1-1 at ¶¶ 10, 91, 96, 101.  Sergeant Doe argues the Amended Complaint against him should be dismissed against him for four reasons. DE 50 at 4.  First, because the Plaintiffs are public figures, their Amended Complaint lacks the required element of actual malice on the part of Sergeant Doe. *Id.*  Second, Florida's qualified privilege doctrine protects Sergeant Doe from liability in this case. *Id.*  Third, the federal supremacy and official duty doctrines protect Sergeant Doe from liability. *Id.*  Fourth

---

[5] The Defendants' last asserted subject matter jurisdiction basis is 28 U.S.C. § 1442(a), a removal statute for public officers.  However, the Court's finding of a jurisdictional basis in 28 U.S.C. § 1442a renders it unnecessary for the Court to decide whether Liam Doe is also an officer of the United States.

and finally, Sergeant Doe raises a counterclaim pursuant to Fla. Stat. § 768.295, also known as Florida's Anti Strategic Lawsuits Against Public Participation ("Anti-SLAPP") statute. *Id.*

The Plaintiffs respond that they are not public figures, and thus, not subject to the actual malice pleading requirement. DE 71 at 4.   However, if they are, the Amended Complaint sufficiently raises facts to show Sergeant Doe's actual malice. *Id.* at 8.   The Plaintiffs further contend that immunity doctrine and the Anti-SLAPP statute do not apply. *Id.* at 11–18.

## B.  Relevant Facts

According to their Amended Complaint, the Plaintiffs are "major social media influencers," former champion kickboxers, investors, and international businessmen who share a "collective business identity and reputation." DE 1-1 at ¶¶ 13, 17–19.  They "first garnered press attention in 2008" through their kickboxing careers and then "parlayed that fame" into appearances on British reality TV shows for both brothers and sports commentating bookings for Tristan Tate. *Id.* at ¶ 29.  "Their massive social media presence" numbered in the tens of millions at one point, "putting them in the top 1% of social media personalities" worldwide. *Id.* at ¶ 22. They emphasize that "young men worldwide" look to them for "inspiration and practical instruction for legitimate ways to rise above class and race-based injustice." *Id.* at ¶ 26.

The Plaintiffs have "generate[d] income from multiple business ventures," with "revenues estimated in hundreds of millions of dollars." *Id.* at ¶ 21.  One of the businesses in which they participated was the webcam modeling industry, through which they engaged women "in partnerships" where the women would model on Tik Tok or OnlyFans and the brothers would reap some of the rewards. *Id.* at ¶ 30.  The Plaintiffs have "long since moved on from this industry" but have "occasionally advised women looking to make careers in lawful webcam modeling, social media, or other modeling sites . . . after being solicited to do so." *Id.* at ¶ 30.

It is through the Plaintiffs' continuing ties to the e-modeling industry that they met Jane Doe and allowed her to stay with them in Romania. *Id.* at ¶ 34–35, 83.  Instead of "pursu[ing] opportunities in Romania as an e-model," the Plaintiffs claim that she sought to exploit them by falsely accusing them of human trafficking. *Id.* at ¶ 83.

The Plaintiffs accuse all the Defendants of spreading lies to the Plaintiffs' detriment.  The Complaint cites to and includes portions of a series of messages between Jane Doe and others to suggest that Jane Doe and Mary Doe were not victims and never believed they were in real danger. *Id.*

As to Sergeant Doe specifically, the Amended Complaint alleges that Jane Doe sent "distressing messages" to him that she and Mary Doe were being "human trafficked." *Id.* at ¶ 89. In the text messages attached to the Amended Complaint, those distressing messages include that Jane Doe had to make a plan to leave using her "hidden" passport; that "the hard thing [was] getting out the house;" that "groomers and handlers" were present; and that if those handlers saw women leave, "they [would] call the brothers [and] then [the] brothers [would] call airports and stop [them] from leaving." DE 31-4 at 5.

According to the Amended Complaint, Sergeant Doe advised her to contact the U.S. Embassy in Romania and stated that he would call his U.S. government contacts himself. *Id.* Though Jane Doe asked Sergeant Doe to refrain from calling anyone and said she wanted to go to London instead, her messages increased in tenor. *Id.*   Jane Doe disclosed that "they," presumably the Plaintiffs, "know everyone" and have mob ties. *Id.* at 6. Jane Doe shared that the Plaintiffs "are actually evil," making "women cut themselves" and "sell their bodies" through coercion and threats of abduction or death. *Id.*   Jane Doe attributed her lack of injuries to her short tenure at the house and not yet being suspected of wanting to leave. *Id.*   Sergeant Doe again

15

encouraged Jane Doe to contact the U.S. Embassy but she did not "feel safe doing that" and also wanted to go on her trip instead of being shipped back stateside. *Id.* at 7.  She continued, stating that she and Mary Doe would be fine and would "get out" if they "face[d] any issues." *Id.* at 8.  Then, Sergeant Doe decided to call the Embassy.

### C. Legal Standard

A plaintiff must provide a "short and plan statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Though "a complaint 'does not need detailed factual allegations,' it must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1359 (S.D. Fla. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In analyzing motions to dismiss, a court must accept as true a plaintiff's factual allegations and grant all plausible inferences in favor of a plaintiff. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).  A court must also limit its review to the "pleadings and exhibits attached thereto." *Thaeter v. Palm Beach Cnty. Sheriff's Off.*, 449 F.3d 1342, 1352 (11th Cir. 2006) (quoting *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)).  "[D]ismissal is proper when, 'on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action.'" *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015) (quoting *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

### D. Florida Qualified Immunity Analysis

Florida law encompasses "a broad range of [conditionally] privileged occasions" during which a person's statements, within certain parameters, are protected from liability. *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984).  A court may determine the existence of a privilege

as a question of law when "the circumstances surrounding a defamatory communication are undisputed, or are so clear under the evidence as to be unquestionable." *Id.* at 810. The Florida Supreme Court has articulated the broadest expression of this privilege:

> A communication *made in good faith* on any subject matter *by one having an interest therein, or in reference to which he has a duty*, is privileged if *made to a person having a corresponding interest or duty*, even though it contains matter which would otherwise be actionable, and *though the duty is not a legal one but only a moral or social obligation.*

*Id.* at 809 (emphasis added).

Florida courts have applied this privilege to parents speaking about the welfare of their child to "one having the power or duty to take action for the benefit of the child;" statements made to an employer about the performance of its employee; and a statement "to a political authority regarding matters of public concern, i.e., the school curriculum and the performance of a public employee" *Id.* Florida courts also have extended this qualified privilege to purportedly defamatory statements from "private individuals to the police or the state's attorney prior to the institution of criminal charges are presumptively qualifiedly privileged." *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992).

To overcome this qualified privilege, "a plaintiff would have to establish by a preponderance of the evidence that the defamatory statements were false and uttered with common law express malice—i.e., that the defendant's **primary motive** in making the statements was the intent to injure the reputation of the plaintiff." *Id.* (emphasis added) (citing *Nodar*, 462 So. 2d at 806). The "**mode**, manner, or purpose of the **communication**" factors into whether a person has abused or forfeited the privilege." *Nodar*, 462 So. 2d at 809 (emphasis added).

The circumstances surrounding Sergeant Doe's defamatory communication are easy to distill to their basic parts. The Plaintiffs claim that Sergeant Doe received a series of text

17

messages about Jane Doe being a victim of human trafficking and then reported those claims to various members of the U.S. government, including U.S. Embassy personnel and members of the Armed Forces. DE 1-1.  Sergeant Doe has since supplied that he is a member of the U.S. Armed Forces. DE 21-2 at 3–4.

Florida's qualified privilege doctrine could apply to Sergeant Doe's alleged defamatory communications in at least two ways.  One is that, if Sergeant Doe was acting outside his duties as a Reservist, the privilege established in *Fridovich v. Fridovich* would protect allegedly defamatory statements made to the authorities "prior to the institution of criminal charges." 598 So. 2d 65, 69 (Fla. 1992).  But if Sergeant Doe was acting within his duties, he was speaking with other U.S. government officials about stopping human trafficking.  And these U.S government officials all shared at least a moral interest in combatting trafficking, if not an interest based on the duty to combat trafficking.  Therefore, the general privilege in *Nodar v. Galbreath* would apply.  Whether acting within or outside his Reservist duties, in reporting his suspicions to relevant government personnel, Sergeant Doe shared valuable information to help investigative authorities carry out their duty.

Moreover, the Plaintiffs' rendition of the facts does not support a finding of express malice that would render the qualified privilege inapplicable.  By way of example, the mode of Sergeant Doe's communication does not support any reasonable inference of express malice; Sergeant Doe first consulted his supervising officer in the U.S. military for advice and then followed that advice to alert U.S. authorities in Romania.  In reporting a suspected crime to U.S. authorities, he did what the legal system encourages people who suspect criminal activity to do—alert authorities with the power to investigate and act.  As for Sergeant's Doe's primary motive, the texts that he received were very concerning.  The Court cannot conclude that any

reasonable inference of express malice can be read into Sergeant Doe's actions, even if he personally disliked the Plaintiffs. Stated differently, the text messages that Sergeant Doe received were so concerning and involved a situation so serious that any reasonable person would have acted to save the potential trafficking victim, and the Court cannot conclude that Sergeant Doe's *primary* motive "was to injure the reputation of the plaintiff[s]." *Id.* Therefore, Florida's qualified immunity doctrine applies to the statements made by Sergeant Doe, and further amendment on this subject would be futile.

### E. Anti-SLAPP Claims

The Eleventh Circuit has not settled "whether Florida's Anti-SLAPP statute can be applied to actions in federal court." *Condo. Ass'n of Parker Plaza Ests., Inc. v. Moreff*, No. 22-61638-CIV, 2023 WL 3600495, at *1 (S.D. Fla. Mar. 2, 2023) (noting that the Eleventh Circuit came close to addressing this topic in *Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) but ultimately refrained because the appellant had waived the argument). Neither party has addressed the threshold question of whether Florida's Anti-SLAPP statute applies in federal court and to what extent. Therefore, the Court refrains from ruling on the merits of the Anti-SLAPP claim.[6]

### F. Conclusion

For the foregoing reasons, the Court concludes that the Plaintiffs' own construction of the facts renders amendment as to Sergeant Doe futile. Therefore, the Court **DISMISSES WITH PREJUDICE** every claim against Sergeant Doe. Without Sergeant Doe, there is no longer a basis for federal court jurisdiction in this case. Under 28 U.S.C. § 1367, district courts "may decline to exercise supplemental jurisdiction" over remaining claims once it has "dismissed all

---

[6] The Court also believes this issue would be better addressed by the state court judge with the remainder of the Defendants.

claims over which it has original jurisdiction." Accordingly, the Court elects to decline jurisdiction over the remainder of these claims. Therefore, the Court issues no decision on the merits of the Motions to Dismiss from the remaining Defendants and **REMANDS** this case.

It is therefore **ORDERED AND ADJUDGED** that:

- The Plaintiffs' Motion to Remand, DE 11, is **DENIED**.

- John Doe, June Doe, and Liam Doe's Motion to Dismiss, DE 50, is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**. The Court **DISMISSES WITH PREJUDICE** Liam Doe from this suit.

- The case is **REMANDED** to the Fifteenth Judicial Circuit, in and for Palm Beach County, and the Clerk of Court is instructed to **CLOSE THE CASE** and **DENY ALL PENDING MOTIONS WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION**.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 18th day of January, 2024.

Copies furnished to:
Counsel of record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

20